Jeffrey L. Fazio (146043) (jlf@fazmiclaw.com)
Dina E. Micheletti (184141) (dem@fazmiclaw.com)
**FAZIO | MICHELETTI LLP**
2410 Camino Ramon, Suite 315
San Ramon, CA 94583
T: 925-543-2555
F: 925-369-0344

Steven A. Schwartz (*pro hac vice*) (SAS@chimicles.com)
Timothy N. Mathews (*pro hac vice*) (TNM@chimicles.com)
**CHIMICLES & TIKELLIS LLP**
361 W. Lancaster Avenue
Haverford, PA 19041
T: 610-642-8500
F: 610-649-3633

*Interim Co-Lead Class Counsel*
(Additional Counsel Listed at End of Document)

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE APPLE IPHONE/IPOD WARRANTY LITIGATION<br><br>This Document Relates to All Actions | No. CV-10-01610<br><br>**DECLARATION OF DINA E. MICHELETTI IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT**<br><br>DATE: TBD<br>TIME: TBD<br>COURTROOM: 3<br><br>**Hon. Richard G. Seeborg** |

I, Dina E. Micheletti, declare as follows:

1. I am a member of the law firm of Fazio | Micheletti LLP, counsel of record for Plaintiffs Gallion and Johal in this litigation, and a member in good standing of the bar of the State of California. My firm and the firm of Chimicles & Tikellis LLP are Court-appointed Interim Co-Lead Class Counsel. Except where noted, the testimony set forth in this declaration is based on first-hand knowledge, about which I would and could testify competently in court if called upon to do so.

2. Unless otherwise noted, capitalized words and phrases used in this declaration and the accompanying memorandum of points and authorities have the same meaning as the same terms that are defined in Section I of the Stipulation of Settlement and Release of Claims ("Settlement Agreement"), a true and correct copy of which is attached hereto as Exhibit 1.

3. As discussed in greater detail below, the following related actions were filed in this litigation: *Gallion v. Apple Inc.*, No. 10-CV-1016 (N.D. Cal.); *Corsi v. Apple Inc.*, No. CV-10-03316 (N.D. Cal.); *Calix v. Apple Inc.*, No. CV-10-0676 (M.D. La.); and *Pennington v. Apple Inc.*, No. 10-CV-162659 (Cal. Super. Ct., Santa Clara County). *Gallion, Corsi*, and *Calix* have been consolidated into the present action, which is titled *In re Apple iPhone/iPod Warranty Litigation*, No. 10-CV-1016 (N.D. Cal.). I am informed and believe that, pursuant to the Settlement Agreement, counsel for the *Pennington* plaintiffs have filed a complaint with this Court for the purpose of having it consolidated with the present action, and will abate the *Pennington* state-court action pending final approval of the Settlement Agreement, at which point that case will be dismissed with prejudice.

4. The proposed Class Representatives in this case are Charlene Gallion, Christopher Corsi, Raj Johal, Sean Pennington, and Meghan White. Each Class Representative owned at least one Class Device that failed while it was covered by Apple's warranty. More specifically, Plaintiffs Gallion, Corsi, White and

-1-

Pennington owned various iterations of the iPhone, and Plaintiff Johal owned an iPod touch. Their experiences demonstrate how Apple's Former Liquid Damage Policy affected them, and their experiences are illustrative of the Settlement Class Members they seek to represent in this action, in that:

- each Class Representative presented at least one Class Device to Apple for warranty repair during the Settlement Class period;

- each Class Representative was denied warranty coverage by Apple solely because an external Liquid Submersion Indicator ("LSI") had turned pink or red;

- each Class Representative denied Apple's insistence that he or she had abused the Class Device by submersing it in liquid, but to no avail;

- in each case, Apple relied solely on a Class Device's external LSIs to deny warranty coverage;[1]

- after Apple denied his or her warranty claim, each Class Representative was forced to purchase at least one replacement Class Device, for which he or she was charged a replacement price of $99 to $199 plus tax.[2]

---

[1] I am informed and believe that, after he was told that his warranty claim had been denied because his Class Device's external LSI had been triggered, Mr. Corsi was able to persuade Apple to open and inspect his iPhone. Although the Apple representative found that the device's internal LSIs were not triggered, Apple denied warranty coverage anyway pursuant to its Former Liquid Damage Policy, despite the absence of any evidence of liquid exposure or liquid damage.

