Jeffrey L. Fazio (146043) (jlf@fazmiclaw.com)
Dina E. Micheletti (184141) (dem@fazmiclaw.com)
**FAZIO | MICHELETTI LLP**
2410 Camino Ramon, Suite 315
San Ramon, CA  94583
T:  925-543-2555
F:  925-369-0344

Steven A. Schwartz (*pro hac vice*) (sas@chimicles.com)
Timothy N. Mathews (*pro hac vice*) (tnm@chimicles.com)
**CHIMICLES & TIKELLIS LLP**
361 W. Lancaster Avenue
Haverford, PA  19041
T:  610-642-8500
F:  610-649-3633

*Co-Lead Class Counsel*

Anthony F. Fata (*pro hac vice*)
**CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP**
30 N. LaSalle, Suite 3200
Chicago, IL 60602
T: 312-782-4880
F: 312-782-4485

*State Plaintiffs Liaison Counsel*
(Additional Counsel Listed on Signature Page)

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE APPLE iPHONE/iPOD WARRANTY LITIGATION<br><br>This Document Relates to All Actions | No. 10-CV-01610<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR AWARD OF ATTORNEYS' FEES, COSTS AND INCENTIVE AWARDS**<br><br>DATE:  January 29, 2014<br>TIME:   1:30 p.m.<br>COURTROOM:  3<br><br>**Hon. Richard G. Seeborg** |

# TABLE OF CONTENTS

NOTICE OF MOTION ............................................................................................ x

I.      INTRODUCTION ..................................................................................... 1

II.     BACKGROUND ...................................................................................... 10

    A.    Class Counsel Achieved an Outstanding $53 Million, All-Cash, Non-Reversionary Settlement for the Benefit of the Settlement Class. ...................... 10

    B.    Class Counsel Performed Comprehensive and Difficult Work to Overcome the Significant Risks Presented by this Litigation and to Create the $53 Million Settlement Fund. ......................................................... 10

    C.    The Settlement Agreement Provides for a Percentage of the Fund to be Awarded to Class Counsel as Attorneys' Fees and Expenses, and for Incentives to be Awarded to the Class Representatives. ...................................... 10

III.    ARGUMENT ........................................................................................... 12

    A.    In this Common-Fund Case, and Pursuant to the Settlement Agreement, the Fee Award Should be Calculated Using the Percentage-of-the Fund Method. ................................................................................ 13

    B.    An Upward Adjustment of the Ninth Circuit Benchmark to 30% of the Fund is Warranted and Reasonable In Light of the Wonderful Results Achieved by Class Counsel, the High-Quality Work they Performed, and Other Relevant Factors. ...................................................... 16

        1.    Class Counsel Achieved Extraordinary Results for the Settlement Class. ........................................................................... 17

        2.    The Litigation Involved Complex Issues and Significant Risks, Which Required High Levels of Skill and Superior Work to Overcome. .................................................................. 20

        3.    In Addition to the Non-Reversionary $53 Million Fund, Class Counsel's Work Also Led to Non-Monetary Benefits. .......................... 25

        4.    Class Counsel Took on the Burden of a Heavy Contingency Risk, Advanced All of the Costs of the Litigation, and Forewent Other Work to Achieve the Settlement—All Without Any Guarantee of Compensation or Reimbursement. ....................................... 26

        5.    The Requested Fee of 30% of the Fund Falls Well Within the Range of Percentage Fee Awards Approved by the Ninth Circuit and District Courts in Other Cases. .......................................... 28

        6.    Although a Lodestar Crosscheck is Unnecessary in Percentage-of-the Fund Cases, a Crosscheck Confirms that the Requested 30% Fee Award is Reasonable. ....................................... 31

-i-

C.     As Class Counsel, State Plaintiffs' Counsel are Entitled to Share in Any Fee Award that the Court May Approve............................................................ 34

D.     The Class Representatives Should Receive Incentive Awards for Their Efforts on Behalf of the Class. ............................................................................. 36

**IV.**     **CONCLUSION** ........................................................................................................ **38**

1

# **TABLE OF AUTHORITIES**

2

3

### *Cases*

4

5

In re Aetna, Inc. Sec. Litig.,
    2001 WL 20928 (E.D. Pa. Jan.4, 2001) ................................................. 30, 33

6

Allapattah Services v. Exxon Corp.,
    454 F. Supp. 2d 1185 (S.D. Fla. 2006) ................................................. 29, 30

7

Apple Computer, Inc. v. Superior Court,
    126 Cal. App. 4th 1253 (2005) ................................................. 14

8

9

In re AremisSoft Corp. Sec. Litig.,
    210 F.R.D. 109 (D. N.J. 2002) ................................................. 27

10

In re AT & T Corp.,
    455 F.3d 160 (3d Cir. 2006) ................................................. 18, 32

11

Been v. O.K. Industries, Inc.,
    2011 WL 4478766 (E.D. Okla. 2011) ................................................. 31

12

13

Bell v. Farmers Ins. Exchange,
    115 Cal. App. 4th 715 (2004) ................................................. 14

14

Birch v. Office Depot, Inc.,
    Case No. 06cv1690 (S.D. Cal. Sept. 28, 2007) ................................................. 28

15

In re Bisys Securities Litig.,
    2007 WL 2049726 (S.D. N.Y. Jul. 16, 2007) ................................................. 29

16

17

In re Bluetooth Headset Products Liab. Litig.,
    654 F.3d 935 (9th Cir. 2011) ................................................. 11, 14, 31, 34

18

Boeing Co. v. Van Gemert,
    444 U.S. 472 (1980) ................................................. 12

19

20

Bolton v. U.S. Nursing Corp.,
    2013 WL 5700403 (N.D. Cal. Oct. 18, 2013) ................................................. 15

21

Brailsford v. Jackson Hewitt Inc.,
    2007 WL 1302978 (N.D. Cal. May 3, 2007) ................................................. 16, 28

22

23

In re Busiprone Patent Antitrust Litig.,
    No. 01–MD–1410 (S.D. N.Y. Apr. 11, 2003) ................................................. 29, 32

24

In re Cadence Design Sys., Inc. Sec. & Derivative Litig.,
    2012 WL 1414092 (N.D. Cal. April 23, 2012) ................................................. 33

25

26

Camden I Condominium Ass'n v. Dunkle,
    946 F.2d 768 (11th Cir. 1991) ................................................. 14, 15, 17

27

28

Campion v. Old Republic Home Prot. Co.,
  272 F.R.D. 517 (S.D. Cal. 2011) .................................................................................. 20

In re Cardizem CD Antitrust Litig.,
  M.D.L. No. 1278 (E.D. Mich. Nov. 26, 2002) ...................................................... 29, 33

In re Cellphone Fee Termination Cases,
  186 Cal. App. 4th 1380 (2010) ....................................................................................... 36

In re Cendant Corp. Litig.,
  264 F. 3d 201 (3d Cir. 2001) .......................................................................................... 30

In re Charter Communications, Inc., Securities Litig.,
  2005 WL 4045741 (E.D. Mo. June 30, 2005) ................................................................ 32

Chavez v. Netflix, Inc.,
  162 Cal. App. 4th 43 (2008) ..................................................................................... 14, 33

City of Oakland v. Oakland Raiders,
  203 Cal. App. 3d 78 (1988) ............................................................................................ 33

In re Combustion, Inc.,
  968 F. Supp. 1116 (W.D. La. 1997) ............................................................................... 29

In re Commercial Explosives Antitrust Litig.,
  MDL No. 1093 (D. Utah Dec. 29, 1998) ....................................................................... 29

In re Consumer Privacy Cases,
  175 Cal. App. 4th 545 (2009) ............................................................................. 13, 15, 16

In re Corel Corp., Inc. Sec. Litig.,
  293 F. Supp. 2d 484 (E.D. Pa. 2003) ............................................................................. 18

Craft v. County of San Bernardino,
  624 F. Supp. 2d 1113 (C.D. Cal. 2008) ................................................................. passim

In re Crazy Eddie Sec. Litig.,
  824 F. Supp. 320 (E.D. N.Y. 1993) ............................................................................... 18

Culpepper v. Volkswagen of America, Inc.,
  33 Cal. App. 3d 510 (1973) ............................................................................................ 21

Davis v. J.P. Morgan Chase & Co.,
  827 F. Supp. 2d 172 (W.D. N.Y. 2011) .................................................................... 29, 32

Di Giacomo v. Plains All American Pipeline,
  2001 WL 34633373 (S.D. Tex. Dec. 19, 2001) ............................................................. 32

In re EVCI Career Colleges Holding Corp. Sec. Litig.,
  2007 WL 2230177 (S.D. N.Y. 2007) .............................................................................. 33

Fischel v. Equitable Life. Assur. Soc'y,
  307 F. 3d 997 (9th Cir.2002) .......................................................................................... 13

-iv-

Fraley v. Facebook, Inc.,
    2013 WL 4516806 (N.D. Cal. Aug. 26, 2013) ........................................ 13, 36

Garner v. State Farm Mut. Auto. Ins. Co.,
    2010 WL 1687829 (N.D. Cal. Apr. 22, 2010) ....................... 17, 25, 26, 27, 28

Gavaldon v. DaimlerChrysler Corp.,
    32 Cal. 4th 1246 (2004) .................................................................................. 21

In re General Instr. Sec. Litig.,
    209 F. Supp. 2d 423 (E.D. Pa. 2001) ............................................................. 18

Grinnel v. Charles Pfizer & Co.,
    274 Cal. App. 2d 424 (1969) .......................................................................... 21

Hanlon v. Chrysler Corp.,
    150 F. 3d 1011 (9th Cir. 1998) .................................................................. 14, 16

Hauter v. Zogarts,
    14 Cal. 3d 104 (1975) ..................................................................................... 21

In re Heritage Bond Litig.,
    2005 WL 1594403 (C.D. Cal Jun. 10, 2005) ............................................ 18, 28

In Re IDB Communication Group, Inc., Sec. Litig.,
    No. 94-3618 (C.D. Cal. Jan. 17, 1997)   ....................................................... 32

In re Ikon Office Solutions, Inc. Sec. Litig.,
    194 F.R.D. 166 (E.D. Pa. 2000) ................................................................ 30, 33

In re Informix Corp. Sec. Litig.,
    No. 97-1289 (N.D. Cal. Nov. 23, 1999) ..................................................... 28, 29

Johansson-Dohrmann v. Cbr Systems, Inc.,
    2013 WL 3864341 (S.D. Cal. Jul. 24, 2013) ......................................... 15, 33, 37

Johnson v. General Mills, Inc.,
    2013 WL 3213832 (C.D. Cal. Jun. 17, 2013) ................................................ 33

Kanawi v. Bechtel Corp.,
    2011 WL 782244 (N.D. Cal. Mar. 1, 2011)........................... 24, 25, 26, 27, 28

Kearney v. Hyundai Motor America,
    2013 WL 3287996 (C.D. Cal. Jun. 28, 2013) ........................................... 27, 36

Keith v. Volpe,
    501 F. Supp. 403 (C.D. Cal. 1980) ................................................................ 33

Kurzweil v. Philip Morris Co.,
    1999 WL 1076105 (S.D. N.Y. 1999)............................................................. 29

Lealao v. Beneficial Cal., Inc.,
    82 Cal. App. 4th 19 (2000) ...................................................................... 12, 15

In re Linerboard Antitrust Litig.,
    2004 WL 1221350 (E.D. Jun. 2, 2004) ................................................. 29, 30, 33

Linney v. Cellular Alaska Partnership,
    1997 WL 450064 (N.D. Cal. Jul. 18, 1997) ................................................. 28

Linney v. Cellular Alaska Partnership,
    151 F. 3d 1234 (9th Cir. 1998) ................................................. 16, 28

Lopez v. Youngblood,
    2011 WL 10483569 (E.D. Cal. Sept. 2, 2011) ................................................. 13

Maley v. Del Global Technologies Corp.,
    186 F. Supp. 2d 358 (S.D. N.Y. 2002) ................................................. 32

Mangold v. Cal. Pub. Utils. Comm'n,
    67 F. 3d 1470, 1478-79 (9th Cir. 1995) ................................................. 12

McCown v. City of Fontana,
    565 F. 3d 1097 (9th Cir. 2009) ................................................. 34

In re Medical X-Ray Film Antitrust Litig.,
    1998 WL 661515 (E.D. N.Y. Aug. 7, 1998) ................................................. 18

In re Mego Fin. Corp. Sec. Litig.,
    213 F. 3d 454 (9th Cir. 2000) ................................................. 36

In re Melridge, Inc., Sec. Litig.,
    No. 87-1426 (D. Or. Apr. 15, 1996) ................................................. 29

In re Mercury Interactive Corp. Sec. Litig.,
    618 F. 3d 988 (9th Cir. 2010) ................................................. 11

In re Merry-Go-Round Enterprise, Inc.,
    244 B.R. 327 (Bankr. D. Md. 2000) ................................................. 29

Minkler v. Safeco Ins. Co.,
    49 Cal. 4th 315 (2010) ................................................. 21

Moore v. Verizon Communications Inc.,
    2013 WL 4610764 (N.D. Cal. Aug. 28, 2013) ................................................. 37

Munoz v. BCI Coca-Cola Bottling Co.,
    186 Cal. App.4th 399 (2010) ................................................. 36

In re Nat'l Health Labs. Sec. Litig.,
    Nos. 92-1949 & 93-1694 (S.D. Cal. Aug. 15, 1995) ................................................. 28, 29

In re Netflix Privacy Litig.,
    2013 WL 1120801 (N.D. Cal. Mar. 18, 2013) ................................................. 37

Norwood v. Judd,
    93 Cal. App. 2d 276 (1949) ................................................. 21

In re Oracle Securities Litig.,
    852 F. Supp. 1437 (N.D. Cal. 1994) ............................................................ 14, 18

In re Pacific Enterprises Sec. Litig.,
    47 F. 3d 373 (9th Cir. 1995) .......................................................... 17, 20, 28

Palmer v. Nigaglioni,
    508 Fed. Appx. 658 (9th Cir. 2013) ............................................................ 16

Parkinson v. Hyundai Motor America,
    258 F.R.D. 580 (C.D. Cal. 2008) ............................................................ 20

Paul, Johnson, Alston & Hunt v. Graulty,
    886 F. 2d 268 (9th Cir. 1989) ............................................................ 16

Petersen v. Lowe's HIW, Inc.,
    2012 U.S. Dist. LEXIS 123018 (N.D. Cal. Aug. 24, 2012) ........................................ 36

Pokorny v. Quixtar, Inc.,
    2013 WL 3790896 (N.D. Cal. Jul. 18, 2013) ............................................................ 30

In re Portal Software, Inc. Sec. Litig.,
    2007 WL 4171201 (N.D. Cal. Nov. 26, 2007) ............................................................ 18