[2] Before joining this lawsuit, Mr. Johal filed a complaint with the Consumer Protection Division of the Washington Attorney's General office, which was unsuccessful. Also, I am informed and believe that Mr. Pennington specifically informed Apple that, unless it provided him with the free replacement to which he was entitled, he would be forced to file a class action lawsuit.

1  5. For purposes of this declaration and accompanying memorandum of points and authorities, the work performed by Class Counsel is discussed collectively, without any attempt to differentiate between the contributions of each law firm or groups of law firms. True and correct copies of the firm resumes for the following Class Counsel are attached to this declaration as Exhibits 2 through 7: Fazio | Micheletti LLP and Chimicles & Tikellis LLP (Interim Co-Lead Class Counsel); The Kralowec Law Group; the Law Offices of Earl L. Bohachek; Chavez & Gertler LLP; Cafferty Clobes Meriwether & Sprengel LLP (proposed State Plaintiffs' Liaison Counsel). URLs for websites containing biographical and other information for the following additional Class Counsel are as follows: Shepherd, Finkelman, Miller & Shah LLP (www.sfmslaw.com); Bohrer Law Firm LLC (www.bohrerlaw.com); Keogh, Cox & Wilson (www.kcwlaw.com); and Heins Mills & Olson, P.L.C. ( www.heinsmills.com).

6. Attached to this declaration as Exhibit 8 is a true and correct copy of a document titled Water Contact Indicator Tape 5557 Condensation Test, which I am informed and believe was prepared by 3M Company, the manufacturer of the Water Contact Indicator Tape ("WCIT") Apple used to make its Liquid Submersion Indicators.

7. This settlement of this litigation was initially reached after more than two years of adversarial litigation and vigorous negotiations between Apple and Class Counsel in the Federal and State Actions. While Class Counsel believe their claims are strong, they are based in part on untested legal theories against an extremely sophisticated defendant who asserted numerous potentially viable defenses, which were supported by testimony from and testing conducted by its own engineers. This litigation involved substantial risk and uncertainty.

8. Apple changed its Former Liquid Damage Policy as it pertained to the iPhone in or around November 2009. As with other policy changes, Apple made no

-3-

1 public announcement of the change. Apple continued to enforce its Former Liquid Damage Policy as to the iPod touch until May 2010, many months after Class Counsel served demand letters required by the Consumers Legal Remedies Act and filed these lawsuits. While Apple actually changed its Former Liquid Damage Policy one month prior to the dates used to define the Settlement Class, the extra months reflect the fact that new policies take time to implement, thus the addition of the extra months allows people who may have been affected by the older policy to file claims.

9. Apple continues to adamantly deny any liability for denying warranty coverage under its Former Liquid Damage Policy and, until the settlement of this litigation, declined to reimburse consumers whose warranty claims it had rejected pursuant to its Former Liquid Damage Policy.

10. Because of the dearth of case law squarely addressing the core legal issues in dispute in this case, and the parties' starkly different view regarding the core factual issues, including, but not limited to, whether a pink or red LSI established that a Class Device had been abused or damaged by liquid, virtually every aspect of this litigation was hotly contested from beginning to end.

11. Although the claims asserted in this action have substantial merit, there was a very real risk of loss for both sides, which augured in favor of reaching a settlement—including, *inter alia*, the vigorously disputed and complex nature of the legal and technical issues, the expense involved with sorting them out for trial, the substantial amounts of time and expense that would be involved with taking this action through class certification, trial and possible appeals, and the absence of extant case law or litigation addressing the disputed issues in this litigation.