Powers v. Eichen,
    229 F. 3d 1249 (9th Cir. 2000) ............................................................ 16

In re Prison Realty Securities Litig.,
    No. 3:99-0458 (M.D. Tenn. Feb. 9, 2001) ............................................................ 29

In re Prudential Ins. Co. America Sales Practice Litig. Agent Actions,
    148 F. 3d 283 (3rd Cir. 1998) ............................................................ 31

Radcliffe v. Experian Solutions, Inc.,
    715 F. 3d 1157 (9th Cir. 2013) ...................................................... iv, 11, 35, 36

Rigo v. Kason Indus., Inc.,
    2013 WL 3761400 (S.D. Cal. Jul. 16, 2013) ............................................................ 17, 36

In re Rite Aid Corp. Sec. Litig.,
    146 F. Supp.2d 706 (E.D. Pa. 2001) ............................................................ 17, 34

In re Rite Aid Corp. Sec. Litig.,
    362 F. Supp. 2d 587 (E.D. Pa. 2005) ............................................................ 32

In re Rite Aid Corp. Securities Litig.,
    396 F. 3d 294 (3rd Cir. 2005) ............................................................ 13, 33

Roberts v. Texaco, Inc.,
    979 F. Supp. 185 (S.D. N.Y. 1997) ............................................................ 32

Robertson v. Fleetwood Travel Trailers of Cal., Inc.,
    144 Cal. App. 4th 785 (2006) ............................................................ 21

*Rodriguez v. Disner,*
        688 F. 3d 645 (9th Cir. 2012) ............................................................... 12

*Rodriguez v. West Publishing Corp.,*
        563 F. 3d 948 (9th Cir. 2009) ......................................................... 36, 37

*Rosenburg v. Cottrell, Inc.,*
        2007 WL 1120242 (S.D. Ill. Apr. 13, 2007) ........................................ 21

*Serrano v. Unruh,*
        32 Cal. 3d 621 (1982) ......................................................................... 12

*Six (6) Mexican Workers v. Arizona Citrus Growers,*
        904 F. 2d 1301 (9th Cir. 1990) .................................. 12, 13, 16, 17, 20, 26

*Smith v. CRST Van Expedited, Inc.,*
        2013 WL 163293 (S.D. Cal. Jan. 14, 2013) ................................... 15, 28

*In re Southeastern Milk Antitrust Litig.,*
        2013 WL 2155387 (E.D. Tenn. May 17, 2013) ..................................... 29

*Staton v. Boeing Co.,*
        327 F. 3d 938 (9th Cir. 2003) ....................................... 12, 15, 26, 36

*Sternwest Corp. v. Ash,*
        183 Cal. App. 3d 74 (1986) ................................................................. 32

*Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.,*
        2005 WL 1213926 (E.D. Pa. May 19, 2005) .................................... 32, 33

*Sullivan v. DB Investments, Inc.,*
        2008 WL 8747721 (D. N.J. May 22, 2008) ...................................... 19, 27

*In re Sutter Health Uninsured Pricing Cases,*
        171 Cal. App. 4th 495 (2009) .............................................................. 33

*Swedish Hosp. Corp. v. Shalala,*
        1 F. 3d 1261 (D.C. Cir. 1993) ......................................................... 14, 31

*In re Telik, Inc. Securities Litig.,*
        576 F. Supp. 2d 570 (S.D. N.Y. 2008) ................................................. 31

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
        2013 WL 149692 (N.D. Cal. Jan. 14, 2013) ....................................... 28

*In re TFT-LCD (Flat Panel) Antitrust Litigation,*
        2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) ....................................... 33

*Torrisi v. Tucson Elec. Power Co.,*
        8 F. 3d 1370 (9th Cir. 1993) ............................................................... 26

*Van Vranken v. Atlantic Richfield Co.,*
        901 F. Supp. 294 (N.D. Cal. 1995) ................................................. 32, 33

Vedachalam v. Tata Consultancy Servs., Ltd.,
  2013 WL 3941319 (N.D. Cal. Jul. 18, 2013).................................... 17, 28

In re Vitamins Antitrust Litig.,
  2001 WL 34312839_(D. D.C. Jul. 16, 2001).................................. 29

Vizcaino v. Microsoft,
  142 F. Supp. 2d 1299 (W.D. Wash. 2001),.................................. 32

Vizcaino v. Microsoft Corp.,
  290 F. 3d 1043 (9th Cir. 2002) .......................................... passim

In re Wash. Pub. Power Supply Sys. Sec. Litig.,
  19 F. 3d 1291 (9th Cir. 1994) ......................... 13, 14, 16, 27, 30, 34

Wershba v. Apple Computer, Inc.,
  91 Cal. App. 4th 224 (2001) ........................................ 13, 32, 33

Wren v. RGIS Inventory Specialists,
  2011 WL 1230826 (N.D. Cal. Apr. 1, 2011) .............................. 28

Yeagley v. Wells Fargo & Co.,
  365 Fed. Appx. 886 (9th Cir. 2010) ..................................... 15

## Statutes

Cal. Civ. Code § 1794.3 .................................................... 21

Cal. Evid. Code § 500 ..................................................... 21

## Rules

Fed. R. Civ. P. 23(h) ..................................................... 34

## Treatises

Alba Conte & Herbert B. Newberg,
  NEWBERG ON CLASS ACTIONS (4th ed. 2002; Supp. 2013)................ 14, 17, 31

## Other Authorities

Court Awarded Attorney Fees, 3d Cir. Task Force,
  108 F.R.D. 237 (1985) .............................................. 12

Fitzpatrick, "An Empirical Study of Class Action Settlements and Their Fee Awards,"
  7 J. Empirical L. Studies 811 (2010) ............................... 31

MANUAL FOR COMPLEX LITIGATION (4th ed. 2004) .................... 14, 17, 31

-ix-

## NOTICE OF MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

NOTICE IS HEREBY GIVEN THAT on January 29, 2014 at 1:30 p.m., or as soon as counsel may be heard, before the Honorable Richard G. Seeborg, United States District Judge, Courtroom 3, 17th Floor of the United States Courthouse, 450 Golden Gate Avenue, San Francisco, California, Plaintiffs Charlene Gallion, Christopher Corsi, and Raj Johal, and Sean Pennington and Megan White, will, and hereby do, move for the following awards of attorneys' fees and costs to Class Counsel and incentive awards to the Class Representatives to be paid out of the total common Settlement Fund,[1] which amounts to $53,000,000 (not including the cost of settlement administration):

1.    Attorneys' fees and costs to Class Counsel of 30% of the Settlement Fund, which equals $15.9 million.  Class Counsel are not seeking an award of costs separate from the proposed attorneys' fees award; Class Counsel's costs incurred for the benefit of the Settlement Class shall be paid from out of any fee award, pursuant to the Settlement Agreement (¶ 47).

2.    Incentive awards of $1,000 each for Class Representatives Gallion, Corsi, and Johal, and a single joint incentive award of $1,000 for Class Representatives Pennington and White, as husband and wife, pursuant to the Settlement Agreement (¶ 47) and *Radcliffe v. Experian Solutions, Inc.*, 715 F.3d 1157 (9th Cir. 2013).  The total amount of the incentive awards sought is $4,000.

This motion is brought pursuant to Rules 23(h) and 54(d)(2) of the Federal Rules of Civil Procedure, the Court's Preliminary Approval Order (Dock. No. 88), and the parties' Settlement Agreement (¶ 47).  It is based on this Notice, the memorandum of points and authorities set forth below, the accompanying declarations of Class Counsel, the accompanying declarations of the

---

[1] All capitalized terms in this Notice and in the accompanying Memorandum shall have the definitions set forth in the parties' Stipulation of Settlement and Release of Claims ("Settlement Agreement" or "SA"), filed with this Court as Exhibit 1 to the Declaration of Dina E. Micheletti in Support of Motion for Preliminary Approval of Settlement (Dock. No. 76), filed on May 28, 2013 (hereafter "Micheletti Prelim. Decl."), and in the Court's Preliminary Approval Order (Dock No. 88), filed on June 20, 2013.

1    Class Representatives, all other papers and records in the Court's file, and such other and further

2    matters as may be presented at the hearing.

3    DATED:  November 13, 2013            THE KRALOWEC LAW GROUP

4                                        By:  /s/ Kimberly A. Kralowec
                                        Kimberly A. Kralowec (163158)
5                                        Elizabeth Newman (257329)
                                        188 The Embarcadero, Suite 800
6                                        San Francisco, CA 94105
                                        Telephone: 415-546-6800
7                                        Facsimile: 415-546-6801

8                                        Co-Counsel for the Class

9                                        FAZIO | MICHELETTI LLP

10                                       By:  /s/ Jeffrey L. Fazio
                                        Jeffrey L. Fazio (146043)
11                                       Dina E. Micheletti (184141)
                                        2410 Camino Ramon, Suite 315
12                                       San Ramon, CA  94583
                                        Telephone:  925-543-2555
13                                       Facsimile:  925-369-0344

14                                       CHIMICLES & TIKELLIS LLP

15                                       By:  /s/ Steven A. Schwartz
                                        Steven A. Schwartz (pro hac vice)
16                                       Timothy N. Mathews (pro hac vice)
                                        361 W. Lancaster Avenue
17                                       Haverford, PA  19041
                                        Telephone:  610-642-8500
18                                       Facsimile:  610- 649-3633

19                                       Co-Lead Class Counsel

20                                       CAFFERTY CLOBES MERIWETHER
                                             & SPRENGEL LLP
21
                                        By: /s/ Anthony F. Fata
22                                       Anthony F. Fata (pro hac vice)
                                        30 N. LaSalle, Suite 3200
23                                       Chicago, IL 60602
                                        Telephone: 312-782-4880
24                                       Facsimile: 312-782-4485

25                                       State Plaintiffs Liaison Counsel

26

27

28

## I.    INTRODUCTION

This exemplary consumer class action settlement will generate a $53 million, non-reversionary cash fund for the benefit of the Settlement Class.   The defendant, Apple Inc., will separately pay all costs of class notice and settlement administration.   The settlement will provide cash payments for up to as many as 175,000 Settlement Class members, to compensate them for Apple's wrongful denial of warranty coverage for their iPhones and iPod touch devices. The cash payments to the Settlement Class members will average approximately $211 per device.   This represents ***over 100%*** of the average price Apple charged its customers for replacement devices during the Class Period.[2]   To be entitled to a payment, most of the Settlement Class members did not even have to submit a claim form; they will simply be sent checks in the mail.

By any measure, this settlement is an extraordinary result.

Class Counsel now respectfully ask to be compensated for the comprehensive work they performed, and continue to perform, to achieve this result for the class and to see it through to the time of payment.   Pursuant to the Settlement Agreement, they seek an award of 30% of the Settlement Fund, or $15.9 million.  SA ¶ 47.[3]  They do not seek a separate award to cover their litigation expenses.  *Id.*  In addition, the Class Representatives seek incentive awards of $1,000 each (with a single joint award for Pennington and White), for a total of $4,000, in recognition of their service on behalf of the class.  *Id.*

The proposed 30% fee is reasonable compensation for Class Counsel's outstanding work in this case.  To determine fees in common-fund cases, like this one, courts in the Ninth Circuit award a percentage of the fund, beginning with a 25% "benchmark," which the courts then adjust to a percentage that is reasonable in light of the circumstances of the particular litigation.

---

[2] As discussed below, these figures assume that all Settlement Class members' claims are determined to be valid, *and* that fees and incentive awards are made by the Court in the amounts requested.  In other words, the figures are possibly understated, but they are not overstated.

[3] As discussed below, the Settlement Agreement does not contain a "clear sailing" provision.  *See* SA ¶¶ 46-47.  That fact sets this case apart from most other class action settlements.  This settlement is exceptional in other ways as well.

1  *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002).[4]  Awards of 30% of the

2  common fund are regularly approved.  *See* Part III.B, *infra*.  In determining the appropriate

3  percentage, the courts consider the results achieved by counsel, the risks involved in the

4  litigation, including the skill required and the quality of the work performed to overcome those

5  risks, the burdens borne by counsel in taking on the litigation, and the size of fee awards

6  approved in comparable cases.  *Vizcaino*, 290 F.3d at 1048-50.

7      In this case, each of the factors amply supports the proposed fee award.

8  **Results Achieved**

9      As explained in more detail below, and in the accompanying motion for final approval,

10  Class Counsel achieved a superb result for the Settlement Class in this case.  The highlights are

11  as follows:

12      •    Class Counsel negotiated an all-cash, non-reversionary $53 million Settlement

13  Fund.  Even after deducting the proposed awards of fees and incentives, the Fund is large enough

14  to provide payments of about $211 per Class Device to (a) approximately 132,000 Direct

15  Payment Settlement Class members, and (b) up to 43,000 Claims Made Settlement Class

16  Members whose claims are in the process of being verified.  Declaration of Patrick M. Passarella

17  of Kurtzman Carson Consultants ("KCC") re: Notice Campaign and Settlement Administration

18  ("KCC Decl.") ¶¶ 38, 45.  This represents approximately 103% of full recovery of the average

19  price Apple charged for replacement Class Devices.[5]  *Id.*  This is an exceptional result.

20      •    In addition to the direct monetary relief, Class Counsel also obtained Apple's

21  agreement to separately pay all costs associated with notice and settlement administration.  SA

22  ¶ 21.  The costs incurred to date exceed $648,000, with additional administration work yet to be

---

24  [4] The percentage-of-the-fund method, rather than the lodestar method, is the appropriate method for determining fees in this case, for the reasons explained below.  *See* Part III.A, *infra*.

25  [5] Apple's average replacement price for all Class Devices during the Class Period was

26  $203.89.  *See* Declaration of Ajivit Sen ("Sen Decl."), at ¶13; KCC Decl., ¶ 45  Thus, assuming all Claims Made Settlement Class Members' claims are deemed valid, and if this motion for

27  attorneys' fees and class representative incentive awards is granted, the average amount to be distributed to all eligible Settlement Class members will be approximately $211, or

28  approximately $103% of the average cost of their replacement Class Devices.  KCC Decl., ¶¶ 38, 45.

-2-

1  done.  KCC Decl., ¶ 52.  In many settlements, these costs are paid from out of the Settlement

2  Fund.  This settlement stands in stark contrast to other settlements in this regard.

3  •  Class Counsel negotiated a state-of-the art, consumer-friendly process for

4  distributing the Fund to the Settlement Class members in a manner that far exceeds the often

5  cumbersome claims processes required in other settlements. As a result of Class Counsel's

6  efforts, if the settlement is finally approved, at least 132,546 "Direct-Payment" Settlement Class

7  Members will be sent checks without ever having to submit a claim form; all they were required

8  to do was provide or update their address if needed.  SA ¶¶ 26, 33-34; KCC Decl., ¶ 38.  In

9  addition, "Claims-Made" Settlement Class members were able to submit a claim entirely online,

10  using a straightforward claim form.  SA ¶ 35.  There is also a paper claim form option for those

11  who prefer to submit their claim by mail.  *Id.*  At least 43,254 potential Claims Made Settlement

12  Class members have already stepped forward and submitted claims, which KCC is in the process

13  of verifying.  KCC Decl. ¶ 45.