12. Discovery in this case was extensive. Class Counsel provide only a brief summary of discovery in these preliminary approval papers and anticipate providing additional details in the papers submitted in support of final approval

-4-

and in support of Class Counsel's petition for an award of attorneys' fees and litigation expenses.

13. Class Counsel conducted comprehensive, wide-ranging discovery from Apple and non-parties 3M, FoxConn Corporation and FoxConn International Holdings, Inc. (the Chinese manufacturer of the iPhone), Hon Hai Precision Industry Co. (FoxConn's parent), Exponent (which performed testing of Class Devices for Apple), SquareTrade, Inc. (which offered extended, third-party warranties for Class Devices), and AT&T Mobility (the sole provider of cellular service during the relevant time period).

14. Class Counsel's discovery efforts included, among other things (a) the review, and analysis of approximately 300,000 pages of documents produced by Apple and by third-parties; (b) dozens of lengthy meet-and-confer sessions with Apple and third-parties; (c) depositions of several high-ranking Apple personnel and witnesses; (d) depositions of the 3M engineer who invented the WCIT and 3M's chief sales representative and liaison for 3M's account with Apple; (e) analyses conducted by Plaintiffs' experts, who include (i) one of the world's foremost authorities on the reliability and failure analysis; (ii) an expert I am informed and believe has extensive experience with handheld devices; and (iii) an expert with, *inter alia*, considerable hands-on experience working for a major computer maker that involved testing the effects of high-humidity environments on the reliability and performance of packaged electronic devices; (f) obtaining answers to multiple sets of interrogatories and requests for admission regarding Apple's policies and the technology upon which it relied; and (g) thorough independent research into myriad technical and other fact issues.

15. Throughout the litigation, both sides took seriously their obligation to resolve disputes, particularly discovery disputes, without needlessly involving the Court. The parties had numerous, extensive disputes regarding many document

requests, interrogatories, deposition notices and assertions of privilege, but they resolved each of these disagreements (sometimes with the assistance of the mediators) without resorting to motion practice before this Court. Plaintiffs were, however, forced to file a motion to compel 3M Company to produce what proved to be some of the most critical documents in the litigation. As discussed more fully below, that motion was granted by a Magistrate Judge of the District of Minnesota. 3M's appeal to the District Court was denied.

16. Class Counsel promptly initiated formal and informal discovery at the outset of the litigation. Their efforts included retaining a formidable team of experts from whom Class Counsel sought advice regarding a variety of issues, including their evaluation of the evidence obtained in formal and informal discovery and the technical issues arising from that evidence; drafting myriad discovery requests; supporting the motion for an order compelling 3M to produce the subpoenaed documents; and preparing for mediation, class certification, and trial.

17. Shortly after the inception of the litigation, the parties engaged in extended negotiations over the proper level of coordination between the Federal Action and the State Action. Ultimately, the parties agreed on a coordination strategy that maximized efficiency without causing Plaintiffs to lose rights available to them under the various state and federal rules of civil procedure.

18. Very early on, the parties also engaged in prolonged negotiations regarding two foundational issues; namely, the terms of the protective orders, including the proper scope of Apple's confidentiality designations, and issues concerning the nature and scope of Apple's search for responsive documents, including the appropriate use of key words that Apple would use to help guide its initial document-production efforts.

19. I am informed and believe that Class Counsel in the State Action were required to seek the involvement of the court in that action to resolve issues

1 relating to the protocol for Apple's production of documents and the terms of the protective order ultimately entered in that Court.