14  •  The high participation rate is a result not only of Class Counsel's insistence that

15  checks simply be mailed to as many Direct-Payment Settlement Class members as possible, but

16  also of Class Counsel's negotiation of a comprehensive notice program for the both the Direct-

17  Payment and the Claims-Made Settlement Class Members.  SA ¶¶ 26-30.  Each Direct-Payment

18  Settlement Class Member for whom a mailing address could be located was mailed a post card

19  notice.  *Id.* ¶26(a); KCC Decl. ¶¶ 9, 21, 23-24.  Each Direct-Payment Settlement Class Member

20  for whom an email address was located was also sent two rounds of notice by email.  KCC Decl.

21  ¶¶ 31-35.  To the extent KCC had mailing addresses and email addresses for a Direct-Payment

22  Settlement Class member, he or she received notice by mail and by email.  SA ¶ 26; KCC Decl.

23  ¶¶ 9, 21, 23-24.  Two rounds of email notices were also sent to over 6.4 million *potential* class

24  members, *i.e.*, persons who owned a Class Device and made a customer-service appointment at

25  an Apple retail store, possibly for the purpose of obtaining warranty coverage, during the

26  relevant timeframe, followed up by postcard notices to many in this group.  SA ¶ 27; KCC Decl.

27  ¶¶ 11-12, 23-29.  Class Counsel insisted that Apple pay for this over-inclusive notice, and as a

28  result of this massive notice campaign, up to an additional 43,254 Claims-Made Settlement Class

1   members will receive payment from the Fund, if the settlement is approved and their claims are

2   eligible for payment, KCC Decl. ¶ 45.

3   • The Settlement Fund will be equitably distributed as a result of Class Counsel's

4   negotiation of a proportionate allocation method using data they obtained from Apple in the

5   discovery process. SA ¶ 33. Again, each Settlement Class Member will receive a share of the

6   Net Settlement Fund that is tied to the average replacement cost charged by Apple for the

7   particular type and configuration of device that they owned, and for which Apple denied

8   warranty coverage. *Id.*

9   • Only if there is a residual remaining after all the checks are mailed out and cashed

10  —after appropriate follow-up by the Settlement Administrator and best efforts by the parties to

11  locate and fully compensate all of the Settlement Class members—will any part of the Fund be

12  paid to a *cy pres* recipient. SA ¶¶ 18, 38.

13  • Class Counsel also negotiated a narrowly-tailored release. SA ¶ 53. The release

14  will encompass only those persons who experienced warranty denials as a result of Apple's

15  Formal Liquid Damage Policy during the relevant period, and will be limited exclusively to

16  causes of actions arising out of those denials. *Id.*

17  In short, Class Counsel achieved exemplary results for the Settlement Class and amply

18  deserve a reasonable, 30% share of the Fund that their work created.

19  **The Risks Involved and Work Performed by Class Counsel to Overcome Them**

20  This was not an easy case. To achieve the result they accomplished for the Settlement

21  Class, Class Counsel took on and overcame a series of very significant risks. The work that

22  Class Counsel performed began before any of the cases were filed, continues to this day, and will

23  extend beyond final approval until the last dollar is equitably distributed to the class members (or

24  *cy pres*). The work was extensive and of top quality, and includes all of the following (see also

25  the final approval brief, filed concurrently herewith, and Part III.B.2 of this brief, below, for a

26  more detailed discussion of the risks and the work).

27  As the Court is by now well aware, this case centers on the propriety of Apple's Former

28  Liquid Damage Policy. Pursuant to this policy, Apple personnel denied warranty coverage for

iPhone and iPod touch devices based solely on a single triggered Liquid Submersion Indicator ("LSI") installed adjacent to the dock connector or in the headphone jack ("external LSI"). An LSI is a paper-ink laminate made from Water Contact Indicator Tape ("WCIT") manufactured by 3M Company. It is intended to change color from white to red when the unlaminated portion is exposed to liquid. Apple claimed that a red or pink external LSI, standing alone, was sufficient proof that the device had been damaged by liquid, thereby voiding the device owner's warranty under the "liquid spill or submersion" and/or "abuse" clauses of the "Exclusions and Limitations" provisions of Apple's warranties. Plaintiffs disagreed. Their actions asserted that Apple wrongfully denied their valid warranty claims, and those of the similarly situated consumers they represent.

In order to pursue this case, under this theory, Class Counsel took on a prodigious uphill battle, both factually and legally. They had to devise a way to prove the claims, as a factual matter, classwide, and they had to develop a legal theory that could be successfully certified for class treatment. The task was a challenging one, especially given the fact that the defendant, Apple, was a sophisticated opponent, with vast resources, who hired top-flight counsel from a major class-action defense firm to represent it in this case.

Factual issues hotly contested by Apple included whether the LSI paper-ink laminate is capable of detecting liquid abuse or liquid damage, and whether a red or pink external LSI demonstrated that a Class Device was abused or damaged by liquid. Class Counsel had to overcome testing evidence developed by Apple engineers that purported to show that LSIs functioned as intended, and that only exposure to an abusive amount of liquid would trigger an external LSI. Through discovery and other investigatory work, Class Counsel marshaled contrary evidence, including expert testimony, publicly-available 3M test reports, and non-publicly-available document and deposition discovery from 3M and Apple. Based on this evidence, Class Counsel were prepared to prove that because of their materials and design, LSIs can and do turn pink when exposed to humidity during ordinary, foreseeable use. Class Counsel were ready and able, after significant discovery and investigatory work, to prove that a triggered LSI indicates nothing more than that a Class Device *may* have been exposed to liquid, but does

1  not and cannot establish that a Class Device has been *damaged* by exposure to liquid, which

2  would be necessary for the warranty exclusion to apply.

3      Apple, armed with a team of in-house and outside engineers, of course challenged this

4  evidence.  Apple contended that 3M's humidity testing was conducted on indicator tape open to

5  the elements (rather than contained inside a Class Device) and at unrealistic extremes of

6  temperature and humidity.  Apple argued that *its* humidity testing, conducted by its world-

7  renowned engineers, demonstrated that the LSIs in the Class Devices would *not* change color as

8  a result of real-world heat and humidity, and that the LSIs would *not* turn pink or red unless a

9  Class Device had been damaged or abused as a result of extensive liquid contact.

10     In addition to painstakingly creating a factual record sufficient to prove the class

11  members' claims, Class Counsel also had to overcome legal arguments vigorously advanced by

12  Apple.  One of the legal questions was whether Apple, as the proponent of an exclusion from

13  warranty coverage, bore the burden of proving that the exclusion applied—that is, that a

14  malfunctioning Class Device presented for warranty service had been damaged through customer

15  abuse, including "liquid spill or submersion."  Apple contended that *plaintiffs* must carry the

16  initial burden of proving that the malfunction was the result of a design or manufacturing defect

17  in the Class Device—as well as the burden of *also* proving that each Class Device had *not* been

18  subjected to "liquid spill or submersion" sufficient to bring the claim within the warranty

19  exclusion.  The resolution of these questions would be critical to Class Counsel's success in

20  achieving class certification, because Apple contended that plaintiffs could meet these burdens

21  only by questioning each proposed class member and examining his or her Class Device. Class

22  certification was by no means certain.

23     To overcome these factual and legal obstacles (as described in detail below the

24  accompanying final approval motion, and in Part III.B.2, *infra*), Class Counsel sought and

25  obtained extensive discovery from Apple, 3M and numerous other third parties, including multi-

26  day depositions of Apple personnel and 3M personnel and several hundred thousand pages of

27  documentary evidence.  Accomplishing this required Class Counsel to conduct protracted meet-

28  and-confer sessions not only with Apple's counsel, but also with the uncooperative counsel of

**-6-**

1    third parties, including 3M, AT&T, and others.  Extracting documents from 3M required a

2    motion to compel filed in federal court in Minneapolis.

3    Class Counsel also conducted exhaustive legal research to arrive at a novel, but they

4    believed workable, legal theories that would be amenable to class treatment.  They identified and

5    retained a team of high-level experts, whom they consulted regarding a variety of issues as the

6    litigation progressed.  They prepared for and participated in an extended, multi-session mediation

7    with two JAMS mediators (retired Magistrate Judge Edward Infante and Ms. Catherine Yanni),

8    which resulted in a final settlement only after months of intensive negotiations, with Apple

9    reminding Class Counsel throughout the process that the settlement would not be considered

10   final until the heavily-negotiated Settlement Agreement was signed (which did not occur until

11   fifteen months after the parties agreed on the amount of the non-reversionary Settlement Fund

12   and that Apple would bear the additional cost of settlement administration).  Even after the

13   Settlement  Agreement was fully executed, Apple still threatened to pull out more than once.

14   The settlement discussions and the discovery, including negotiations for additional

15   document production from Apple and the depositions of Apple apex witnesses, necessarily

16   proceeded in tandem.  The monetary component of the settlement was achieved when all parties

17   accepted a mediator's proposal—which happened barely two weeks before Plaintiffs' class

18   certification motion would have been due pursuant to the Court's scheduling order (Dock. No.

19   62).

20   Class Counsel's work did not end there.  Finalizing the settlement details was a

21   protracted, difficult process, which required three additional mediation sessions plus numerous

22   teleconferences with the mediators and Apple.  Class Counsel insisted on adequate post-

23   settlement confirmatory discovery on several key points relevant to the allocation plan, the notice

24   plan, and claims requirements for different groups of Settlement Class members.  This was time-

25   consuming and difficult to obtain.  Class Counsel also negotiated each and every aspect of the

26   Settlement Agreement summarized above.  And because Apple insisted that each and every

27   exhibit be finalized before it would sign the Agreement, Class Counsel were forced to spend a

28   considerable amount of time and effort drafting, and negotiating with Apple concerning, multiple

-7-

1  versions of each type of notice and each version of the claim form, as well as the rest of the

2  exhibits to the Agreement, before the Agreement was signed.  SA Exs. A-O.

3       Apple finally signed the Settlement Agreement in mid-April 2013.  Class Counsel then

4  drafted and filed a comprehensive set of preliminary approval papers, on which this Court

5  remarked: "I do want to compliment you.  I think it was a really well-done submission, and it

6  actually anticipated the questions that I often have.  Most of the time I don't see that.  So, I

7  thought it was very thorough, very well done, and gave me … the information I needed … to do

8  this part of the process."  Transcript of Proceedings, June 19, 2013, at 4:25-5:6.

9       Until all the documentation and exhibits were finalized and signed by Apple, Class

10  Counsel could not be certain that the settlement would ever be consummated.  Apple refused to

11  publicly inform the Court that the parties had reached a settlement in principle and repeatedly

12  threatened to back out of the settlement during the drafting process for various reasons.

13       Even after signing the Settlement Agreement, Apple threatened to nullify it when Apple

14  learned that *Wired* magazine had obtained a copy of the Settlement Agreement and published the

15  settlement online, along with a short article.  Ultimately, Apple backed off its threat, but the very

16  nature of that dispute provides an apt illustration of the difficulties and uncertainties faced by

17  Class Counsel even after the Settlement Agreement was actually signed.

18       The work continued.  After the Court granted preliminary approval and approved the

19  notice plan, Class Counsel closely monitored the work of the settlement administrator, KCC.

20  Class Counsel were required to step in, deal with, and resolve a variety of issues that arose

21  during the notice and claims process.  These issues are discussed in more detail below (Part

22  II.B).  As a result of Class Counsel's vigilance, the issues were promptly identified and

23  efficiently resolved.

24       Class Counsel then drafted a comprehensive set of final approval motion papers, filed

25  concurrently with this motion.

26       In short, the case was risky and hard-fought, and the settlement was achieved for the

27  benefit of the class only as a result of Class Counsel's high-quality legal work, and their

28

-8-

1  comprehensive and unrelenting labors at every phase of the case.  Those labors will continue

2  until the Fund is fully distributed.

3  **Burdens Carried by Class Counsel in Taking on the Litigation**

4  Class Counsel performed all of this work on a pure contingency-fee basis, with no

5  guarantee that they would ever be paid for any of their work or reimbursed for any of their out-

6  of-pocket costs.  They turned down other potentially lucrative matters in order to take on this

7  large-scale case, and devoted resources to it that could have been devoted to other potentially

8  income-generating matters.  *See* Declarations of Class Counsel, filed concurrently herewith, and

9  Part III.B.4, *infra*.  Counsel's willingness to undertake this complicated litigation and see it

10  through to completion, notwithstanding these burdens and the risk that they might never be paid

11  at all, should be recognized and rewarded, in accordance with Ninth Circuit precedent.  *See*

12  *Vizcaino*, 290 F.3d at 1049.

13  **Fee Awards in Comparable Cases**

14  As discussed in detail below (Part III.B.5, *infra*), 30% of the common fund is a

15  reasonable amount routinely approved in comparable class action cases in this District, in the

16  Ninth Circuit, and by federal courts throughout the country.  The award is particularly

17  appropriate in this case, given the size of the fund, the risks overcome, and the work involved to

18  to achieve a settlement that will make the Settlement Class members, on average, up to 103%

19  whole—even if the requested 30% fee is awarded.

20  **Incentive Awards for the Class Representatives**

21  The requested incentive awards of $1,000 for each Class Representative (with a single

22  award for Pennington and White) are appropriate and should be approved.  The awards properly

23  serve to compensate the Class Representatives for their work on behalf of the class, and to

24  recognize their willingness to step forward and take on the burdens of this litigation on behalf of

25  all similarly-situated Apple consumers.

26  Below, in the final approval motion filed concurrently herewith, and in their

27  accompanying declarations, Class Counsel have provided the Court with complete support for

28

1   this motion for fees and incentive awards, including detailed information regarding the work they

2   performed and how that work contributed to this outstanding settlement.

3   **II.    BACKGROUND**

        **A.   CLASS COUNSEL ACHIEVED AN OUTSTANDING $53 MILLION, ALL-CASH, NON-REVERSIONARY SETTLEMENT FOR THE BENEFIT OF THE SETTLEMENT CLASS.**

The final approval motion filed concurrently herewith, and incorporated herein by this reference, describes in detail the outstanding $53 million, all-cash, non-reversionary settlement that was created as a result of Class Counsel's work in this case.