20. Collectively, Class Counsel propounded eight sets of comprehensive document requests covering every issue in the litigation, 14 sets of interrogatories, and five sets of requests for admission. Given the fiercely-contested nature of the litigation, the parties engaged in dozens of lengthy meet-and-confer sessions regarding, *inter alia*, the scope of virtually every one of Plaintiffs' discovery requests; the manner in which Apple proposed to conduct its document and database searches; Apple's confidentiality designations; privilege and work-product-related issues; privilege-log issues; document custodian-issues; deposition-related issues; the sufficiency of Apple's discovery responses; and other discovery-related matters.

21. These meet-and-confer efforts required Class Counsel to engage in, among other things, comprehensive legal research, multiple rounds of letter writing, and dozens of lengthy telephone conferences with Apple's counsel.

22. For example, on one occasion a dispute concerning Apple's assertions of privilege in connection with a specific set of documents and deposition questioning was resolved on the eve of Class Counsel's intended filing of a fully-drafted motion to compel that they had prepared after prior meet-and-confer efforts had failed.

23. Class Counsel's document requests resulted in Apple producing approximately 265,000 pages of documents, which Class Counsel reviewed and analyzed.

24. In addition, Class Counsel conducted multi-session depositions of three high-level Apple employees, each of whom Apple had designated to testify on its behalf concerning nearly every aspect of this litigation.

25. Class Counsel utilized the information obtained in discovery to, among other things, depose witnesses, prepare for class certification, estimate potential

-7-

damages, assist their experts, support Plaintiffs' arguments in connection with trial preparation and mediation/settlement negotiations, and refute Apple's defenses.

26. Class Counsel also engaged in prolonged meet-and-confer sessions with Apple concerning depositions of executive "apex" witnesses. Those efforts included essentially briefing the issue in the course of persuading Apple to make these witnesses available for deposition. In January 2012, Apple agreed to make these (and other) witnesses available for deposition. Class Counsel began preparing for those depositions, but, shortly before those additional depositions were scheduled to take place, the litigation was resolved in principle at the next mediation session on January 16, 2012.

27. Class Counsel's third party subpoenas ultimately resulted in the production of an additional 77,000 pages of documents, many of which Class Counsel had not received from Apple in response to Plaintiffs' document requests.

28. Obtaining information from non-parties was also challenging. For example, 3M fought hard to resist producing documents, then sought to unduly restrict the nature and scope of its production and insisted that Class Counsel bear the full cost of 3M's document collection and production efforts. The meet-and-confer process with 3M took place over several months and ultimately proved to be impossible to resolve on a cooperative, informal basis. Accordingly, Class Counsel were required to file a motion to compel production of the documents with the District of Minnesota, which was granted by the Magistrate Judge who heard the motion. 3M then appealed that order, which was upheld by the District Judge, who ordered 3M to pay one half of the costs incurred by 3M in responding to the subpoena and Class Counsel to pay the other half.

29. Class Counsel subsequently traveled to Minnesota to depose the 3M engineer who invented and held the patent for the WCIT Apple used manufacture its LSIs, and to depose the chief salesperson in charge of 3M's account with Apple.

-8-

30. Other third parties resisted discovery as well. For example, after months of negotiations with AT&T over the terms of a protective order and the scope of its production, Class Counsel learned that AT&T had intercepted the documents it sent via Federal Express from Federal Express before they were delivered to Class Counsel. AT&T then refused to release the documents, which resulted in more lengthy negotiations with AT&T's counsel regarding AT&T's insistence on additional changes to the protective order entered by this Court.

31. After the protective-order issue was finally put to rest, AT&T refused to produce documents unless Plaintiffs agreed to pay AT&T over $100,000 in purported document-production costs. Class Counsel were preparing for motion practice when their efforts to meet and confer finally persuaded AT&T to release the documents.

32. Some of the documents produced by these third parties and testimony from the 3M witnesses were critical pieces of evidence that Class Counsel and their experts used to support Plaintiffs' allegations and refute Apple's defenses while preparing for certification and for trial and during settlement negotiations.