        **B.   CLASS COUNSEL PERFORMED COMPREHENSIVE AND DIFFICULT WORK TO OVERCOME THE SIGNIFICANT RISKS PRESENTED BY THIS LITIGATION AND TO CREATE THE $53 MILLION SETTLEMENT FUND.**

The final approval motion filed concurrently herewith, and incorporated herein by this reference, describes in detail the comprehensive and difficult work performed by Class Counsel to overcome the significant risks presented by this litigation, and to create the $53 million Settlement Fund for the benefit of the Settlement Class.[6]

        **C.   THE SETTLEMENT AGREEMENT PROVIDES FOR A PERCENTAGE OF THE FUND TO BE AWARDED TO CLASS COUNSEL AS ATTORNEYS' FEES AND EXPENSES, AND FOR INCENTIVES TO BE AWARDED TO THE CLASS REPRESENTATIVES.**

As the Settlement Agreement acknowledges, Class Counsel prosecuted the actions, and performed all of the work detailed in the accompanying final approval motion and declarations, on a fully-contingent basis from the beginning, without any guarantee of compensation, and without receiving any reimbursement for their out-of-pocket litigation expenses.  SA ¶ 46.[7]

---

[6] The work performed by Class Counsel is discussed in this brief, and in the final approval motion, collectively, without any attempt to differentiate between the contributions of each law firm or groups of law firms.  Additional support for both motions appears in the declarations of Class Counsel filed concurrently herewith.  However, the Class Counsel firms do not endorse the statements made in declarations filed by other firms.

Although Class Counsel made efforts to reach agreement on how any fees awarded should be allocated, they were unable to do so.  Accordingly, pursuant to their Allocation Agreement, Class Counsel will file a separate motion or motions addressing allocation issues after the Court rules on this fee petition.  *See* Declaration of Kimberly A. Kralowec in Support of Motion for Award of Attorneys' Fees, Costs and Incentive Awards, filed concurrently herewith, ¶97 & Ex. X.

[7] See also the accompanying declarations of Class Counsel.

1    Accordingly, the Settlement Agreement authorizes Class Counsel to seek a percentage of

2    the Settlement Fund—up to 30% (or $15.9 million)—to compensate them for their work and

3    repay their litigation expenses. *Id.* ¶ 47. Unlike many class-action settlements, the Settlement

4    Agreement in this case does not include a "clear-sailing" provision, "wherein the defendant

5    agrees not to oppose a petition for a fee award up to a specified maximum value."[8]    SA ¶ 47.

6    Instead, although Apple acknowledged that Class Counsel are entitled to an award of reasonable

7    attorneys' fees and reimbursement of their expenses, the Agreement leaves Apple free to assert

8    valid objections to the amount of that award if it chooses to do so. *See id.* The maximum

9    percentage stated in *this* agreement therefore caps what Class Counsel may seek in fees and

10    expenses, but it has no impact on Apple's ability to oppose the amount sought.

11    In addition, the Settlement Agreement authorizes incentive awards not to exceed $5,000

12    for each Class Representative (with a single award for Pennington and White) for their services

13    on behalf of the Settlement Class. *Id.* In the preliminary approval motion, Class Counsel

14    advised the Court that the incentive awards request was being limited to $1,000 each, as a result

15    of the Ninth Circuit's *Radcliffe* decision, which had been handed down on April 22, 2013 (about

16    ten days after the Agreement had been signed). Motion for Preliminary Approval of Settlement

17    Agreement, filed 05/28/13 (Dock. No. 75) at 25 (citing *Radcliffe v. Experian Solutions, Inc.*, 715

18    F.3d 1157 (9th Cir. 2013)). The modified request appeared in all of the notices to the Settlement

19    Class. *See*, *e.g.*, Detailed Notice ¶ 21 (KCC Decl., Exs. A1-A8).

20    As required by the Court's preliminary approval order dated June 20, 2013 (Dock. No.

21    88), this motion for fees, costs and incentive awards has been filed well before the deadline for

22    Settlement Class Members to file objections or submit opt-out requests (which is December 4,

23    2013). *See In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 993 (9th Cir. 2010);

24    Preliminary Approval Order (Dock. No. 88) ¶¶ 22-23.

25

26

27

28    [8] *In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 940 n.6 (9th Cir. 2011).
Such provisions are "disfavored" and demand special scrutiny. *Id.* at 949.

-11-

1  **III.    ARGUMENT**

2       Under the common fund doctrine, Class Counsel are entitled to an award of reasonable

3  attorneys' fees to be paid from the Settlement Fund.

4       Federal courts have consistently "recognized that ... a lawyer who recovers a common

5  fund for the benefit of persons other than ... his [or her] client is entitled to a reasonable

6  attorney's fee from the fund as a whole."  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980);

7  *see Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990)

8  (common fund doctrine "permits recovery of fees from the damage award obtained").  Similarly,

9  under California law, parties "preserving or recovering a fund for the benefit of others in addition

10  to [themselves]" may "recover [their] costs, including [their] attorneys' fees, from the fund of

11  property itself …."  *Lealao v. Beneficial Cal., Inc.*, 82 Cal. App. 4th 19, 27 (2000) (citing

12  *Boeing*, 444 U.S. at 478; *Serrano v. Unruh*, 32 Cal. 3d 621, 632 (1982)).[9]

13       The common-fund doctrine's purpose is to "avoid the unjust enrichment of those who

14  benefit from the fund that is created … by the litigation and who otherwise would bear none of

15  the litigation costs."  Court Awarded Attorney Fees, 3d Cir. Task Force, 108 F.R.D. 237, 250

16  (1985); *see Staton v. Boeing Co.*, 327 F.3d 938, 967 (9th Cir. 2003) (citing *Boeing*, 444 U.S. at

17  478); *Lealao*, 82 Cal. App. 4th at 27 ("the common fund doctrine 'rest[s] squarely on the

18  principle of avoiding unjust enrichment'" (quoting *Serrano*, 32 Cal. 3d at 632)).  The doctrine

19  achieves this purpose by "ensur[ing] that each member of the winning party contributes

20  proportionately to the payment of attorneys' fees."  *Staton*, 327 F.3d at 967.

21       In this case, as many as 175,000 Settlement Class members stand to benefit from the

22  creation of the Settlement Fund,[10] and they should share in the cost of creating it, including the

23

---

24       [9] Because the claims asserted in these actions all arose under California law, the fee
25  analysis is governed by California law.  *See Rodriguez v. Disner*, 688 F.3d 645, 653 n.6 (9th Cir.
   2012) (for federal court exercising diversity jurisdiction over state-law claims, "state law would
26  control" both entitlement to fees and "the method of calculating such fees" (citing *Mangold v.
   Cal. Pub. Utils. Comm'n*, 67 F.3d 1470, 1478-79 (9th Cir. 1995)).  As explained in the text, in
27  common-fund cases such as this, federal and California law require essentially the same analysis.

       [10] As mentioned elsewhere in this brief, they will each be mailed a check averaging $211
28  per Class Device, even if the full fee award requested by this motion is granted.

1  attorneys' compensation.  For the reasons discussed in detail below, the percentage-of-the-fund

2  method should be used to determine the fees to be paid to Class Counsel, and the percentage

3  amount that would fairly and reasonably compensate Class Counsel for their work is 30% of the

4  Fund.

5       Additionally, for the reasons discussed below, an incentive award of $1,000 is reasonable

6  and appropriate for each of the Class Representatives (with a single award for Pennington and

7  White), and should be approved.

8       **A.    IN THIS COMMON-FUND CASE, AND PURSUANT TO THE SETTLEMENT**
        **AGREEMENT, THE FEE AWARD SHOULD BE CALCULATED USING THE**
9          **PERCENTAGE-OF-THE FUND METHOD.**

10       In common-fund cases, under both California and federal law, "courts possess the

11  'discretion to apply either a lodestar method or the percentage-of-the-fund method in calculating

12  a fee award.'"  *Fraley v. Facebook, Inc.*, 2013 WL 4516806, *2 (N.D. Cal. Aug. 26, 2013)

13  (citing *Fischel v. Equitable Life. Assur. Soc'y*, 307 F.3d 997, 1006 (9th Cir.2002); *Vizcaino*, 290

14  F.3d at 1047; *In re Consumer Privacy Cases*, 175 Cal. App. 4th 545, 558 (2009)); *see also In re*

15  *Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1295 (9th Cir. 1994) (hereafter

16  "*WPPSS*")) (same); *Wershba v. Apple Computer, Inc.*, 91 Cal. App. 4th 224, 254 (2001) (courts

17  may use either "percentage of recovery method" or "lodestar/multiplier method" "for calculating

18  attorney fees in civil class actions").  The choice "depends on the circumstances." *Six (6)*

19  *Mexican Workers*, 904 F.2d at 1311.

20       In this case, the Court is respectfully asked to use the percentage-of-the fund method to

21  determine Class Counsel's fees.

22       Although the Court has discretion to use either method, in the Ninth Circuit and

23  California alike, "the *primary* basis of the fee award remains the percentage method." *Vizcaino*,

24  290 F.3d at 1050 (emphasis added); *see also In re Rite Aid Corp. Securities Litig.*, 396 F.3d 294,

25  307 (3rd Cir. 2005) ("the lodestar cross-check does not trump the primary reliance on the

26  percentage of common fund method"); *Lopez v. Youngblood*, 2011 WL 10483569, *3 (E.D. Cal.

27  Sept. 2, 2011) ("the percentage of the available fund analysis is the preferred approach in class

28  action fee requests"); *Craft v. County of San Bernardino*, 624 F. Supp. 2d 1113, 1116, 1123-24

1  (C.D. Cal. 2008) (noting courts' preference for and "general trend" in favor of percentage

2  method in class-action common-fund cases (citing *Vizcaino*)).[11]

3    The percentage-of-the-fund method is generally preferred over the lodestar method

4  because "it more closely aligns the interests of the counsel and the class [in that] class counsel

5  directly benefit from increasing the size of the class fund and working in the most efficient

6  manner." *Lopez*, 2011 WL 10483569, *3 (citing *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261,

7  1266-67 & fn.3, 1269-71 (D.C. Cir. 1993); *Camden I Condominium Ass'n v. Dunkle*, 946 F.2d

8  768, 774 (11th Cir. 1991) ("percentage of the fund approach is the better reasoned in a common

9  fund case")); *see also Craft*, 624 F. Supp. 2d at 1123 (same); *In re Oracle Securities Litig.*, 852

10  F. Supp. 1437, 1454 (N.D. Cal. 1994) (same).  It is also preferred because it encourages early

11  settlement of meritorious cases, and it "ensur[es] that competent counsel continue to be willing

12  to undertake risky, complex, and novel litigation." Federal Judicial Center, *Manual for Complex*

13  *Litigation*, §14.121 (4th ed. 2004).  For these reasons, "the vast majority of courts of appeals

14  now permit or direct district courts to use the percentage-fee method in common-fund cases." *Id.*

15  (citing, *e.g.*, *WPPSS*, 19 F.3d at 1295)).

16    The lodestar approach is used mainly in cases in which there is no common fund, such as

17  "employment, civil rights and other injunctive relief class actions." *Hanlon v. Chrysler Corp.*,

18  150 F.3d 1011, 1029 (9th Cir. 1998).  In such cases, "there is no way to gauge the net value of

19  the settlement or any percentage thereof." *Id.*; *see also Bluetooth*, 654 F.3d at 941, 942 (lodestar

20  method appropriate when relief obtained "is primarily injunctive in nature and thus not easily

21  monetized," whereas in common-fund cases "the benefit to the class is easily quantified"); 4

22  Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* §14.7 (4th ed. 2002; Supp. 2013)

23  (hereafter "*Newberg on Class Actions*") ("the lodestar method is often employed precisely

24

25

26  [11] *Accord*, *e.g.*, *Chavez v. Netflix, Inc.*, 162 Cal. App. 4th 43, 63 (2008) (applying percentage-of-the-fund method); *Apple Computer, Inc. v. Superior Court*, 126 Cal. App. 4th 1253, 1270 (2005) (fee awards under the common fund doctrine "are based on a 'percentage-of-the-benefit' analysis," while the lodestar method is used when a fee-shifting statute applies); *Bell v. Farmers Ins. Exchange*, 115 Cal. App. 4th 715, 726 (2004) (trial court employed percentage-of-the-fund method in case generating $90 million common fund).

-14-

1   because there is no common fund or because the monetary outcome of the lawsuit is not the key

2   component of the plaintiff's recovery").

3          By contrast, the percentage method is appropriate in cases like this one, in which there *is*

4   a common fund and "the class benefit can be monetized with a reasonable degree of certainty."

5   *Johansson-Dohrmann v. Cbr Systems, Inc.*, 2013 WL 3864341, *8 (S.D. Cal. Jul. 24, 2013)

6   (citing *Consumer Privacy Cases*, 175 Cal. App. 4th at 556-57; *Lealao*, 82 Cal. App. 4th at 26-

7   27); *see also Bolton v. U.S. Nursing Corp.*, 2013 WL 5700403, *5 (N.D. Cal. Oct. 18, 2013)

8   ("percentage-of-the-fund method is appropriate where the amount of the settlement is fixed

9   without any reversionary payment to the defendant"); *Smith v. CRST Van Expedited, Inc.*, 2013

10  WL 163293, *4 (S.D. Cal. Jan. 14, 2013) (same).

11         In this case, for several reasons, the Court should use the percentage-of-the-fund method

12  to determine the fee award.  <u>First</u>, the Settlement Agreement creates a non-reversionary fund of

13  $53 million for the benefit of the Class, the value of which is certain; <u>second</u>, the parties to the

14  Settlement Agreement agreed that the fee award would be calculated based on a percentage of

15  the Settlement Fund (SA ¶ 47);[12] <u>third</u>, the members of the Class were notified that counsel

16  would seek an award based on a percentage of the Settlement Fund;[13] <u>fourth</u>, in similar cases in

17  which counsel's efforts created such a fund, the Courts have employed the percentage method

18  (as discussed below); and, <u>fifth</u>, Class Counsel have respectfully asked the Court to determine

19  their award using that method.[14]

---

[12] *See Staton*, 327 F.3d at 972 (parties to class action settlement may agree that fees will be sought pursuant to common-fund principles, and district court would not err in deferring to such agreement); *see also Yeagley v. Wells Fargo & Co.*, 365 Fed. Appx. 886, 887 (9th Cir. 2010) ("parties can request in their settlement agreement that the district court award attorneys' fees using common-fund principles" (citing *Staton*, 327 F.3d at 969, 972)).

[13] *See* Detailed Notice (KCC Decl., Ex. A8), ¶21 ("Class Counsel will ask the Court to approve payment of up to 30% of the $53 million Settlement Fund ….").

[14] When the percentage-of-the-fund method is used, the lodestar calculation is relegated to, at most, "merely a cross-check." *Vizcaino*, 290 F.3d at 1050 & n.5 (noting drawbacks of lodestar approach) (citing *Camden*, 946 F.2d at 773-74).  *See* Part III.B.5, *infra*, for further discussion of the lodestar crosscheck in this case.