33. My partner, Jeffrey Fazio, and I independently investigated the legal and factual bases for our clients' claims without knowledge that other counsel were also investigating similar claims on behalf of their clients. I am informed and believe that counsel for Mr. Corsi and counsel for Mr. Pennington and Ms. White also independently investigated the legal and factual bases for their clients' claims without knowledge that other counsel were also investigating similar claims.

34. The first demand letter pursuant to the California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1782(a) is dated December 7, 2009. Apple refused to provide the monetary relief requested in the CLRA demands. The first complaint was filed on January 29, 2010.[3]

---

[3] At the time my firm served a demand letter under the CLRA and then filed a complaint, we were unaware of the other actions. I am informed and believe that

-9-

35. Upon learning of one another's efforts, Class Counsel promptly began discussions between themselves regarding appropriate coordination, so as to efficiently prosecute the litigation for the common benefit of what became the Settlement Class.

36. Initially, we coordinated our efforts informally and sought to formally coordinate the Federal Actions. On August 13, 2010, the Court issued an order formally relating the *Gallion* and *Corsi* cases, each of which were filed in this Court on behalf of a proposed national class.

37. The *Calix* action was filed in Louisiana state court on behalf of a class of Louisiana residents in September 2010. Apple then removed that action to the Middle District of Louisiana, and it was subsequently transferred to this Court. On December 29, 2010, this Court consolidated *Gallion*, *Corsi* and *Calix* and titled the consolidated action *In re Apple iPhone/iPod Warranty Litigation* (No. 10-CV-1610). Counsel for Plaintiffs Gallion and Corsi then moved for appointment of interim co-lead class counsel pursuant to Federal Rule of Civil Procedure 23(g). The Court granted that motion, appointing Fazio | Micheletti LLP and Chimicles & Tikellis LLP as Interim Co-Lead Class Counsel. In June 2011, the Federal Plaintiffs prepared and filed the Amended Master Complaint, which incorporates the allegations contained in the prior *Gallion, Corsi,* and *Calix* complaints.

38. I am informed and believe that Mr. Calix and his counsel support the Settlement Agreement. Because Mr. Calix's warranty was not denied pursuant to Apple's Former Liquid Damage Policy, Mr. Calix is not a signatory to the Settlement Agreement and is not a Settlement Class Member. The parties intend to voluntarily dismiss the Calix action with prejudice upon final approval of the Settlement Agreement.

---

the same is true for counsel representing Plaintiffs Corsi, White and Pennington. The scope of the CLRA letters and complaints differed as to class definition, class devices, and claims.

-10-

39. Thereafter, Federal Plaintiffs' Counsel and State Plaintiffs' Counsel generally continued to coordinate their efforts with respect to discovery from Apple, and both groups of counsel participated in the mediation and settlement negotiation process that resulted in this Settlement Agreement for the common benefit of the Settlement Class.

40. As a result of the parties diametrically opposing views on the nature, scope, and extent of Apple's liability and the suitability of this case for class treatment, the parties had starkly different views regarding the settlement value of this case. Consequently, the settlement was only achieved after protracted, well-informed mediation efforts, which did not commence until Class Counsel had conducted substantial investigation and discovery, which enabled them to make informed decisions throughout the settlement process. The parties participated in six full-day in-person mediation sessions before retired U.S. Magistrate Judge Edward Infante and/or Ms. Catherine Yanni of JAMS. Those mediation sessions took place on October 13, 2011, November 10, 2011, January 16, 2012, February 3, 2012, February 24, 2012, and April 27, 2012. The parties also participated in dozens of telephone conferences with one or both mediators between and after the formal mediation sessions.

41. Litigation continued in parallel with those mediation sessions. Class Counsel's litigation efforts included taking and preparing for the 3M depositions and additional depositions of Apple witnesses; ongoing document production and review; ongoing meet-and-confer sessions regarding many discovery disputes; and expert analysis of the technology issues.