### B.    AN UPWARD ADJUSTMENT OF THE NINTH CIRCUIT BENCHMARK TO 30% OF THE FUND IS WARRANTED AND REASONABLE IN LIGHT OF THE WONDERFUL RESULTS ACHIEVED BY CLASS COUNSEL, THE HIGH-QUALITY WORK THEY PERFORMED, AND OTHER RELEVANT FACTORS.

The Ninth Circuit uses a "25% benchmark rate" as "a starting point for analysis" of a percentage-of-the fund award. *Vizcaino*, 290 F.3d at 1048; *see Hanlon*, 150 F.3d at 1029 ("This circuit has established 25% of the common fund as a benchmark award for attorney fees.").[15] Courts adjust the benchmark figure "upward or downward" "to fit the individual circumstances" of the specific case. *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272, 273 (9th Cir. 1989) (hereafter "*Graulty*").[16] "[A] district court may exceed the benchmark if it makes clear how it arrives at the figure ultimately awarded." *Brailsford v. Jackson Hewitt Inc.*, 2007 WL 1302978, *5 (N.D. Cal. May 3, 2007) (citing *Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000)); *see Craft*, 624 F. Supp. 2d at 1125 ("Higher awards are available when they are warranted under the circumstances.").

The Ninth Circuit has identified a series of factors to be considered in adjusting the benchmark. These include: (1) the degree of success counsel achieved for the class, (2) the risks involved in the litigation, including the skill required and the quality of the work performed to overcome those risks, (3) generation of "benefits beyond the cash settlement fund," (4) the contingent nature of the fee and the burdens borne by class counsel in taking on the litigation; (5) the range of awards made in similar cases. *Vizcaino*, 290 F.3d at 1048-50.

Applying these factors, the Ninth Circuit has repeatedly affirmed fee awards exceeding the 25% benchmark. *Id.* at 1050 (affirming award of 28% of common fund); *Palmer v. Nigaglioni*, 508 Fed. Appx. 658, 658 (9th Cir. 2013) (affirming award of 28% of common fund); *Linney v. Cellular Alaska Partnership*, 151 F.3d 1234 (9th Cir. 1998) (affirming award of 33.3%

---

[15] "Under the percentage method, California has recognized that most fee awards based on either a lodestar or percentage calculation are 33 percent and has endorsed the federal benchmark of 25 percent." *Johansson-Dohrmann*, 2013 WL 3864341 at *9 (citing *In re Consumer Privacy Cases*, 175 Cal. App. 4th at 556 n.13).

[16] *See also WPPSS*, 19 F.3d at 1298 ("courts cannot rationally apply any particular percentage—whether … 25 percent or any other number—in the abstract, without reference to all the circumstances of the case"); *Six (6) Mexican Workers*, 904 F.2d at 1311 ("benchmark percentage should be adjusted" to account for "special circumstances").

1  of common fund); *In re Pacific Enterprises Sec. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995)

2  (affirming award of 33.3% of common fund).  In fact, "[a] fee award of 30 percent is within the

3  'usual range' of fee awards that Ninth Circuit courts award in common fund cases"; *Garner v.*

4  *State Farm Mut. Auto. Ins. Co.*, 2010 WL 1687829, *1 (N.D. Cal. Apr. 22, 2010) (citing

5  *Vizcaino*, 290 F.3d at 1047); *see also In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 735

6  (E.D. Pa. 2001) (noting that in a study of 287 settlements ranging from less than $1 million to

7  $450 million, "[t]he average attorney's fees percentage is shown as 31.71%, and the median

8  turns out to be one-third"), *cited in Rigo v. Kason Indus., Inc.*, 2013 WL 3761400, *7 (S.D. Cal.

9  Jul. 16, 2013).  Thirty percent has been described as "only modestly more than the Ninth

10  Circuit's 25% 'benchmark' percentage" and "well within the usual range of percentages awarded

11  in similar cases."  *Vedachalam v. Tata Consultancy Servs., Ltd.*, 2013 WL 3941319, *2 (N.D.

12  Cal. Jul. 18, 2013).

13      As discussed in detail below, each of the factors amply supports an upward adjustment

14  of the benchmark in this case.  The requested 30% fee is more than reasonable in light of the

15  extraordinary results Class Counsel achieved and the significant risks they undertook on behalf

16  of the Class, and it falls well within the range awarded in similar class action litigation.

17      **1.    Class Counsel Achieved Extraordinary Results for the Settlement**
         **Class.**

18

19      The most important factor is the degree of success counsel achieved for the class.  *See*

20  *Vizcaino*, 290 F.3d at 1048 (considering counsel's "exceptional results"); *Six (6) Mexican*

21  *Workers*, 904 F.2d at 1311 (noting plaintiffs' "substantial success").  To measure that success,

22  "the factor given the greatest emphasis is the size of the fund created, because 'a common fund is

23  itself the measure of success … [and] represents the benchmark from which a reasonable fee will

24  be awarded.'"  *Manual for Complex Litigation*, *supra*, §14.121 (quoting *Newberg on Class*

25  *Actions* § 14:6 at 547, 550 (citing *Camden I*, 946 F.2d at 774); *see also Garner*, 2010 WL

26  1687829 at *1 (awarding 30% fee; noting that "Class Counsel achieved outstanding monetary

27  results for the Class members" by creating a non-reversionary fund of $15 million for the class).

28

1    The $53 million monetary component of the settlement is sizeable. It will benefit up to

2    approximately 175,000 class members, all of whom will be mailed checks for an average of $211

3    per Class Device—***even if*** the Court approves the full requested fee award. In other words, even

4    after subtracting the proposed fee award, eligible Settlement Class members will receive

5    approximately 103% of the average price charged by Apple to replace the Class Devices for

6    which Apple denied warranty coverage. *See* KCC Decl., ¶¶ 38, 45; Sen Decl., ¶ 13 (schedule of

7    average prices). Not a penny of the $53 million cash fund will revert to Apple. Instead, on top

8    of the cash fund, Apple has already separately incurred over $648,000 in notice and settlement

9    administration costs, with more costs to come. KCC Decl, ¶ 51.

10    This is a fantastic result by any measure. The percentage of estimated damages

11    recovered is quite high, which is an important factor favoring an upward adjustment of the

12    benchmark. *See In re Oracle*, 852 F. Supp. at 1459 (describing settlement recovering 24.5% of

13    estimated damages as "relatively good" and "respectable" and stating that a recovery of 77% of

14    estimated damages would be "remarkable"); *see also*, *e.g.*, *In re Heritage Bond Litig.*, 2005 WL

15    1594403, *19 (C.D. Cal Jun. 10, 2005) (describing settlement recovering 36% of estimated

16    damages as "an exceptional result" and awarding 33.3% of the fund in fees); *In re Medical X-*

17    *Ray Film Antitrust Litig.*, 1998 WL 661515, *7-8 (E.D. N.Y. Aug. 7, 1998) (court increased 25%

18    benchmark to 33.3% where counsel recovered 17% of damages); *In re Crazy Eddie Sec. Litig.*,

19    824 F. Supp. 320, 326 (E.D. N.Y. 1993) (court increased 25% benchmark to 33.8% where

20    counsel recovered 10% of damages); *In re General Instr. Sec. Litig.*, 209 F. Supp. 2d 423, 431,

21    434 (E.D. Pa. 2001) (one third fee awarded from settlement fund that was 11% of estimated

22    damages); *In re Corel Corp., Inc. Sec. Litig.*, 293 F. Supp. 2d 484, 489-90, 498 (E.D. Pa. 2003)

23    (one-third fee awarded from settlement fund that equaled about 15% of damages).[17]

24    Moreover, in this case, the "the entire value of the benefits accruing to class members is

25    properly attributable to the efforts of class counsel." *In re AT & T Corp.*, 455 F.3d 160, 173 (3d

26    _____

27    [17] *Cf. In re Portal Software, Inc. Sec. Litig.*, 2007 WL 4171201, *3 (N.D. Cal. Nov. 26, 2007) (observing that all securities class action settlements in 2005 and 2006 averaged between

28    2.4% and 3.1% of estimated damages).

1   Cir. 2006).  Class Counsel were not aided by a governmental investigation, as in many large-

2   scale class actions; rather, the winning theory, the damning evidence, and the amazing settlement

3   all grew out of the legal acumen and hard work of Class Counsel—and Class Counsel alone.  *See*

4   *id.*; *Sullivan v. DB Investments, Inc.*, 2008 WL 8747721, *31 (D. N.J. May 22, 2008) ("The large

5   size of the settlement is particularly noteworthy, because Plaintiffs' counsel litigated the case

6   without the assistance of a governmental investigation or prosecution, a factor that distinguishes

7   this case from others, such as securities class actions.").

8        In addition to the substantial size of the fund, and the large number of class members who

9   will receive money from it, Class Counsel achieved much more in this case.  They negotiated a

10  settlement whereby more than 132,000 Direct-Payment Settlement Class Members will be

11  mailed a check without having to complete any claim form (or, for the vast majority of them, to

12  do anything at all; a subset had to update their addresses).  This process required Apple and KCC

13  to mine Apple's data and qualify as many potential class members as Direct Payment Settlement

14  Class members as possible.  For all other potential Settlement Class members,  Class Counsel

15  designed an effective notice plan, comprising a combination of email, postcard, and published

16  notice, intended to reach a large group of potential class members who could not be individually

17  identified from Apple's records.  As a result of Class Counsel's efforts, summarized in more

18  detail above, more than 43,000 claimants have stepped forward from this group.  The claims

19  form and submission process that Class Counsel created for the latter group effectively elicited

20  needed information for claims verification and to deter fraud, while at the same time was simple

21  enough to encourage tens of thousands of people to submit claims.

22       Class Counsel also negotiated an equitable allocation method tied to the average

23  replacement cost of the particular device each class member owned, and a narrowly-tailored

24  release preserving unrelated claims.

25       When issues arose in the notice and claims phase, Class Counsel identified and dealt with

26  them effectively.  And their work is not over.  Class Counsel anticipate that significant additional

27  work will be required to see this settlement through to payment of the final dollar of the $53

28  million Settlement Fund.

1    These outstanding results weigh strongly in favor of an upward adjustment of the 25%

2  "benchmark" for average cases to a fee award of 30% for this exceptional one.  As discussed

3  below, Courts routinely award 30% in cases in which Class Counsel achieved far less success

4  than was garnered here.

5    **2.    The Litigation Involved Complex Issues and Significant Risks, Which**
        **Required High Levels of Skill and Superior Work to Overcome.**

6    The next factor justifying an upward departure from the benchmark is the complexity of

7  the issues and degree of risk faced by class counsel, and the skill they deployed and the work

8  they performed to successfully overcome the risks.  *Vizcaino*, 290 F.3d at 1048; *see also Pacific*

9  *Enterprises*, 47 F.3d at 379 (holding fees justified "because of the complexity of the issues and

10  the risks"); *Six (6) Mexican Workers*, 904 F.2d at 1311 (noting that case "involved complicated

11  legal and factual issues"); *Craft*, 624 F. Supp. 2d at 1117 (noting that "the law was not settled in

12  the areas encompassed by the suit").

13    As discussed in more detail above, this case involved significant complexities and risks,

14  both legal and factual.  Factually, Class Counsel had to overcome testimony of Apple engineers

15  that external LSIs are reliable as the sole indicator of customer abuse by liquid immersion.  The

16  key to refuting this testimony was evidence developed through investigation and discovery,

17  coupled with analysis by experts.  Class Counsel vigorously and relentlessly pursued discovery

18  not only from Apple, but also from 3M and other third parties.  Legally, Class Counsel had to

19  establish facts and develop a theory that could both succeed on the merits and be amenable to

20  class treatment.  Class certification is frequently denied in breach-of-warranty actions for the

21  very reasons Apple asserted—that an individualized examination of the circumstances of each

22  warranty denial is required.[18]  Moreover, in most cases, as Apple asserted, a plaintiff seeking

23

24

25    _____

26    [18] *See*, *e.g.*, *Campion v. Old Republic Home Prot. Co.*, 272 F.R.D. 517, 530 (S.D. Cal. 2011) ("it is evident an individual inquiry into the handling of each class member's claim would

27  be necessary to determine whether a breach occurred"); *Parkinson v. Hyundai Motor America*, 258 F.R.D. 580, 595 (C.D. Cal. 2008) ("to determine whether each class member's warranty

28  was, in fact, breached, the trier of fact will be required to inquire into the individual circumstances of each alleged denial of warranty coverage").

1    warranty coverage usually does have to establish a defect in the product.[19]  Without a way

2    around this problem, the case was doomed as a class action for damages.

3        The law was unsettled regarding whether plaintiffs bear the burden of proving the

4    existence of a defect covered by warranty or whether Apple must bear the burden of proving an

5    exclusion from warranty coverage (such as the liquid-damage and/or abuse exclusions in Apple's

6    warranty contracts).  In the insurance context, "the insurer has the burden of establishing that a

7    specific exclusion applies."  *Minkler v. Safeco Ins. Co.*, 49 Cal. 4th 315, 322 (2010).  While the

8    Supreme Court has likened warranty agreements to insurance, *see Gavaldon v. DaimlerChrysler

9    Corp.*, 32 Cal. 4th 1246, 1258 (2004), the primary authority squarely on point originated from

10   out of state, *see Rosenburg v. Cottrell, Inc.*, 2007 WL 1120242, *1 (S.D. Ill. Apr. 13, 2007) ("As

11   the party seeking to invoke a warranty exclusion, [the defendant] bears the burden of pleading

12   and proving its effect.  Furthermore, warranty exclusions are strictly construed against the

13   author." (citation omitted)).  The main supporting *California* authorities were more general.

14   *E.g.*, Evid. Code § 500 ("a party has the burden of proof as to each fact the existence or

15   nonexistence of which is essential to the claim for relief or defense that he is asserting."); *Hauter

16   v. Zogarts*, 14 Cal.3d 104, 119 (1975) ("any disclaimer or modification must be strictly construed

17   against the seller"); *see also* Cal. Civ. Code § 1794.3 ("The provisions of this chapter shall not

18   apply to any defect or nonconformity in consumer goods caused by the unauthorized or

19   unreasonable use of the goods following sale"); *Norwood v. Judd*, 93 Cal. App. 2d 276, 282

20   (1949) (party seeking to invoke exemption from generally-applicable statute bears burden of

21   establishing exemption).  A loss on this legal question would, in all probability, have been fatal

22   to class certification as well.

23        Nevertheless, Class Counsel believed they could prevail on the merits, achieve class

24   certification, and recover damages for the class—which they did.