42. As set forth above, the parties were well informed about every issue in this case well before the first mediation began in October 2011. Each side was represented by counsel who are familiar with the underlying legal and factual issues as a result of the analyses conducted in connection with this litigation (before

-11-

and after the complaints were filed) and decades of experience with complex litigation, and negotiations took place with the assistance of experienced and capable mediators.

43. As set forth above, because settlement discussions were so contentious, formal discovery continued unabated from the first mediation session in October 2011 until the parties ultimately agreed on the principal terms of a settlement in January 2012. The parties engaged in substantial confirmatory discovery efforts from January 2012 through June 2012, and additional confirmatory discovery efforts have taken place since then as well. As discussed below, the parties also continued to work on a detailed and voluminous Settlement Agreement and the documents that are attached to it for months thereafter. The Settlement Agreement was not finalized or signed by Apple until April 10, 2013.

44. Between the October 2011 and January 2012 mediation sessions, Class Counsel continued deposing certain Apple personnel; deposed the 3M witnesses in Minnesota; secured, over Apple's objections, deposition dates for the resumption of additional deposition days of the witnesses Apple had designated pursuant to Rule 30(b)(6) and Cal. Code of Civil Procedure § 2025.010 and for the depositions of persons Apple considered "apex" witnesses; continued to propound and meet and confer over prior formal written discovery (meet-and-confer sessions took place throughout December 2011 and early January 2012); and prepared for class certification proceedings.

45. Before the first mediation session began in October 2011, the mediators received briefing of relevant legal and factual issues from each of the parties. The State and Federal plaintiffs submitted separate mediation briefs. Apple submitted its own brief, and made a formal PowerPoint presentation of its defense. By the end of the first session, the parties had made no progress towards

DECLARATION OF DINA E. MICHELETTI ISO MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT
(CASE NO. CV-10-01610)

settlement, but agreed to continue their efforts to resolve the litigation by settlement, while continuing to litigate.

46. In connection with the second mediation session in November 2011, Class Counsel, with expert assistance, prepared and presented an extensive PowerPoint presentation of their case for the mediators and for Apple. The presentation addressed key aspects of Plaintiffs' position and was based on documents Apple and 3M had produced in discovery, materials that Class Counsel obtained by way of informal investigations and informal research and discovery efforts, and on sworn testimony by the witnesses Apple and 3M had designated to testify on their behalf. Once again, however, the parties were unable to reach agreement and the litigation continued.

47. Plaintiffs continued to vigorously pursue discovery in December 2011 and early January 2012, while the mediators engaged in shuttle diplomacy with the parties. After multiple discussions with the mediators (including throughout the holidays), the parties made sufficient progress to warrant a third mediation session.

48. That mediation occurred on January 16, 2012. After a full day of intensive, hard-fought negotiations, the parties narrowed their differences to a gap that was only closed by a mediators' proposal from Judge Infante and Ms. Yanni. Both sides accepted that proposal, thereby reaching tentative agreement (subject to approval by Apple's senior executives and confirmatory discovery) that Apple would pay $53 million into a non-reversionary settlement fund and that Apple would bear the cost of class notice and settlement administration, which was estimated at that time to be more than $1 million.

49. After reaching agreement on the amount of the settlement, the parties still had a substantial amount of work to do. Finalizing the settlement details involved a difficult, protracted process that ultimately required three additional full mediation sessions in February and April 2012, plus numerous teleconferences with

-13-

the mediators before and after the last formal mediation session. The parties also spent considerable time researching, finalizing, drafting, and negotiating myriad other Settlement details, including, but not limited to, an allocation plan; the notice plan; the details of a user-friendly claims process; the content of claim forms and various forms of notice; the selection of a Settlement Administrator; and the research and other efforts necessary to identify potential appropriate *cy pres* recipients.