25

26

---

27   [19] *E.g.*, *Robertson v. Fleetwood Travel Trailers of Cal., Inc.*, 144 Cal. App. 4th 785, 798
     (2006); *Culpepper v. Volkswagen of America, Inc.*, 33 Cal. App. 3d 510, 519 (1973); *Grinnel v.
28   Charles Pfizer & Co.*, 274 Cal. App. 2d 424, 434-35 (1969).

-21-

1    Their approach was to focus, not on proving that the class members' devices were

2    defective, but rather on establishing the *uniformity* of Apple's *conduct* in handling warranty

3    claims.  Apple uniformly denied coverage for all devices based on a single triggered external

4    LSI—without even looking for evidence of actual liquid intrusion, let alone proof of *damage*

5    caused by the intrusion.  Once plaintiffs established as a factual matter that a triggered external

6    LSI, standing alone, is insufficient evidence of liquid damage, Apple would be unable to prove

7    that an exclusion applied, which Class Counsel believed was Apple's burden under the law.

8    As for establishing a defect, Class Counsel planned to assert theories of waiver, estoppel,

9    and course of performance.  Apple never required customers to prove a defect when a device was

10   presented for warranty service; instead, Apple put the question of coverage into hands of its own

11   service personnel.  In fact, Apple warned its customers *never* to open their devices, on pain of

12   voiding the warranty entirely.   Accordingly, Class Counsel argued, Apple waived and was

13   estopped from asserting that class members must bear the burden of proving a defect.[20]

14   Only after establishing these underlying facts, and after prevailing on these novel legal

15   theories, would Class Counsel be able to achieve class certification.  Common questions would

16   predominate because there would be at least two basic issues common to the entire class: (1)

17   whether Apple breached its warranties and the implied covenant of good faith and fair dealing by

18   using external LSIs as the sole basis to deny warranty claims; and (2) whether advising

19   customers that a red or pink external LSI establishes that a Class Device had been damaged by

20   liquid constitutes common-law fraud and violations of the CLRA and UCL.

21   To overcome these factual and legal barriers to recovery, Class Counsel engaged in the

22   protracted discovery battles described in detail above, involving Apple, 3M, AT&T, and others.

23   *See* the final approval motion, filed concurrently herewith; *see also* the accompanying

24   declarations of Class Counsel.

25   To summarize:

26

27

28   [20] This approach was outlined in plaintiffs' Master Complaint, filed June 30, 2011 (Dock.
No. 53) ¶¶ 13-32.

1    • Class Counsel served comprehensive production requests on Apple, which

2    ultimately yielded more than 265,000 pages of production, which Class Counsel reviewed, coded

3    and analyzed.  To achieve this, however, Class Counsel had to engage in dozens of lengthy meet-

4    and-confer sessions with Apple's counsel, which continued up to the eve of the January 2012

5    mediation, and thereafter with respect to confirmatory discovery.  The discussions covered

6    almost every aspect of Apple's production.

7    • Class Counsel served a comprehensive third-party subpoena on 3M Company to

8    obtain documents related to the WCIT used in Apple's LSIs.  This led to protracted and

9    contentious meet-and-confer negotiations with 3M's counsel, who initially refused to produce

10   any documents whatsoever; negotiation of a special protective order to cover 3M's production;

11   and a contested motion to compel filed in the U.S. District Court for the District of Minnesota.

12   The motion was granted and upheld following 3M's appeal from the Magistrate Judge's ruling.

13   This led to production of critical documents by 3M, including documents that Apple had not

14   produced, and that refuted some of Apple's defenses.  Among other things, 3M's production

15   showed that Apple had failed to produce any custodial files of a key Apple designee (Ms.

16   Sivagnanasundaram) whose deposition had already been scheduled.  This prompted a further

17   protracted discovery battle with Apple.

18   • Class Counsel subsequently traveled to Minnesota to take trial depositions of the

19   3M engineer who invented and held the patent for the WCIT used for Apple's LSIs and the 3M

20   manager of the Apple account.  These depositions similarly yielded critical evidence.

21   • Class Counsel served a comprehensive third-party subpoena on AT&T Mobility.

22   AT&T initially suggested that it would produce some documents, but on the eve of its

23   production, AT&T's counsel intercepted the documents from FedEx and had them called back.

24   AT&T thereafter refused to produce any documents until Class Counsel completed a protracted

25   negotiation over the terms of a special protective order.  After this Court entered the special

26   protective order that AT&T eventually agreed to, AT&T informed Class Counsel that it was

27   holding the documents hostage, and demanded payment of $118,000 in "costs," even though it

28   had never mentioned such "costs" during months of negotiations.  Class Counsel were gearing

-23-

1    up for motion practice when their efforts to meet and confer finally persuaded AT&T to release

2    the documents.

3    •    Class Counsel conducted multi-day depositions of three Apple employees whom

4    Apple had designated to testify on its behalf concerning every aspect of this litigation. Apple

5    agreed to these depositions only after protracted meet-and-confer discussions. The depositions

6    yielded critical information essential to establishing the functioning of LSIs in Apple's iPhones

7    and iPod touch devices and their reliability as an indicator of liquid damage. Class Counsel also

8    engaged in negotiations with Apple for the production of high-level Apple "apex" witnesses,

9    which yielded an agreement to make the witnesses available only after the negotiations verged

10    on motion practice.

11    As result of all this work (and the work described in more detail above), Class Counsel

12    were able to marshal evidence to prove, among other things, that LSIs can and do turn pink when

13    exposed to humidity during ordinary, foreseeable use. All of this work also allowed Class

14    Counsel to prepare for class certification, estimate potential damages, assist their experts, support

15    their arguments in connection with trial preparation, and refute Apple's defenses.

16    This work also positioned the case for resolution. The mediation process that led to the

17    Settlement Agreement was lengthy and contentious, as explained at length in the final approval

18    motion. *See also* Declaration of Catherine A. Yanni in Support of Plaintiffs' Motion for an

19    Order Granting Final Approval of Class Action Settlement ("Yanni Decl."), filed concurrently

20    herewith, ¶¶ 6, 9, 23. Finalizing the details of the settlement was also protracted and difficult,

21    requiring additional mediation sessions and conference calls with the mediators and Apple.

22    Class Counsel requested the necessary confirmatory discovery and obtained it from Apple only

23    with difficulty. After many months of additional work, the Settlement Agreement was finalized

24    and executed. *See* Final Approval Motion, filed concurrently herewith; Class Counsel

25    declarations, filed concurrently herewith; Yanni Decl., ¶¶ 6, 9, 13.

26    All the while, Apple refused to publicly acknowledge the existence of any settlement at

27    all. On several occasions, Apple threatened to try to back out. "Uncertainty loomed throughout

28    the litigation." *Kanawi v. Bechtel Corp.*, 2011 WL 782244, *2 (N.D. Cal. Mar. 1, 2011).

-24-

1    After the Court granted preliminary approval, Class Counsel monitored the work of the

2    settlement administrator and identified and dealt with a series of critical issues related to the

3    notice and claims process. As a result of Class Counsel's vigilance, the notice process was

4    completed in a timely manner. *See* Final Approval Motion, filed concurrently herewith, and the

5    accompanying declarations of Class Counsel.

6    In sum, to use the words of another court in which a 30% fee was awarded, "prosecuting

7    this case required an extraordinary commitment of time, resources, and energy from Class

8    Counsel, and the relief achieved simply would not have been possible but for the commitment

9    and skill of Class Counsel." *Garner*, 2010 WL 1687829 at *2. The risks were threefold, "in

10   establishing liability, in obtaining class certification—both of which were vigorously

11   contested—and in reaching a favorable settlement." *Craft*, 624 F. Supp. 2d at 1120. All of this

12   "favors an increase in the benchmark rate." *Kanawi*, 2011 WL 782244 at *2. A 30% fee award

13   is more than reasonable and appropriate for Class Counsel's work in this case.

14          **3.    In Addition to the Non-Reversionary $53 Million Fund, Class
                    Counsel's Work Also Led to Non-Monetary Benefits.**
15

16   Courts also consider the "[i]ncidental or non-monetary benefits conferred by the

17   litigation." *Vizcaino*, 290 F.3d at 1049. Such benefits can justify an upward departure from the

     benchmark, and they do in this case.
18

19   Here, Apple changed its Former Liquid Damage Policy for the iPhone in or around

20   November 2009. Sen Decl., ¶ 6. As with other policy changes, Apple made no public

21   announcement of the change. Micheletti Prelim. Decl., ¶ 8. Apple continued in force its Former

22   Liquid Damage Policy for the iPod touch until May 2010, Sen Decl., ¶ 6, many months after

23   Class Counsel served demand letters required by the Consumers Legal Remedies Act and filed

     these lawsuits, Micheletti Prelim. Decl. ¶ 8. Hence, in addition to the non-reversionary cash
24
     settlement fund of $53 million, Class Counsel's efforts led to a broader policy change for the
25
     benefit for many Apple consumers who have valid warranty claims. *See id.*[21]
26

27   _____

28   [21] Although the policies changed in November 2009 and May 2010, the Settlement
     Agreement encompasses costumers who experienced improper warranty denials for a month

**-25-**

1    In addition, as mentioned above, Class Counsel obtained Apple's agreement to separately

2    pay all of the costs associated with notice and settlement administration.  SA ¶ 21.  The costs

3    have already exceeded $648,000 to date, and will continue to increase as the settlement and

4    claims process continues to completion.  KCC Decl., ¶ 51.

5    Such benefits, beyond the cash fund itself, are "a relevant circumstance to consider in

6    determining what percentage of the fund is reasonable as fees."  *Staton*, 327 F.3d at 945-46.  In

7    evaluating this factor, courts consider not merely the benefits afforded to the class members, but

8    those afforded to non-class members going forward.  *See Garner*, 2010 WL 1687829 at *2

9    (nothing that class counsel achieved non-monetary relief that "will benefit Class members and

10   other current and former insureds for the foreseeable future" (citing *Staton* and *Vizcaino*)); *see*

11   *Kanawi*, 2011 WL 782244 at *2 (non-monetary relief obtained "favors an increase in the

12   benchmark rate").

13   In this case, the non-monetary benefits Class Counsel achieved, over and above the $53

14   million fund, provide additional support for an upward departure from the 25% benchmark.

15   **4.    Class Counsel Took on the Burden of a Heavy Contingency Risk,**
          **Advanced All of the Costs of the Litigation, and Forewent Other**
16        **Work to Achieve the Settlement—All Without Any Guarantee of**
          **Compensation or Reimbursement.**

17   The burdens borne by class counsel in taking on the litigation is another relevant factor

18   that justifies an upward adjustment of the benchmark.  *Vizcaino*, 290 F.3d at 1050 (citing *Torrisi*

19   *v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1377 (9th Cir. 1993); *Six (6) Mexican Workers*, 904

20   F.2d at 1311).  The contingency risk, the length of the litigation, the cost of the litigation, and

21   whether counsel were forced to forego other significant legal work are all relevant

22   considerations.  *Id.*; *see Craft*, 624 F. Supp. 2d at 1120 ("Class counsel declined substantial other

23   work to pursue this case.").

24   As the accompanying declarations of Class Counsel attest, Class Counsel have been

25   laboring on this case for almost four years on a pure contingency basis, with no guarantee of

26

27   _____

28   beyond those dates, reflecting the fact that new policies take time to implement.  *See* Micheletti
     Prelim. Decl., ¶ 8.

1    recovery.  They advanced all out-of-pocket costs, including expert costs, deposition costs,

2    mediation costs, and over $26,000 to reimburse 3M for 50% of its document production costs,

3    per an order of the federal district court in Minneapolis.  All told, Class Counsel collectively

4    report almost $200,000 in unreimbursed, out-of-pocket costs, all of which were advanced with

5    no promise of repayment.[22]  Class Counsel also declined other potentially remunerative work in

6    order to take, and continue working on, this large-scale suit, without knowing whether the case

7    would ever generate any revenue.  *See* Class Counsel declarations, filed concurrently herewith.

8        In large and complex cases like this one, the contingency risk "'is very real.'" *Sullivan*,

9    2008 WL 8747721 at *33 (quoting *In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 134

10   (D.N.J. 2002)).  The risk is only "heightened when Plaintiffs' counsel press to achieve the very

11   best result for their clients" by devoting more and more time, energy, and resources to a case.  *Id.*

12   (quoting *AremisSoft*); *see also Kearney v. Hyundai Motor America*, 2013 WL 3287996, *9 (C.D.

13   Cal. Jun. 28, 2013) ("All counsel on this case worked on a contingency fee basis, which created

14   significant risks for counsel given the amount of hours they worked and the legal uncertainty

15   they faced." (applying lodestar method)).

16       Courts recognize that "the public interest is served by rewarding attorneys who assume

17   representation on a contingent basis with an enhanced fee to compensate them for the risk that

18   they might be paid nothing at all for their work."  *Garner*, 2010 WL 1687829 at *2 (citing

19   *Vizcaino*, 290 F.3d at 1050; *WPPSS*, 19 F.3d at 1299).  "Such a practice encourages the legal

20   profession to assume such a risk and promotes competent representation for plaintiffs who could

21   not otherwise hire an attorney."  *Kanawi*, 2011 WL 782244 at *2; *see WPPSS*, 19 F.3d at 1299-

22   1300 ("premium[s]" in contingency-fee cases are "a legitimate way of assuring competent

23   representation for plaintiffs who could not afford to pay on an hourly basis").

24

25

26   _____

27       [22] *See* Declaration of Gary M. Gray, filed concurrently herewith, ¶ 5 (summarizing
     reported expenses, which total $199,342.77).  Each Class Counsel firm vouches for the expense
28   figures stated in its own declaration, but has not verified those reported by other firms.

Class Counsel's high-risk and successful efforts on behalf of the Settlement Class should be rewarded and encouraged by granting them the requested 30% fee, which is only modestly above the ordinary benchmark for average cases.

### 5. The Requested Fee of 30% of the Fund Falls Well Within the Range of Percentage Fee Awards Approved by the Ninth Circuit and District Courts in Other Cases.

Finally, courts consider "the range of fee awards out of common funds of comparable size." *Vizcaino*, 290 F.3d at 1049-50. "In light of the many cases in this circuit that have granted fee awards of 30% or more, the requested fee is well within the usual range of percentages awarded in similar cases." *Vedachalam*, 2013 WL 3941319 at *2 (citing, *e.g.*, *Pacific Enters.*, 47 F.3d at 379; *Garner*, 2010 WL 1687829; *Brailsford*, 2007 WL 1302978 at *5; *Heritage Bond*, 2005 WL 1594403 at *18; *Linney v. Cellular Alaska Partnership*, 1997 WL 450064. *7 (N.D. Cal. Jul. 18, 1997), *aff'd*, 151 F.3d 1234 (9th Cir. 1998)).