50. The settlement documents were numerous, lengthy and complicated to draft and reach agreement on because, among other factors, they included different notice and claims procedures that are dependent upon the contact and other information available in Apple's records, and because the Settlement Agreement provides for direct payments to class members where possible. Class Counsel also negotiated a state-of-the-art, but simple and easy-to-understand notice and claims process that is designed to maximize payments to Settlement Class Members. Thus, the settlement agreement has a total of 15 exhibits, nine of which are different tailored versions of notices and claim forms—each of which required multiple rounds of negotiations to finalize. Due to the number of issues left open following the January 2012 mediation session at which the parties agreed on the amount of the Settlement Fund, the finality of this settlement remained in doubt until the Settlement Agreement was signed in April 2013.

51. Apple has advised Class Counsel that it has identified approximately 153,000 Class Devices owned by potential Direct-Payment Settlement Class Members. According to Apple, its records currently reflect potential postal and/or email addresses associated with approximately 130,000 of those Class Devices. The parties will work with the Settlement Administrator (they propose Kurtzman Carson Consultants LLC ("KCC")) to verify and refine address and email

-14-

information for the owners of those Class Devices, and for the owners of the approximately 23,000 other Class Devices.

52. Class Counsel is informed and believes that the Settlement Administrator will mail checks to as many as approximately 153,000 Direct-Payment Settlement Class Members without the need for them to submit a claim form, provided Apple's records reflect, or the Settlement Class Member provides, a current mailing address. Claims-Made Settlement Class Members will be able to submit their claims by filling out a straightforward Claim Form, which they may elect to do entirely online or submit via regular mail.

53. To the extent a residual remains in the Settlement Fund and/or further distributions to Settlement Class Members is impracticable, none of those funds will revert to Apple. Instead, those funds will first be used to pay Settlement Class Members up to 200% of the average replacement cost for their particular Class Device, and any remainder will be distributed *cy pres* to one or more entities approved by this Court.

54. Class Counsel propose, subject to approval by the Court, that the National Consumer Law Center, the National Association of Consumer Advocates, Consumers Union, the Consumer Federation of America, and the Center for Auto Safety, are appropriate *cy pres* recipients. As Class Counsel will demonstrate more fully in further briefing during the settlement-approval process, each of these candidates has proposed a project that is consistent with recent Ninth Circuit jurisprudence in that each project is national in scope and is sufficiently related to the purpose of this lawsuit.

55. The allocation plan described in the Settlement Agreement was agreed to by the parties after they reached agreement on the amount of the Settlement Fund, and then only after extensive discussion between the parties with substantial assistance from Judge Infante and Ms. Yanni.

-15-

56. As for deciding on the amount that would be acceptable for the purpose of resolving this litigation by way of settlement, Class Counsel accounted for the nature of Apple's procedures for processing warranty claims. Warranty claims are submitted to Apple in two ways: **(a)** by delivering the Class Device to the Apple Call Center by mail; or **(b)** by making an appointment with the Genius Bar at an Apple retail store ("Apple Store"). Class Counsel are informed and believe that warranty claims processed through Apple's mail-in Call Center were necessarily documented and logged into Apple's warranty database.

57. Class Counsel are also informed and believe that Apple's corporate policy called for logging into its records database information for Class Devices tendered for repair or replacement at an Apple Store, but that not every individual service technician followed Apple's protocol in that regard. Consequently, an estimate of potential damages had to include an estimate of the number of denied warranty claims that may not be completely reflected in Apple's records.

58. Apple has advised Class Counsel that its records contain information that is sufficient to identify approximately 153,105 specific Class Devices that were presented for warranty coverage by Settlement Class Members whose warranty claims were denied pursuant to Apple's Former Liquid Damage Policy. To the extent Apple's records contain contact information for these individuals, they are Direct-Payment Settlement Class Members who are eligible to receive their proportionate share of the Settlement Fund without having to submit claim forms. Apple's counsel has advised Class Counsel that, to date, Apple's records reflect potential postal and/or email addresses associated with approximately 130,000 of those approximately 153,105 Class Devices.