In cases of comparable size, fee awards of 30% or higher are common. The following cases from federal district courts in California are illustrative:

| Case | Size of Fund | % Awarded |
|---|---|---|
| *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 WL 149692 (N.D. Cal. Jan. 14, 2013) (Illston, J.) | $68 million | 30% |
| *Wren v. RGIS Inventory Specialists*, 2011 WL 1230826 (N.D. Cal. Apr. 1, 2011) | $27 million | 41.9% |
| *Kanawi v. Bechtel Corp.*, 2011 WL 782244 (N.D. Cal. Mar. 1, 2011) (Breyer, J.) | $18.5 million | 30% |
| *Garner v. State Farm Mut. Auto. Ins. Co.*, 2010 WL 1687829 (N.D. Cal. Apr. 22, 2010) | $15 million | 30% |
| *Birch v. Office Depot, Inc.*, Case No. 06cv1690 (S.D. Cal. Sept. 28, 2007) (described in *Smith v. CRST Van Expedited, Inc.*, 2013 WL 163293, *5 (S.D. Cal. Jan. 14, 2013)) | $16 million | 40% |
| *In re Heritage Bond Litig.*, 2005 WL 1594403 (C.D. Cal Jun. 10, 2005) | $27.8 million | 33.3% |

| Case | Size of Fund | % Awarded |
|---|---|---|
| *In re Informix Corp. Sec. Litig.*, No. 97-1289 (N.D. Cal. Nov. 23, 1999) (described in *Vizcaino*, 290 F.3d at 1052) | $137 million | 30% |
| *In re Nat'l Health Labs. Sec. Litig.*, Nos. 92-1949 & 93-1694 (S.D. Cal. Aug. 15, 1995) (described in *Vizcaino*, 290 F.3d at 1052) | $64 million | 30% |
| **Average:** | $46.7 million | 33.15% |

In *Vizcaino* itself, the Ninth Circuit identified, and cited with approval, numerous cases involving settlement funds exceeding $50 million in which the fee award equaled or exceeded 30%. *Vizcaino*, 290 F.3d at 1052 (citing *In re Merry-Go-Round Enterprise, Inc.*, 244 B.R. 327 (Bankr. D. Md. 2000) (40% of $185 million settlement fund); *Informix*, *supra* (30% of $137 million settlement fund); *In re Combustion, Inc.*, 968 F. Supp. 1116 (W.D. La. 1997) (36% of $127 million settlement fund); *Kurzweil v. Philip Morris Co.*, 1999 WL 1076105 (S.D. N.Y. 1999) (30% of $124 million settlement fund); *In re Commercial Explosives Antitrust Litig.*, MDL No. 1093 (D. Utah Dec. 29, 1998) (30% of $77 million settlement fund); *Nat'l Health Labs.*, *supra* (30% of $64 million settlement fund); *In Re Melridge, Inc., Sec. Litig.*, No. 87-1426 (D. Or. Apr. 15, 1996) (37.1% of $54 million fund)).[23]

Post-*Vizcaino* examples also abound. *See*, *e.g.*, *In re Southeastern Milk Antitrust Litig.*, 2013 WL 2155387 (E.D. Tenn. May 17, 2013) (33.3% of $158.6 million fund; noting prior award in same case of 33.3% of separate $145 million fund); *Davis v. J.P. Morgan Chase & Co.*, 827 F. Supp. 2d 172 (W.D. N.Y. 2011) (33.3% of $42 million fund); *In re Bisys Securities Litig.*, 2007 WL 2049726 (S.D. N.Y. Jul. 16, 2007) (30% of $65.87 million fund); *Allapattah Services v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1210-1211 (S.D. Fla. 2006) (31.3% of $1.06 billion fund; citing 11 cases involving settlement funds between $40 million and $365 million and fee awards

---

[23] *See also In re Vitamins Antitrust Litig.*, 2001 WL 34312839, *9, *12_(D. D.C. Jul. 16, 2001) (33.3% of $365 million fund); *In re Prison Realty Securities Litig.*, No. 3:99-0458 (M.D. Tenn. Feb. 9, 2001) (30% of $111 million fund) (cited in *Linerboard*); *Kurzweil v. Philip Morris Cos.*, 1999 WL 1076105, *1 (S.D. N.Y. Nov. 30, 1999) (30% of $123.8 million fund); *In re Combustion, Inc.*, 968 F. Supp. 1116, 1136 (W.D. La. 1997) (36% of $127 million fund).

1    of 30% to 35% of the fund); *In re Linerboard Antitrust Litig.*, 2004 WL 1221350 (E.D. Jun. 2,

2    2004) (30% of $202.6 million fund); *In re Busiprone Patent Antitrust Litig.,* No. 01–MD–1410

3    (S.D. N.Y. Apr. 11, 2003) (33.3% of $200 million fund) (cited in *Linerboard*); *In re Cardizem*

4    *CD Antitrust Litig.*, M.D.L. No. 1278 (E.D. Mich. Nov. 26, 2002) (30% of $110 million fund)

5    (cited in *Linerboard*); *In re Aetna, Inc. Sec. Litig.*, 2001 WL 20928 (E.D. Pa. Jan.4, 2001) (30%

6    of $81 million fund); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166 (E.D. Pa. 2000)

7    (30% of $111 million fund).[24]

8    　　　As these cases illustrate, the percentage to be awarded does not bear an inverse relation to

9    the size of the fund.  On the contrary, any rule requiring reduced percentage fee awards in large-

10   fund cases, simply due to the size of the fund, would contravene the Ninth Circuit's directives to

11   "consider the fund's size in light of the particular case" and avoid "applying percentages

12   indiscriminately."  *WPPSS*, 19 F.3d at 1297-98; *see Powers*, 229 F.3d at 1256 ("The district

13   court abuses its discretion when it uses a mechanical or formulaic approach that results in an

14   unreasonable award"); *Vizcaino*, 290 F.3d at 1047 (declining to adopt so-called "increase-

15   decrease rule" "as a principle governing fee awards").[25]

16   　　　In this case, the proposed 30% fee is reasonable and should be approved because of the

17   outstanding results Class Counsel obtained, the risks Class Counsel faced and overcame, the

18   extensive and high-quality work they performed, and the burdens they undertook in pursuing the

19   litigation on a pure-contingency basis.  It is also reasonable in light of fee awards in other cases

20   of comparable size.  For all of these reasons, under *Vizcaino*, an upward adjustment of the 25%

21   "benchmark" to 30% is amply justified.

22

23

24   ────────────

[24] *See also Pokorny v. Quixtar, Inc.*, 2013 WL 3790896, *1 (N.D. Cal. Jul. 18, 2013)
25   (29.5% of $55 million fund).

[25] *See In re Cendant Corp. Litig.*, 264 F.3d 201, 284 n.55 (3d Cir. 2001) (declining
26   percentage approach has been "criticized by respected courts and commentators" because "such
     a fee scale often gives counsel an incentive to settle cases too early and too cheaply");
27   *Allapattah*, 454 F. Supp. 2d at 1213 ("By not rewarding Class Counsel for the additional work
     necessary to achieve a better outcome for the class, the sliding scale approach creates the
28   perverse incentive for Class Counsel to settle too early for too little.").

6.    **Although a Lodestar Crosscheck is Unnecessary in Percentage-of-the-Fund Cases, a Crosscheck Confirms that the Requested 30% Fee Award is Reasonable.**

A lodestar crosscheck is sometimes used to confirm the reasonableness of a requested percentage fee. *See Vizcaino*, 290 F.3d at 1050. Such a crosscheck is not required, however, and "[e]mpirical evidence suggests that courts do a lodestar cross-check in [only about] half of all percentage method cases." *Newberg on Class Actions* §14.7, n. 0.25 (citing Fitzpatrick, "An Empirical Study of Class Action Settlements and Their Fee Awards," 7 *J. Empirical L. Studies* 811, 833-34 (2010)); *see Bluetooth*, 654 F.3d at 942 (in common-fund cases, percentage method may be used "*in lieu of* the often more time-consuming task of calculating the lodestar" (emphasis added)); *Craft*, 624 F. Supp. 2d at 1122 ("[a] lodestar cross-check is not required in this circuit").[26]

Class Counsel respectfully submit that the reasonableness of the requested 30% fee is amply established by application of the *Vizcaino* factors, as discussed above. Nevertheless, with this motion, to permit the Court to perform a lodestar crosscheck if it wishes to do so, each of the Class Counsel firms has filed a declaration describing the time that each firm is claiming as hours devoted to this case, as reflected in that firm's billing records.[27] The record contains more than adequate evidence supporting the conclusion that the requested 30% fee award is reasonable under a lodestar crosscheck.

The lodestar calculation "measures the lawyers' investment of time in the litigation," and "provides a check on the reasonableness of the percentage award." *Vizcaino*, 290 F.3d at 1050. Multipliers in the range of between 3 and 4 are commonly approved in class litigation. *Id.* at 1050-51 (upholding multiplier of 3.65); *see id.* at 1052-54 (noting district court cases approving multipliers as high as 19.6) (citing *In re Prudential Ins. Co. America Sales Practice Litig. Agent*

---

[26] *See also Manual for Complex Litigation*, *supra*, §14.121 ("At least one court has discontinued using the lodestar as a check on the reasonableness of percentage awards because of the lodestar method's perceived faults." (citing *Swedish Hosp.*, 1 F.3d at 1266-67 & n.3).

[27] The Class Counsel who signed these declarations are solely responsible for their content, including their representations about their hours and lodestars, as well as any representations concerning their contributions to the case. Class Counsel cannot, and do not, vouch for the accuracy of the information contained in other firms' declarations.

1   *Actions*, 148 F.3d 283, 341 (3rd Cir. 1998) ("'[M]ultiples ranging from one to four are frequently

2   awarded in common fund cases when the lodestar method is applied'") (quoting *Newberg on*

3   *Class Actions*, *supra*, §14.03 at 14–5); *see also*, *e.g.*, *Been v. O.K. Industries, Inc.*, 2011 WL

4   4478766, *11 (E.D. Okla. 2011) (citing a study "reporting average multiplier of 3.89 in survey of

5   1,120 class action cases"); *In re Telik, Inc. Securities Litig.*, 576 F. Supp. 2d 570, 590 (S.D. N.Y.

6   2008) ("In contingent litigation, lodestar multiples of over 4 are routinely awarded by courts,

7   including this Court."); *Vizcaino v. Microsoft*, 142 F. Supp. 2d 1299, 1305 (W.D. Wash. 2001)

8   (holding that "a multiplier of at least 3 or 4 is wholly justified"), *aff'd*, 290 F.3d 1043 (9th Cir.

9   2002); *Van Vranken v. Atlantic Richfield Co.*, 901 F. Supp. 294, 298 (N.D. Cal. 1995)

10  ("Multipliers in the 3-4 range are common in lodestar awards for lengthy and complex class

11  action litigation."); *Wershba*, 91 Cal. App. 4th at 255 ("Multipliers can range from 2 to 4 or even

12  higher."); *Sternwest Corp. v. Ash*, 183 Cal. App. 3d 74, 76 (1986) (remanding for a lodestar

13  enhancement of "2, 3, 4 or otherwise").[28]

14      In fact, courts have approved multipliers vastly exceeding that range. *See*, *e.g.*, *Stop &*

15  *Shop Supermarket Co. v. SmithKline Beecham Corp.*, 2005 WL 1213926, *18 (E.D. Pa. May 19,

16  2005) (awarding multiplier of 15.6); *Davis*, 827 F. Supp.2d at 185 (awarding 5.3 multiplier;

17  while this "is toward the high end of acceptable multipliers, it is not atypical for similar fee-

18  award cases"); *Craft*, 624 F. Supp. 2d at 1123 (awarding 5.2 multiplier; citing cases approving

19  multipliers ranging from 4.7 to 19.6); *In re Charter Communications, Inc., Securities Litig.*, 2005

20  WL 4045741, *18 (E.D. Mo. June 30, 2005) (awarding 5.61 multiplier); *Busiprone, supra*, No.

21  01–MD–1410 (awarding 8.46 multiplier) (cited in *Stop & Shop*, 2005 WL 1213926 at *16); *In re*

22  *Rite Aid Corp. Sec. Litig.*, 362 F. Supp. 2d 587 (E.D. Pa. 2005) (approving 6.96 multiplier);

23  *Maley v. Del Global Technologies Corp.*, 186 F. Supp. 2d 358, 369 (S.D. N.Y. 2002) (awarding

24  4.65 multiplier; describing this figure as "well within the range awarded by courts in this Circuit

25

26  _____

27      [28] *In re AT & T Corp.*, 455 F.3d 160, 173 (3d Cir. 2006) (a lodestar of 2.99 may be
    reasonable even "in a short and 'relatively simple' case," including one that "was neither legally

28  nor factually complex," lasted only four months, and in which "discovery was virtually
    nonexistent").

and courts throughout the country"); *Di Giacomo v. Plains All American Pipeline*, 2001 WL 34633373, *11 (S.D. Tex. Dec. 19, 2001) (awarding 5.3 multiplier); *In Re IDB Communication Group, Inc., Sec. Litig.*, No. 94-3618 (C.D. Cal. Jan. 17, 1997) (awarding 6.2 multiplier) (cited in *Vizcaino*, 290 F.3d at 1052); *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 197-98 (S.D. N.Y. 1997) (awarding 5.5 multiplier).

Here, if the court considers only 75% of the hours reported by Class Counsel, the lodestar for the work performed in this case is approximately $6.58 million, which yields a multiplier of approximately 2.42.[29] Even considering only half of the hours reported by Class Counsel, the lodestar for work performed in this case is approximately $4.39 million, which yields a multiplier of approximately 3.62.[30] Such multipliers are more than justified for the efforts of Class Counsel and the extraordinary results they achieved in this case. Moreover, such multipliers are well supported by the authorities cited above. *See, e.g.*, *Vizcaino*, 290 F.3d at 1050-51 (affirming 3.65 multiplier); *Linerboard*, 2004 WL 1221350 at *16 n.9 (awarding 3.67 multiplier); *Cardizem*, *supra*, M.D.L. No. 1278 (awarding 3.7 multiplier) (cited in *Stop & Shop*, 2005 WL 1213926 at *16); *Aetna*, 2001 WL 20928, *15 (awarding 3.6 multiplier); *Van Vranken v. ARCO*, 901 F. Supp. 294, 299 (N.D. Cal. 1995) (awarding 3.6 multiplier as "well within the acceptable range for fee awards in complicated class action litigation such as this"); *Keith v.*

---

[29] For a chart summarizing the reported hours and lodestars of each Class Counsel firm, as reported in their respective declarations filed herewith, and for the math yielding the multiplier figure, see the declaration of Gray M. Gray, *supra*, ¶¶ 2-5. Each Class Counsel firm is solely responsible for the content of its declaration.