59. I am informed and believe the average value of the potential 153,105 claims is approximately $31.2 million. More specifically, of the Approximately 153,105 Class Devices, Apple's records show that Settlement Class Members paid

-16-

1  $23,988,870.88 to purchase 117,658 replacement devices from Apple, or a weighted
2  average of $203.89 per device ("Purchasers").

3  60.  According to Apple's records, Settlement Class Members who owned
4  the other 35,447 Class Devices did not purchase a replacement device from Apple
5  ("Non-Purchasers"). The Settlement Agreement provides that these Settlement
6  Class Members are entitled to proportionate share of the Net Settlement Fund
7  based on the average replacement cost of the Class Device they owned, which would
8  total approximately $7,211,129.12. Thus, the damages for all 153,105 Class Devices
9  based on the weighted average replacement cost of Class Devices are approximately
10 $31.2 million.

11 61.  As set forth above, during settlement negotiations, Class Counsel
12 asserted that recoverable damages must account for an estimated number of
13 potential additional class members for whom complete information may not have
14 been recorded by Apple, and who might be additional Claims-Made Settlement
15 Class Members.  Class Counsel used the ratio of Purchasers to Non-Purchasers
16 through the Call Center channel to estimate a number of Non-Purchasers at Apple
17 Stores for whom complete information may not have been recorded by Apple
18 customer service personnel.

19 62.  Apple has pointed out that it believes this approach overstates the
20 total potential damages because it is much easier for a customer to purchase a
21 replacement device at an Apple Store than through the Call Center, and, therefore,
22 the ratio of Purchasers to Non-Purchasers through the Call Center is not correlated
23 with the ratio at Apple Stores.

24 63.  Estimates of the total damages in this case range from some amount
25 more than $31.2 million at the low end of the spectrum to approximately $112 to
26 $147 million at the high end, depending on the specific data points and methodology
27 used. The low-end estimate would mean that Apple personnel recorded complete
28

-17-

information for nearly all of the Class Devices for which warranty coverage was denied under its Former Liquid Damage Policy at Apple Stores, and the highest estimate of $147 million would mean that Apple personnel failed to record complete information for approximately 97% of the Class Devices for which warranty coverage was denied under its Former Liquid Damage Policy at Apple Stores.

64. To provide notice to all potential Claims-Made Settlement Members, a summary email notice will be sent to the email address in Apple's records for any person who made an appointment at an Apple Store for a Class Device during the relevant time periods, some of whom may have been denied warranty coverage pursuant to Apple's Former Liquid Damage Policy. Apple has advised Plaintiffs that such an appointment is a prerequisite to obtaining service and/or submitting a warranty claim at an Apple store.

65. Not later than within 10 days of Conditional Approval, Apple will provide the Settlement Administrator with the information described in the preceding paragraph. Class Counsel have been advised that this list is over-inclusive and we are informed and believe it consists of more than four million email addresses, just a subset of which may belong to people eligible for a payment from the Settlement Fund as Claims-Made Settlement Class Members.

66. Prior to or at the preliminary approval hearing, the parties will propose a schedule consistent with *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 993 (9th Cir. 2010). The period between the preliminary approval hearing and the final fairness hearing will be chosen to provide consumers sufficient time to decide whether to opt out of the Settlement Class, to provide potential objectors with sufficient time to review the papers submitted in support of final approval and in support of Class Counsel's petition for the payment of attorneys' fees and costs and incentive awards to the named Plaintiffs, and to allow for the completion of the

1 | claims submission process, which will enable the parties and the Court to consider
2 | the actual claims rate prior to the final fairness hearing.
3 |     I declare under penalty of perjury under the laws of the United States of
4 | America that the foregoing is true and correct, and that this declaration was
5 | executed at San Ramon, California, on May 27, 2013.

                                        *s/ Dina E. Micheletti*
                                        Dina E. Micheletti

-19-

**DECLARATION OF DINA E. MICHELETTI ISO MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT**
(CASE NO. CV-10-01610)