A lodestar crosscheck is distinct from a "full lodestar analysis." *Linerboard*, 2004 WL 1221350 at *15. A crosscheck "need entail neither mathematical precision nor bean-counting," and the court "may rely on summaries submitted by the attorneys and need not review actual billing records." *Rite Aid*, 396 F.3d at 306-07; *see also Johansson*, 2013 WL 3864341 at *11 ("detailed time sheets are not necessary"); *Johnson v. General Mills, Inc.*, 2013 WL 3213832, *6 n.3 (C.D. Cal. Jun. 17, 2013) (same); *Sutter Health*, 171 Cal. App. 4th at 512 ("such detail is not required"; affirming fee award supported by declarations of counsel summarizing work (citing *Wershba*, 91 Cal. App. 4th at 254-55); *Chavez*, 162 Cal. App. 4th at 64 ("detailed time sheets are not required of class counsel to support fee awards in class action cases"). For crosscheck purposes, a close review of billing records is not required because it "would undermine the utility of the percentage method" by reimposing a burden on the Court that the percentage method is meant to ease. *See Linerboard*, 2004 WL 1221350 at *15. Class Counsel will provide their detailed billing records for the Court's *in camera* inspection if the Court desires to see them.

[30] *See* Gray Decl., *supra*, ¶5.

1    *Volpe,* 501 F. Supp. 403, 414-15 (C.D. Cal. 1980) (awarding 3.5 multiplier).[31]

2        In fact, as noted above, courts routinely approve multipliers of 4, 5, or even higher.  In

3    *Craft,* the court observed that while a 5.2 multiplier was "high end," there is "ample authority for

4    such awards resulting in multipliers in this range or higher."  *Craft,* 624 F. Supp. 2d at 1125

5    (citing, *e.g.*, *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 736 n.44 (E.D. Pa. 2001)

6    (describing multipliers of 4.5-8.5 as "handsome" but "unquestionably reasonable")).

7        In *Vizcaino,* the Ninth Circuit explained that multipliers—including the multiplier of 3.65

8    that it approved in that case—are justifiable "to reflect the risk of non-payment in common fund

9    cases."  *Vizcaino,* 290 F.3d at 1051 (quoting *WPPSS,* 19 F.3d at 1299-1300).  Courts applying

10   the lodestar method as the primary method for determining a reasonable fee (rather than merely

11   as a crosscheck, as in this case) consider the results achieved to be the most important factor.

12   *Bluetooth,* 654 F.3d at 942; *McCown v. City of Fontana,* 565 F.3d 1097, 1102 (9th Cir. 2009).

13       In this case, the lodestar crosscheck confirms the reasonableness of the requested 30%

14   fee.  All of the *Vizcaino* factors independently support an upward adjustment of the benchmark

15   percentage, and the crosscheck shows that the 30% fee would represent a lodestar multiplier that

16   falls well within the range approved in other litigation, including *Vizcaino* itself.  For all of these

17   reasons, the Court is respectfully asked to award the requested fee of 30%.

18   C.    **AS CLASS COUNSEL, STATE PLAINTIFFS' COUNSEL ARE ENTITLED TO SHARE IN ANY FEE AWARD THAT THE COURT MAY APPROVE.**

19

20       Federal Rule of Civil Procedure 23(h) allows the Court to award attorneys' fees that are

21   "authorized by law, *or* by the parties' agreement."  Fed. R. Civ. P. 23(h) (emphasis added).

22   Here, the Settlement Agreement expressly provides that: "Class Counsel are *entitled to*

23

_____

24       [31] *See also In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 WL 1365900, *7-*8 (N.D. Cal. Apr. 3, 2013) (approving average multipliers of 2.4-2.6); *In re Cadence Design Sys., Inc.*

25   *Sec. & Derivative Litig.*, 2012 WL 1414092, *5 (N.D. Cal. April 23, 2012) (approving 2.88 multiplier); *In re Ikon*, 194 F.R.D. 166, 195 (approving 2.7 multiplier); *In re EVCI Career*

26   *Colleges Holding Corp. Sec. Litig.*, 2007 WL 2230177, *17 (S.D. N.Y. 2007) (2.48 multiplier "is within the range found to be reasonable"); *In re Sutter Health Uninsured Pricing Cases*, 171

27   Cal.App.4th 495, 512 (2009) (approving 2.52 multiplier); *Chavez*, 162 Cal. App. 4th at 66 (approving 2.5 multiplier); *City of Oakland v. Oakland Raiders*, 203 Cal. App. 3d 78 (1988)

28   (approving 2.34 multiplier).

1  reasonable attorneys' fees."  SA ¶ 47 (emphasis added).  The Settlement Agreement defines

2  "Class Counsel" to include both Federal Plaintiffs' Counsel and State Plaintiffs' Counsel (SA ¶1

3  G, T and PP), and State Plaintiffs' Counsel were appointed as Class Counsel in the Court's

4  Preliminary Approval Order ((Dock. No. 88), at p. 3, ¶ 8).

5  The Settlement Agreement contemplates and provides for an award of attorneys' fees to

6  Class Counsel from the Settlement Fund.  SA ¶¶ 46-48.  The Settlement Agreement states that

7  the motion for such fees "in the Federal Actions shall encompass and resolve the claims … for

8  State Plaintiffs' Counsel's attorneys' fees and expense reimbursement."  SA ¶ 44.  Similarly, the

9  provision of the Settlement Agreement governing the disposition of any attorneys' fees awarded

10  by the Court states that the amount awarded "will be allocated between Federal Plaintiffs'

11  Counsel and State Plaintiffs' Counsel" either by agreement among the attorneys (subject to the

12  Court's approval) or, in the absence of an agreement, by the Court.  SA ¶¶ 48-49.

13  Moreover, even if the Settlement Agreement itself did not did not resolve the entitlement

14  issue, an award of attorneys' fees to State Plaintiffs' Counsel would nonetheless be warranted.[32]

15  As the Advisory Committee Notes to the 2003 Amendments to Rule 23(h) point out, the Rule

16  provides a basis for the award of fees to attorneys whose work benefits the class, including those

17  who are not appointed as class counsel.  As reported by the Advisory Committee, "there may be

18  a basis for making an award to other counsel whose work produced a beneficial result for the

19  class, such as attorneys who acted for the class before certification but were not appointed class

20  counsel."  In this case, as the Settlement Agreement memorializes, "[t]he Federal Plaintiffs and

21  State Plaintiffs prosecuted their respective actions against Apple for the common benefit of

22  members of the Settlement Class, coordinated their efforts regarding discovery from Apple, and

23  both participated in the settlement negotiations and mediations with Apple."  SA ¶ 14.

24

25

26  _____

27  [32] All Class Counsel have agreed that State Plaintiffs' Counsel are entitled to share in the
award of attorneys' fees, subject to the Court's approval.  The allocation of any award of fees
among Class Counsel shall be determined either by agreement (subject to the Court's approval)

28  or by the Court at the allocation stage, after briefing.  *See* Kralowec Decl., ¶ 97, Ex. X.

-35-

The work performed by State Plaintiffs' Counsel is described in more detail in their accompanying declarations.

### D. THE CLASS REPRESENTATIVES SHOULD RECEIVE INCENTIVE AWARDS FOR THEIR EFFORTS ON BEHALF OF THE CLASS.

Plaintiffs also seek an incentive award of $1,000 each (with a single joint award for plaintiffs Pennington and White) as compensation for their services on behalf of the class.[33] This request is reasonable and should be granted.

District courts have the discretion to award incentive payments to named plaintiffs in class action litigation. *Petersen v. Lowe's HIW, Inc.*, 2012 U.S. Dist. LEXIS 123018, *12 (N.D. Cal. Aug. 24, 2012) (*citing In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000)); *see also Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003).[34] "Incentive awards are fairly typical in class action cases ... and are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009) (emphasis omitted) (citing *In re Mego*, 213 F.3d at 463). District courts must "scrutinize carefully the awards so that they do not undermine the adequacy of the class representatives." *Radcliffe*, 715 F.3d at 1163 (citing *Staton*, 327 F.3d at 977). Relevant factors include "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, ... [and] the amount of time and effort the plaintiff expended in pursuing the litigation." *Staton*, 327 F.3d at 977.

The proposed award of $1,000 per class representative is well within the range dictated by applicable law as set forth in *Radcliffe*. *See, e.g., Fraley*, 2013 WL 4516806 at *3-*4 (post-

---

[33] As mentioned above, although the Settlement Agreement authorizes an incentive award request of up to $5,000 for each Class Representative (with a single joint award for Pennington and White), this motion seeks $1,000 each in light of *Radcliffe*, 715 F.3d 1157.

[34] To the extent that California substantive law may govern such payments, the rule is the same. *See, e.g., In re Cellphone Fee Termination Cases*, 186 Cal. App. 4th 1380, 1393-95 (2010) (affirming $10,000 awards to each of four class representatives); *Munoz v. BCI Coca-Cola Bottling Co.*, 186 Cal. App. 4th 399, 412 (2010) (affirming $5,000 awards to each of two class representatives).

1    *Radcliffe*; awarding $1,500 to each of three class representatives); *Rigo*, 2013 WL 3761400 at *8

2    (post-*Radcliffe*; approving $2,500 award to class representative); *Kearney*, 2013 WL 3287996 at

3    *10 (post-*Radcliffe*; approving $2,500 to each of four representatives); *Johnson*, 2013 WL

4    3213832 at *7 (post-*Radcliffe*; granting $1,500 awards to each of four representatives).

5          In this case, the class representatives were not subjected to discovery; Apple propounded

6    neither written production requests, nor interrogatories, nor deposition notices.  Nevertheless, the

7    class representatives in this case did something that up to as many as 175,000 other Settlement

8    Class Members were either unwilling or unable to do—take on a technology giant like Apple in

9    court and prevail.  Each of the class representatives performed numerous tasks ordinarily

10   associated with class action litigation.  They provided their counsel with the facts and

11   circumstances of each of their warranty denials, which allowed counsel to understand Apple's

12   practices and craft the allegations of the complaints; agreed to pursue this action for the benefit

13   of all similarly situated consumers; made themselves available to counsel to confer regarding

14   questions that arose during the course of the litigation and to receive updates on the progress of

15   the case; and evaluated and approved the settlement for the benefit of the class.  *See* Declarations

16   of Charlene Gallion, Raj Johal, Christopher Corsi, and Sean Pennington, filed concurrently

17   herewith; *see also Moore v. Verizon Communications Inc.*, 2013 WL 4610764, *15 (N.D. Cal.

18   Aug. 28, 2013) (approving awards exceeding $1,000 to class representatives who provided

19   similar assistance to counsel); *Johansson-Dohrmann*, 2013 WL 3864341, *12 (same); *Rigo*,

20   2013 WL 3761400 *8 (describing $2,500 award as "arguably nominal … for more than two

21   years of service [and] well within the acceptable range of approval").  Nothing in the record

22   indicates that the proposed awards were an inducement for their support for the settlement, or

23   that there was any fraud or collusion.  On the contrary, as a result of their efforts, and their

24   decision to bring the case, the class members will benefit substantially:  they will, on average, be

25   made whole or more than whole.  The class representatives' willingness to act as private

26   attorneys general by stepping forward and filing this action should be not merely acknowledged,

27   but lauded and encouraged.  *See Rodriguez*, 563 F.3d at 959 (incentive awards "recognize [class

28   representatives'] willingness to act as a private attorney general"); *see also In re Netflix Privacy*

-37-

1   *Litig.*, 2013 WL 1120801, *11 (N.D. Cal. Mar. 18, 2013) (such awards recognize that

2   "assum[ing] the responsibilities and burdens of acting as representatives" exposed them to

3   "public scrutiny through media coverage of this high profile suit" ).

4         The $1,000 awards that the class representatives seek here are amply justified and should

5   be approved.

6   **IV.    CONCLUSION**

7         If the settlement at issue in this litigation does not qualify for a five-percent increase of

8   the 25% benchmark, it is difficult to imagine what would justify such an increase.  The amount

9   of the settlement and the other benefits it confers upon Settlement Class Members are

10  extraordinary, and each of the criteria that determine whether an increase is warranted are

11  satisfied. In short, the proposed award of attorneys' fees and costs to Class Counsel, as well as

12  the proposed incentive awards to the Class Representatives, are reasonable and appropriate

13  under the governing legal standards.  Accordingly, the Court is respectfully asked to approve

14  them.

15  DATED:  November 13, 2013            Respectfully submitted,

16                                       **THE KRALOWEC LAW GROUP**

17                                       By ___*/s/ Kimberly A. Kralowec*_____
                                         Kimberly A. Kralowec (163158)
18                                       Elizabeth I. Newman (257329)
                                         188 The Embarcadero, Suite 800
19                                       San Francisco, CA 94105
                                         Telephone: 415-546-6800
20                                       Facsimile: 415-546-6801

21                                       *Co-Counsel for the Class*

22                                       **FAZIO | MICHELETTI LLP**

23                                       By ___*/s/ Jeffrey L. Fazio*_____
                                         Jeffrey L. Fazio (146043)
24                                       Dina E. Micheletti (184141)
                                         2410 Camino Ramon, Suite 315
25                                       San Ramon, CA  94583
                                         Telephone:  925-543-2555
26                                       Facsimile:  925-369-0344

27                                       *Co-Lead Class Counsel*

28

-38-

1

CHIMICLES & TIKELLIS LLP

2

By:  /s/ Steven A. Schwartz
Steven A. Schwartz (*pro hac vice*)

3

Timothy N. Mathews (*pro hac vice*)
361 W. Lancaster Avenue

4

Haverford, PA  19041
Telephone:  610-642-8500

5

Facsimile:  610- 649-3633

6

*Co-Lead Class Counsel*

7

CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP

8

9

By:  /s/ Anthony F. Fata
Anthony F. Fata (*pro hac vice*)

10

30 N. LaSalle, Suite 3200
Chicago, IL 60602

11

Telephone: 312-782-4880
Facsimile: 312-782-4485

12

*State Plaintiffs Liaison Counsel*

13

Earl L. Bohachek (55476)

14

LAW OFFICES OF EARL L. BOHACHEK
One Maritime Plaza

15

San Francisco, CA 94111
Telephone: 415-434-8100

16

Facsimile: 415-781-1034

17

Rose F. Luzon (221544)
James C. Shah (260435)

18

SHEPHERD, FINKELMAN, MILLER & SHAH, LLP
401 West A Street

19

Suite 2350
San Diego, CA 92101

20

Telephone:  (619) 235-2416

21

Mark A. Chavez
Dan L. Gildor

22

CHAVEZ & GERTLER LLP
42 Miller Avenue

23

Mill Valley, CA 94941
Telephone: 415-381-5599

24

Facsimile: 315-381-5572

25

*Class Counsel*

26

27

28