STEVE A. MILLER (CA Bar No. 171815)
Steve A. Miller, PC
1625 Larimer Street, No. 2905
Denver, CO 80202
Ph# 303-892-9933
Fax: 303-892-8925
Email: sampc01@gmail.com

JOHN C. KRESS (53396MO)
The Kress Law Firm, LLC
4247 S. Grand Blvd
St. Louis, MO 63111
Ph.#: (314) 631-3883
Fax: (314) 332-1534
Email: jckress@thekresslawfirm.com

MAUREEN CONNORS (0074094OH)
6625 Pearl Road
Parma Heights, OH 44130
Phone: (216) 640-9860
Fax: (216) 504-4049
Email: maureenconnors@maureenconnorslaw.com

JONATHAN E. FORTMAN (40319MO)
Law Office of Jonathan E. Fortman, LLC
10 Strecker Rd., Suite 1150
Ellisville, MO 63011
Ph# (314) 522-2312
Fax: (314) 524-1519
Email: jef@fortmanlaw.com

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: APPLE IPHONE/IPOD WARRANTY LITIGATION<br><br>THIS DOCUMENT RELATES TO: ALL ACTIONS | Case No. CV-10-01610<br><br>JEFFREY SCOTT KESSINGER'S OBJECTIONS TO CLASS ACTION SETTLEMENT AND ATTORNEYS' FEES, & NOTICE OF INTENTION TO APPEAR<br>――――――――――――――<br><br>Date: January 29, 2014<br>　　　Time: 1:30 p.m<br>　　　Place: Courtroom 3 (17th Floor)<br>　　　Judge: Hon. Richard Seeborg |

1

COMES NOW, Objector Jeffrey Scott Kessinger who has standing to bring this Objection

having filed his claim with the Settlement Administrator on October 20, 2013, and has complied with

the information requested for Objecting, (attached hereto, and incorporated by reference herein as

EXHIBIT 1 ) and set forth the following:

**I.     The Settlement is unfair and unreasonable to the majority of the Class Members as it requires submission of documentation and claims forms that are unnecessary and redundant, designed specifically to reduce the claims rate among the Class Members, while Apple has the information necessary to pay claims directly to the Class Members.**

What exactly does a Class Member have to do to get his or her payment?  Well, according to the

parties "It depends" and:

> Direct-Payment Settlement Class Members will be able to obtain a cash payment without submitting a Claim Form. You will be notified by e-mail and/or U.S. mail if you are a Direct-Payment Settlement Class Member.  However, if you are a Direct- Payment Settlement Class Member, you will receive a check only if the Settlement Administrator has your current mailing address, so you should check to ensure that the notice you receive reflects your correct mailing address. You can provide or correct your U.S. mail or email address on the Settlement Website at www.AppleWarrantySettlement.com. The deadline for providing or correcting your mailing address is October 21, 2013. If your mailing address changes after the deadline, you must notify the Settlement Administrator within 45 days after the change at the website above. There is no guarantee that you will receive your payment check if the Settlement Administrator does  not have your current mailing address.
>
> **If you do not receive a notice by e-mail or by U.S. mail advising you that you are a Direct-Payment Settlement Class Member, or if you are unsure whether you are a Direct-Payment Settlement Class Member, then you must submit a valid, timely Claim Form in order to receive money from this settlement.**

(#12-What do I have to do to get a cash payment from the Settlement Fund?)  The problem here is that

in order to receive a check, the Settlement Administrator has to have your correct mailing address.  A

class member will not have that information, since they will not have received the Notice in the first

place- because the Defendant does not have their most recent address.  This will result in many checks

becoming stale, and the parties to the settlement anticipate that this will fund the cy pres benefitting

2

these entities whose interests are unrelated to this litigation.

Notice is simple to provide, and therefore so is the process of making payment directly to the class members, avoiding the unnecessary exercise of requiring the serial number of the device, the approximate date where the warranty was denied, and other information that tends to be forgotten over a period of years.  Consider the arrangements the parties have made to ease the transfer of this very information to the Settlement Administrator:

> Within 10 days after entry of the Conditional Approval Order, Apple shall produce to the Settlement Administrator (a) the names, postal addresses, and email addresses of potential Settlement Class Members and (b) the device type and configuration of Direct –Payment Settlement Class Members' devices eligible for a payment from the Net Settlement fund to enable the Settlement Administrator to determine the amount of such payment as set forth below. Apple will take all reasonable steps necessary to compile this information, including searching all available Apple customer contact databases.  Apple will coordinate with the Settlement Administrator to produce the foregoing information in a format usable by the Settlement Administrator.

(Stlmt Agrmt, Doc # 76-1, p. 16, par. 24).  With this set up, the Settlement Administrator has all the information it needs to determine who receives the benefit, and the amount to bestow.  Therefore, the parties should simply pay out the funds, with Class Members contacting the Settlement Administrator for no other purpose than updating their mailing address.  This would streamline the claims process, and reduce the likelihood of leftover settlement funds, thereby eliminating the need for a cy pres provision. Indeed, the parties have already contemplated providing Notice by mail, and have the necessary provisions to update the Class Members' mailing addresses, to insure that they receive the Notice, including e-mail if necessary (Stlmt Agrmt, Doc # 76-1, p. 16; par.25, 26; p. 17, par. 26 (b) and (c)).

It is also ambiguous as to how long the checks are valid that are issued by the Settlement Administrator.  For those Class Members fortunate enough to receive such checks, it appears that the

checks will only be valid for up to sixty (60) days from the date of issuance. (Stlmt Agrmt, Doc # 76-1, p. 22, par. 38.).  It is also unclear what will occur if such checks are not cashed by such date, as the Settlement Agreement only provides that "The Settlement Administrator shall take appropriate follow-up steps with respect to any Settlement Class Member who has not deposited or cashed their settlement check within 30 and 60 days of mailing." *Id.*

According to the Pocket Guide, "First, consider whether a claims process is necessary at all. The defendant may already have the data it needs to automatically pay the claims of at least a portion of class members who do not opt out." (*Pocket Guide*, p. 30, G. Claims Processes and Response Handling).  While it appears that Direct Payment Class Members will receive their funds, the parties have not divulged the percentage of such persons who are believed to make up this lucky group.

If this Court decides that the parties should not be required to make the claims process a simple and convenient process by simply generating checks to the class members to the addresses that are currently on file , then it should require claims data to be submitted prior to making a decision regarding attorney's fees or cy pres distributions of any sort, so that this Court can have a true understanding of the number of Class Members who benefit from the Settlement.

Sending Class Members their recovery checks without requiring them to provide a claim form is the most expeditious manner of providing the recovery to the class. Everyone who is identified with a valid mailing address should have to do nothing more than wait for their check.  In this way the funds established have the greatest likelihood of being utilized, and will not become subject to a cy pres for a variety of public interest groups and entities to scuffle over to receive the class members' recovery. This can be easily accomplished, since the records are already with the parties as to who is a class member, and who is entitled to a recovery.

This Court should deny the Settlement until such time as the parties agree to disseminate the benefits of the Settlement directly to all Class Members for whom the Defendant has a valid mailing

address, and eliminate the need for claim forms requiring nothing more than Class Members updating their respective mailing addresses if they do not receive their payment.

## II.   The Settlement is unfair as it purports to create a cy pres recovery which is unnecessary and does not meet the standards promulgated in the 9th Circuit for approving a cy pres recovery.

Of the funds remaining due to poor response rate of the Class Members, it is deemed sizable enough that not one, but five (5) cy pres beneficiaries have been selected. (FAQs-#10-What does the Settlement Provide?).  Here is how it works:

> "Non-reversionary" means that none of the money in the Settlement Fund will be returned to Apple. Any money remaining in the Settlement Fund after the payments from the Net Settlement Fund to Settlement Class Members as well as payment of attorneys' fees and costs, and incentive awards to the Class Representatives, will be distributed to one or more of the following organizations upon approval by the Court:
> · Center for Auto Safety
> · Consumer Federation of America
> · Consumers Union
> · National Association of Consumer Advocates
> · National Consumer Law Center

(FAQ's #10- What Does the Settlement Provide?).  Essentially, the settlement provides a cy pres distribution to the pet charities selected by class counsel.  How about the Center for Auto Safety?  What does that have to do with denied warranty claims involving cell phones?  This is a case about cell phones and breach of warranty, not automobiles. The "Center for Auto Safety" is apparently a pet charity of Chavez and Gertler, LLP, a firm that has been appointed Class Counsel by this Court (Stlmt Agrmt, Doc # 76-1, p. 4, par. G). Chavez & Gertler recently promoted the interests of objectors in a class action settlement in the Central District of California, *In re: Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation, Case No.: 8:10 ML 2151 JVS,* that is currently on appeal in the 9th Circuit concerning the cy pres provision of that settlement, and utilized the services of one Clarence M. Ditlow, who is the "Executive Director" of the Center for Auto Safety.  Mr. Chavez used Ditlow to attempt to persuade the trial court in that litigation that the cy

pres component was improper on behalf of Mr. Chavez's clients, Allen Roger Snyder and Linton Stone

Weeks (EXHIBIT 2, attached hereto, and incorporated by reference herein, Declaration of Clarence

Ditlow in Support of Objections of Allen Roger Snyder and Linton Stone Weeks to Cy Pres Provisions

of Class Action Settlement, Doc # 3599, Filed 5/10/13).

     This professional relationship between Class Counsel and the Executive Director for the Center

for Auto Safety alone should give this Court reason to deny the cy pres component of the settlement.

Mr. Ditlow's non-profit has a history of "opposing as well as supporting class-action settlements, and

providing expert testimony." (Doc #3599, EXHIBIT 2, par. 6). Apparently, it appears that Mr. Ditlow's

non-profit can either be identified as a cy pres recipient, or it would be an objector to the settlement.

That is the only explanation that can be drawn for even suggesting that the Center for Auto Safety has

interests aligned with the Class Members in this litigation that would justify a cy pres distribution.

This lawsuit was never about educating consumers concerning automobile safety or accusing

Defendant of not providing "automobile safety research".

     The 9th Circuit will "review a district court's approval of a proposed class action settlement,

including a proposed cy pres settlement distribution, for abuse of discretion." *Dennis v. Kellogg Co,*

*697 F.3d 858, 864 (9th Cir. Sept. 4, 2012) citing Nachshin v. AOL, LLC, 663 F.3d 1034, 1038 (9th Cir.*

*2011).* A trial court abuses its discretion "when it fails to apply the correct legal standard or basis its

decision on unreasonable findings of fact." *Id.*

     It is a fundamental principal that "Appellate review of a settlement agreement is generally

extremely limited", but where class counsel has negotiated a settlement before certification has

occurred requires that courts "must be particularly vigilant not only for explicit collusion, but also for

more subtle signs that class counsel have allowed pursuit of their own self-interest and that of certain

class members to infect the negotiations". *Kellogg Co., 697 F.3rd at 864, citing In re Bluetooth Headset*

*Prods. Liab. Litig., 654 F.3d 935, 947 (9th Cir. 2011).* Therefore, in order to approve a settlement

"requires a higher standard of fairness" along with "a more probing inquiry than may normally be required under Rule 23(e)." *Kellogg Co., 697 F.3rd at 864.* Surviving appellate review under these circumstances requires that "the district court must show it has explored comprehensively all factors" and must give a "reasoned response" to all non-frivolous objections. *Id.* This Court should explore the relationship between Class Counsel, Chavez and Gertler, LLP and the Center for Automobile Safety.

Cy pres is antiquated language for the timeless equitable doctrine "cy pres comme possible", or French for "as near as possible." *Id. at 865.* Historically developed in the area of estates and trusts, as a means of effectuating a testator's intent in making charitable gifts, it has appeared frequently in our federal courts "where the proof of individual claims would be burdensome or distribution of damages costly."*Kellogg Co., 697 F.3rd at 865; Nachshin, 663 F.3d at 1038.*

This Court is aware that "not just any worthy recipient can qualify as an appropriate cy pres beneficiary." *Id.* The 9th Circuit requires that "there be a driving nexus between the plaintiff class and cy pres beneficiaries" *Kellogg Co., 697 F.3rd at 865; Nachshin, 663 F.3d at 1038.* A cy pres award must be "guided by (1) the objectives of the underlying statute(s) and (2) the interests of the silent class members," and must not benefit a group "too remote from the plaintiff class," *Kellogg Co., 697 F.3rd at 865 Six Mexican Workers v. Arizona Citrus Growers, 904 F.2d 1301, 1308 (9th Cir., 1990).*

What do the Plaintiffs have to say about this mandate? Do they pass this rigorous test?

The "Consumer Federation of America" ("CFA") will use the cy pres funds to "educate consumers through easy to read materials concerning ways to avoid and resolve problems arising from consumer warranties and service contracts. These materials would be applicable to telecommunications products and services and would have a nationwide reach." (Stlmt Agrmt, Doc 76-1, Exh. J, "List of Proposed Cy Pres Recipients.", p. 100).

Nothing about this allocation satisfies this Court's requirements under *Kellogg, Co.* None of this has anything to do with the relief sought in this case or the statutes that are the basis of the claims filed

by the Plaintiffs.  The only thing the CFA has in common with the Class Members is that its staff might have used Apple Iphone products.

  And the group benefitting is too remote from the plaintiff class, consisting of a non-profit that is going to provide "easy to read materials" concerning "ways to avoid and resolve problems involving consumer warranties."   The University of Iowa fails the *Kellog* test and cannot receive any cy pres disbursement as a matter of law. The interests of the silent class members primarily focus on not falling prey to consumer fraud involving warranties for cell phones, and not the vague and amorphous promise to help

  Next, the parties propose dumping the remaining funds onto the "Consumers Union" ("CU") for its "public education and investigative reporting" concerning consumer warranties and service contracts. (Stlmt Agrmt., Doc # 76-1, Exh. J, p. 100).  The CU suffers from the same defects as the other non-profits discussed above.  This suit is specifically about cell phone, and breach of the warranty of such product.  The CU's goals, although lofty and perhaps admirable are overly broad and have no nexus with the Class Members in this litigation. None of this has anything to do with the statutes that were the basis underlying this litigation, or the objectives of the lawsuits filed.  The same can be said for the "National Association of Consumer Advocates" ("NACA") and "National Consumer Law Center ("NCLC").  *Id.*

  Without demonstrating to this Court that the cy pres proposed meets this Court's requirements under the test promulgated in *Kellogg Co,* the settlement must be denied. *Kellogg Co., 697 F.3d at 868* ("We do not have the authority to strike down only the cy pres portions of the settlement. It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness and we cannot delete, modify or substitute certain provisions.").  Furthermore, Class Counsel cannot reconcile their proposed pet charities with the more stringent requirements found by the *Kellog* Court:

A cy pres award must be "guided by (1) the objectives of the underlying statute(s) and (2) the interests

of the silent class members," and must not benefit a group "too remote from the plaintiff class,"

 *Kellogg Co.,* 697 F.3rd at 865 *Six Mexican Workers v. Arizona Citrus Growers,* 904 F.2d 1301, 1308

(9th Cir., 1990).

In *Kellogg,* the Court pointed out that the cy pres provision failed the first prong of the test,

because Kellogg was accused of misrepresenting that its cereal improved the attentiveness of the

consumer, these misrepresentations were the basis of the Plaintiffs' cause of action, "not the nutritional

value of Frosted Mini-Wheats. Thus, the appropriate cy pres recipients are not charities that feed the

needy, but organizations dedicated to protecting consumers from or redressing injuries caused by, false

advertising." *Kellogg, Co.,* 697 F.3d at 867.  Likewise, here this lawsuit is not about teaching Class

Members how to read a warranty, or understand a service plan for all consumer products, but it is about

protecting consumers from improper business practices and consumer fraud as it pertains to

telecommunications product warranties. Failure to satisfy the first prong alone causes this settlement to

be denied.

This is a remote interest,-at best. These cy pres beneficiaries have nothing to do with

protecting the consumer from a telecommunications carrier that breaches a warranty for its product.

Indeed, if that is the logic employed and followed, then Apple should simply donate all the funds to to

anyone who uses an Apple Iphone.

The objectives of the underlying statutes as presented by Plaintiff in their Third Amended

Complaint, do not involve safe driving, or driver education.  A simple read of the counts themselves

involve violation of a variety of consumer protection statutes from across the United States, as set forth

in the Table of Contents of their Third Amended Complaint (Doc#2836, p. 4-19).  Many claims in this

litigation involve false advertising, breach of warranty, breach of contract, unfair/deceptive practices.

According to the 9th Circuit, "the UCL is designed to preserve fair competition among business

competitors and protect the public from nefarious and unscrupulous business practices." *Kellogg Co.,*

*697 F.3d at 866.* It was not designed to promote research and education concerning service contracts and warranties.

In the 9th Circuit, "when the selection of cy pres beneficiaries is not tethered to the nature of the lawsuit and the interests of the silent class members, the selection process may answer to the whims and self interests of the parties, their counsel or the court." *Nachshin v. AOL, LLC 663 F.3d 1034, 1039 (9th Cir., 2011)* ("Lawyers and judges have grown accustomed to controlling these pots of money, and they enjoy distributing them to favored charities, alma maters and the like."). It would not be unusual to find out that the planned cy pres distributions are slated to be distributed to business associates of Class Counsel, as is the case with Chavez & Gertler, LLP and their charity, the Center for Auto Safety.

Even if Plaintiffs can somehow satisfy the rigid standards under *Kellog, Co.,* the planned donations still fail. This Court must ensure that the settlement here "retains some connection to the plaintiff class and the underlying claims, however, a cy pres award must qualify as "the next best distribution" to giving the funds directly to class members. " *Kellogg Co., 697 F.3rd at 865; Six Mexican Workers, 904 F.2d at 1309.* This rigorous test of "whether the distribution of the approved class settlement complies with our standards governing cy pres awards" is applied in addition to the trial court "asking whether the class settlement, taken as a whole, is fair, reasonable, and adequate to all concerned." *Kellog Co., 697 F.3rd at 865.*

No argument exists for giving the class recovery to cy pres beneficiaries without first exhausting each and every dollar out of the settlement by giving it to the class members. Class Counsel seems to have forgotten that utilization of the cy pres must be "the next best distribution" to giving the funds directly to the class members.

Approval of this Cy Pres provision will not withstand appellate review, and therefore this Settlement should be denied.

**III.    The Settlement is unfair and should be denied because a conflict of interest exists between Chavez and Gertler, LLP and their business relationship with the charity known as the Center for Auto Safety.**

Chavez and Gertler, LLP have a business relationship with the Executive Director of the non-profit "Center for Auto Safety" (EXHIBIT 2).  The final requirement of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The Ninth Circuit has indicated that "the proper resolution of this issue requires that two questions be addressed: (a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 462 (9th Cir. 2000).*  Here, Class Counsel Chavez and Gertler, LLP have a conflict of interest with the Class Members and the named Plaintiffs, in that their interests diverge from those of the Class Members they purport to represent.  Mr. Chavez has demonstrated in very recent litigation in the Central District of California, that he has a business relationship with one of the proposed cy pres beneficiaries, the "Center for Auto Safety" (EXHIBIT 2).   It appears unlikely that Mr. Chavez will "prosecute the action vigorously on behalf of the class", and has already made arrangements that the Center for Auto Safety has 'first dibs' on any remaining Net Settlement Proceeds that are not paid out to the Class Members. *Point II, Supra.*

Nor did Mr. Chavez disclose this business relationship with the trial court, before advocating that such funds be placed in the control of the Center for Auto Safety.  Indeed, Mr. Chavez is beholden to the interests of the Center for Auto Safety, which so generously provided its expert services In re: Toyota Motor Corp in May of 2013 on behalf of the Mr. Chavez's clients who filed objections in such case concerning the cy pres provision of that Settlement.

California courts do not tolerate such conflicts:

> "it is relatively unimportant whether the status or misconduct claimed to warrant disqualification is proscribed by a particular ethical norm or disciplinary rule or may be characterized as a failure to avoid the

> appearance of impropriety. Since the purpose of a disqualification order
> must be prophylactic, not punitive, the significant question is whether
> there exists a genuine likelihood that the status or misconduct of the
> attorney in question will affect the outcome of the proceedings before the
> court."

*Rotenberg v. Brain Research Labs, LLC* (Cal. App., 2011); *Gregori v. Bank of America*, 207 Call

*App.3d 291 (1989)*.  Here, Chavez and Gertler, LLP are no longer qualified to be Class Counsel, as they

have shown a business relationship with the cy pres beneficiary which stands to be the first to receive

the cy pres funds from this Court, if it were to enter its Order/Judgment.  Nor did Mr. Chavez disclose

this business relationship with the Center for Auto Safety.  At minimum, this is the failure to "avoid the

appearance of impropriety" and this Court can no longer rely on Mr. Chavez and his firm to zealously

represent the interests of the Class Members in this case, particularly since it is highly likely that

millions of dollars will remain behind to be bestowed upon cy pres beneficiaries.

Mr. Chavez's relationship with the Executive Director, Mr. Ditlow of such non-profit has

already effected, or impacted the outcome of these proceedings: such non- profit is the first in line to

receive the cy pres funds, and also has the dubious distinction of having absolutely nothing in common

with the issues in this case or the Class Members.

"The lack of a prohibition on the appearance of impropriety in the Rules of Professional

Conduct does not alter the underlying principle that an attorney owes undivided loyalty to the client."

*Apple Computer, Inc. v. Superior Court*, 126 Cal. App. 4th 1253,  at 1273-1274 (Cal. App., 2005).

Unidentified class members cannot waive a potential conflict of interest. *Cal Pak Delivery, Inc., v.*

*United Parcel Service, Inc.*, 60 Cal. Rptr.2d 207, 213 (Cal. App. 1 Dist., 1997).  It is clear and evident

that Chavez and Gertler, LLP do not have that "undivided loyalty" as they are beholden to the interests

of the non-profit who provides their clients with expert testimony and opinion (EXHIBIT 2).  Nor can

the unidentified Apple Iphone Class Members waive this conflict. *Cal Pak Delivery, supra*.

The general rule in California courts is that "where an attorney violates his or her ethical duties

to the client, the attorney is not entitled to a fee for his or her services. *Cal Pak Delivery, Inc.*, 60 Cal. Rptr2d at 215; *Goldstein v. Lees*, 46 Cal. App. 3d 614 (1975); *Asbestos Claims Facility v. Berry & Berry*, 219 Cal. App.3d 9, 26-27. A trial court finds no reasonable value of attorneys' services because conflict of interest renders the services valueless. *Day v. Rosenthal*, 170 Cal. App.3d 1125, 1162 (1985).

Because Chavez and Gertler, LLP violated their ethical duties to their clients, they are not entitled to a fee for their services. This Court should disregard the Declaration of Mark Chavez for attorney's fees (Doc # 102, filed 11/14/13), and enter an Order specifically barring Chavez and Gertler, LLP from receiving any attorneys fees from this Settlement.

**IV.     The Settlement is unfair to the class members as the parties tout the Defendant's decision to follow the applicable law as means of permitting this Court to provide attorney's fees of 30% of the common fund, when no value can be ascribed to such activity.**

Class Counsel wishes for this Court to consider the "incidental or non-monetary benefits conferred by the litigation" claiming that such benefit "can justify an upward departure from the benchmark" of an award of 25% of the attorney's fees. (Plaintiffs' Motion for Attorney's Fees, Doc #100, p. 37, par. 3). Class Counsel goes on to tout the non-monetary benefit of Apples "policy changes" concerning its former Liquid Damage Policy. *Id. at p. 37-38.* In essence, Class Counsel wants this Court to consider this as a benefit, when it does nothing more than restate a pre existing legal obligation of the Defendant to not breach its warranty with consumers. *Id.*

The problem with warranties, or extensions of them, is that they have zero value unless a class member has an issue that is covered under the warranty. The value of this "benefit" is zero, as it only covers potential defects- not actual occurrences. Moreover, this benefit is meaningless to those class members who no longer possess the phone in question.

The Pocket Guide For Judges, promulgated for the purpose of aiding the judiciary with its decision making in approving- and improving- class action settlements, contains this warning

concerning non-monetary benefits as described above, or a warranty:

Likewise, in cases in which the benefit to the class is nonmonetary (coupons, discounts, warrants, injunctions, and the like), determining the actual value to the class requires looking beyond the face value of nonmonetary or contingent benefits. Redemption data or other evidence of class use is essential. . . In other cases, perhaps a majority, the only reliable test of the benefit to the class will be evidence of class members' use or redemption of the coupons, warrants, or other nonmonetary scrip.

*(Managing Class Action Litigation: A Pocket Guide for Judges, p. 34. Rothstein, Barbara J. &*

*Willging, Thomas E., (Federal Judicial Center, 2010).* Here, Class Counsel should at the very

minimum, be required to demonstrate that class members are utilizing the "Customer Support

Program", including data concerning the number of persons availing themselves of this "benefit".

Understandably, Class Counsel does not attempt to place a value upon such non-monetary relief-

because there is no value to place upon it.

The Pocket Guide makes clear that "in such cases, it is especially importing to link the amount

of any attorney fees with the actual benefit to the class." *(Pocket Guide, p. 34).* Instead, this Court

should give a value that can actually be calculated.

The Pocket Guide provides for Court scrutiny of such ambiguous relief:

A direct way to ensure that you have sufficient information to determine attorney fees in cases with nonmonetary benefits is simply to hold back the portion of any attorney fee awards that is linked with coupons, discounts, or other nonmonetary benefits until after the redemption period has ended and the value of the benefits can be established by calculating class members' actual use.

*(Pocket Guide, p. 34).* If Class Counsel is unwilling to set aside that portion of attorneys' fees that are

attributed to this Program, in order for the Court to establish its true value, then this Court should assess

the value of the Customer Service Program at zero dollars, or refrain from entertaining any valuation of

the Program until such time as the parties provide this Court with rates of utilization of such Program

from the Class Members, and only after such point in time determine the amount of attorneys' fees that

should be awarded based on such valuation.

**V.     The attorneys' fees sought by Class Counsel should be denied by this Court, as the amount sought exceeds the amount permitted in the 9th Circuit.**

14

It is a fundamental concept in class action jurisprudence that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Wininger v. Si Management L.P.,* 301 F.3d 115, 1120 (9th Cir., 2002).

In the 9th Circuit, it is recognized that the benchmark award for attorneys' fees awarded is approximately 25%, with such percentage adjusted downward when the case qualifies as a "megafund". *Vizcaino v. Microsoft Corp.,* 290 F.3d 1043, 1047 (9th Cir., 2002). The fees sought by Class Counsel in this immediate case of a 53 Million Dollar Common Fund are thirty percent (30%) of the common fund.   This Court should not permit Class Counsel to receive 30% of the Common Fund as attorneys fees, until such time that it is confident that the benefits that Class Counsel allege are available to all class members are actually received, and not calculated based upon the cy pres component.

**Conclusion:**

For the reasons outlined above, the Settlement cannot be approved.  Objectors intend to appear at the Fairness Hearing through their Counsel of Record, and reserve the right to cross examine witnesses presented by the parties and introduce evidence based on the Objections lodged above.

WHEREFORE, Objector Jeffrey Scott Kessinger prays that this Court enter its order with the following:

1)  Requiring that Defendant mail payments to all known class members to their last known address, and only require Class Members who cannot be reached by mail with payment to contact the Settlement Administrator to update their mailing address;

2)  Prohibiting the parties from disbursing any funds to any cy pres beneficiaries, and instead taking such remaining funds and paying same to the Class Members;

3)  in the alternative, if a cy pres is permitted, forcing the Plaintiffs to identify beneficiaries that satisfy

this 9th Circuit's rigorous test as promulgated in the _Kellog_ case;

4) Entering an Order specifically barring the law firm of Chavez and Gertler, LLP from receiving any attorney's fees in this matter, and disqualifying the firm as class counsel due to the business relationship the firm has with the cy pres beneficiary the Center for Auto Safety;

5) Issue an Order that the Defendant's abandonment of its past business practice of breaching its warranty with its customers has zero value in terms of calculating the percentage, or an award of attorneys' fees to Class Counsel;

6) Issue an Order that Class Counsels' attorneys' fees shall be awarded based on the amount of money actually recovered, or received by the class as a whole;

7) Issue an Order that the attorneys' fees cannot be based upon a calculation of 30% of the Common Fund, but can be no higher than 25%;

8) Any other relief this Court determines is necessary to meet the interests of justice and facilitate relief to the Class Members.

 /s/ Steve A. Miller
STEVE A. MILLER (CA Bar No. 171815)
Steve A. Miller, PC
1625 Larimer Street, No. 2905
Denver, CO 80202
Ph# 303-892-9933
Fax: 303-892-8925
Email: sampc01@gmail.com

JOHN C. KRESS (53396MO)
The Kress Law Firm, LLC
4247 S. Grand Blvd
St. Louis, MO 63111
Ph.#: (314) 631-3883
Fax: (314) 332-1534
Email: jckress@thekresslawfirm.com

16

MAUREEN CONNORS (0074094OH)
6625 Pearl Road
Parma Heights, OH 44130
Phone: (216) 640-9860
Fax: (216) 504-4049
Email: maureenconnors@maureenconnorslaw.com

JONATHAN E. FORTMAN (40319MO)
Law Office of Jonathan E. Fortman, LLC
10 Strecker Rd., Suite 1150
Ellisville, MO 63011
Ph# (314) 522-2312
Fax: (314) 524-1519
Email: jef@fortmanlaw.com

Jeffrey Scott Kessinger

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of December, 2013 I have filed and served on all parties via this Court's ECF filing system the foregoing Objections to Class Action Settlement and Attorneys' Fee, & Notice of Intention to Appear.
:

s/Steve A. Miller

**EXHIBIT 1**

Apple Warranty Settlement Administrator
P.O. Box 43195
Providence, RI  02940-3195

# AIW

Claim #: AIW- 60016332601
JEFFREY KESSINGER
321 MAKANI ROAD
KAPAA, HI 96746-1250

## Apple iPhone/iPod touch Warranty (Liquid Damage) Settlement

## CLAIM FORM

**Remember**: To be valid, your Claim Form must be completely and accurately filled out, must include all required information, and **must be submitted by 9:00 p.m. Pacific time on October 21, 2013.** Late claims will be denied. Incomplete/inaccurate Claim Forms will also be rejected by the Settlement Administrator, provided, however, a Settlement Class Member who submits an incomplete/inaccurate claim form will have an opportunity to cure any deficiency.

**Claimant Information (* indicates required information):**

The information you provide will be treated as confidential and used for the purposes of this settlement only. Any payment provided in response to your claim will be issued to the name and mailing address you provide on this Claim Form.

| | |
|---|---|
| JEFFREY | KESSINGER |

| |
|---|
| |

| | |
|---|---|
| 321 MAKANI ROAD | |

| | | |
|---|---|---|
| KAPAA | HI | 96746-1250 |

Entering an email address is optional; however, if you provide a current email address, it will facilitate the Settlement Administrator's ability to contact you about your claim if necessary:

| |
|---|
| jscottkessinger@gmail.com |

**Claim Form Page 1 of 3**

## Device Information & Confirmations:

**A.** Device Type (select one):

(X) iPhone

( ) iPod touch

**B.** Affirm that the following statements are true by checking the appropriate boxes:

[X] 1. Apple denied warranty coverage because Apple stated that my iPhone or iPod touch had been damaged by liquid (Apple may have said that the Liquid Contact Indicator or Liquid Submersion Indicator on your iPhone or iPod touch had been triggered (*i.e.*, had turned pink or red)); *AND*

[X] 2. At the time Apple denied warranty coverage, my iPhone or iPod touch was within the coverage period for (you must select one):

(X) Apple's standard one-year limited warranty; *OR*

( ) An AppleCare Protection Plan purchased for my device.

**C.** Approximate Date Warranty Coverage Was Denied:

| 08 | 2008 |
|---|---|

**D.** Location of Apple Store Where Warranty Coverage Was Denied:

| mailed from Kauai, Hawaii | HI |
|---|---|

**E.** Serial Number of Device Denied Warranty Coverage:

| 5K8138NKWH8 |
|---|

If you still have your iPhone or iPod touch, go to "About" in your Settings menu.

If you no longer have your iPhone or iPod touch,
click on https://supportprofile.apple.com/MySupportProfile.do.

If you are prompted for your Apple ID and do not remember it, go to https://appleid.apple.com,
click "Find your Apple ID" and follow the directions on the website.

> **NOTE:** Providing the serial number is the best way to ensure that your claim can be paid. If you do not provide your serial number, the Settlement Administrator will attempt to find it for you, using additional information you must provide. If the Settlement Administrator cannot find your serial number, your claim cannot be paid.

[ ] Check this box if you still cannot find your serial number.

### *Claim Form File Online – Device Verification Page*

### Apple iPhone/iPod touch Warranty (Liquid Damage) Settlement

If you are unable to provide your serial number using the links provided in this claim form, you must complete this section so that the Settlement Administrator can work with Apple to attempt to find it for you. **If your serial number cannot be found, your claim cannot be paid.**

## DEVICE VERIFICATION—NO SERIAL NUMBER AVAILABLE:

**Help us help you:** *The more information you provide, the more likely the Settlement Administrator will be able to validate and pay your claim.* The information you provide will be treated as confidential and used for the purpose of this settlement only.

Apple ID for your iTunes account:

### How to find the serial number if you have your iPhone or iPod touch?

Go to "About" in your Settings menu.

### How to find the serial number if you no longer have your iPhone or iPod touch?

Click on https://supportprofile.apple.com/MySupportProfile.do.

If you are prompted for your Apple ID and do not remember it, go to http://appleid.apple.com, click "Find your Apple ID," and follow the directions on the website.

Email Addresses provided to Apple when registering or purchasing any Apple product:

Telephone numbers provided to Apple when registering or purchasing any Apple product:

If you have an iPhone (even if you are claiming for an iPod touch), please provide your iPhone telephone number (including area code):

## SIGNATURE & DATE:

You must "sign" this claim form by clicking on the box below and entering today's date.

☒ By checking this box, I am affirming, to the best of my recollection, knowledge, and belief, that the information that I have input above is true and correct. I understand that my claim is subject to audit, review and validation using all available information.

\* Date: | 10/20/2013

REMINDERS

**Your Claim Form must be submitted by 9:00 p.m. Pacific on October 21, 2013. Late claims will be denied.**

**All information provided on this Claim Form is subject to verification.**

The amount of the cash payment will vary. Please refer to the Detailed Notice for an explanation and chart of the cash payment amounts.

In re Apple iPhone/iPod Warranty Litigation                                                                    10/20/13 5:06 PM

Home

Claim Form
Instructions

Verify/Update Contact
Information

File a Claim

Detailed Notice

Court Documents

Frequently Asked
Questions

Documents require
Adobe Reader. Download
it free.

 Get
READER®

## Please View and Print/Save Your Claim Form Receipt

This is your receipt for filing your Claim.

Your Claim Number is                    . Please retain this number for your records.

To view a printable copy of your Claim Form formatted as a PDF file, please click on the button below:



*Adobe Reader is required to open this PDF formatted file. Get it here free.*

You do NOT need to mail in the copy of your Claim Form. This is your receipt for filing your Claim Form.
Please keep a copy of your completed Claim Form and copies of any attached documentation for your
records.

For more information about the settlement and the claims filing process, please review the Detailed Notice.

Click here to return to the Home Page.

These documents are formatted as PDF files, and require the Adobe Acrobat Reader
software to be on your system. If your system does not have this software, click on the icon
below to download it, at no charge:

Get
READER®

Home    Claim Form Instructions    Verify/Update Contact Information    File a Claim Online    Detailed Notice    Court Documents    Frequently Asked Questions

EXHIBIT 2

Case 3:10-cv-01610-RS   Document 111   Filed 12/04/13   Page 24 of 33
Case 8:10-ml-02151-JVS-FMO   Document 3599   Filed 05/10/13   Page 1 of 10   Page ID
#:118282

1  CHAVEZ & GERTLER LLP
   MARK A. CHAVEZ (Bar No. 90858)
2  42 Miller Ave.
   Mill Valley, CA  94941
3  Tel: (415) 381-5599
   Fax: (415) 381-5572
4
   *Attorneys for Objecting Class Members*
5  *Allen Roger Snyder and Linton Stone Weeks*

6

7

8              **UNITED STATES DISTRICT COURT**

9            **CENTRAL DISTRICT OF CALIFORNIA**

10

11  IN RE: TOYOTA MOTOR CORP.          Case No:  8:10 ML2151 JVS (FMOx)
    UNINTENDED ACCELERATION
12  MARKETING, SALES PRACTICES,
    AND PRODUCTS LIABILITY            **DECLARATION OF CLARENCE**
13  LITIGATION                        **DITLOW IN SUPPORT OF**
                                      **OBJECTIONS OF ALLEN ROGER**
14                                    **SNYDER AND LINTON STONE**
                                      **WEEKS TO CY PRES**
15                                    **PROVISIONS OF CLASS ACTION**
                                      **SETTLEMENT**
16
17  THIS DOCUMENT RELATES TO:         Date: June 14, 2013
18                                    Time: 9:00 a.m.
    ALL ECONOMIC LOSS CASES
19                                    Place: Courtroom 10C
                                      Judge: Hon. James V. Selna
20

21

22

23

24

25

26

27

28
   DECLARATION OF CLARENCE DITLOW IN SUPPORT OF OBJECTIONS OF ALLEN ROGER SNYDER
   AND LINTON STONE WEEKS TO CY PRES PROVISIONS OF CLASS ACTION SETTLEMENT

Case 3:10-cv-01610-RS   Document 111   Filed 12/04/13   Page 25 of 33
Case 8:10-ml-02151-JVS-FMO   Document 3599   Filed 05/10/13   Page 2 of 10   Page ID
#:118283

I, Clarence M. Ditlow, declare as follows:

1.     I am the Executive Director of the Center for Auto Safety (the "Center"), a non-profit public interest organization that consumer advocate Ralph Nader and the Consumers Union founded in 1970, and I have served in that capacity since 1976.

2.     Neither I nor the Center has a financial stake in this litigation.  To the contrary, I am submitting this declaration in support of the objections of Allen Roger Snyder and Linton Stone Weeks to the proposed settlement of this lawsuit because the Center shares their concerns that the Automobile Safety and Education Program portion of the settlement will not benefit class members and does nothing to detect and eliminate defects in electronic throttle control systems in Toyota vehicles which cause unintended acceleration ("UA").

3.     I have a Bachelor of Science degree in Chemical Engineering from Lehigh University (1965), a J.D. degree from Georgetown University (1970), and an L.L.M. degree from the Harvard law School (1971).  I received the Consumer Lawyer of the Year award from the Washington, D.C. bar Association and the Salzburg Medallion from Syracuse University in 1987.  I have authored several books, including *The Lemon Book:  Auto Rights* (Moyer Bell 1990) with Ralph Nader, *Little Secrets of the Auto Industry:  Hidden Warranties Cost Billions of Dollars* (Moyer Bell 1994) with Ray Gold and *Sudden Acceleration: The Myth of Driver Error* (CALCE EPSC Press, University of Maryland 2003).  I am also the chief editor of *Automobile Design Liability*, a six volume work published by West, and supplemented annually, on state and federal regulation of the automobile.

4.     The Center has approximately 15,000 members who reside in all 50 states and the District of Columbia. The Center is a member of the Consumer Federation of America, and is dedicated to, among other things, promoting motor vehicle safety, ensuring that defective and unsafe vehicles and automotive

1

Case 3:10-cv-01610-RS   Document 111   Filed 12/04/13   Page 26 of 33
Case 8:10-ml-02151-JVS-FMO   Document 3599   Filed 05/10/13   Page 3 of 10   Page ID
#:118284

1   equipment are removed from the road, and ensuring that consumers' interests are

2   protected in matters relating to motor vehicles generally.  The Center is concerned

3   about defects in modern electronics and computers in motor vehicles.  *See*

4   http://www.autosafety.org/campaigns/223365.

5        5.       Since the 1970s, the Center has worked to ensure that consumers

6   have adequate safety information before they purchase automobiles, to remove

7   defective and unsafe automobiles from the road, and to improve the quality and

8   reduce the cost of automotive repairs.  The Center advocates before Congress,

9   administrative agencies, and the courts on issues related to auto safety.  Examples

10  of the Center's many accomplishments include the following:

11       ·   helping to secure lemon laws in every state;

12       ·   working for the recall of the infamous Ford Pinto for exploding gas
13           tanks and the Firestone 500 and Wilderness ATX tires for failures in
             use.

14       ·   exposing General Motors pickups with side saddle gas tanks that
15           resulted in more than 1,500 people being burned to death;

16       ·   advocating for state laws to force manufacturers to disclose secret
17           warranties on cars, laws that will save consumers billions of dollars
             each year;

18       ·   advocating for auto safety and highway standards that helped lower the
19           death rate on America's roads from 5.2 per 100 million miles traveled
20           in 1969 to 1.1 in 2011; and

21       ·   filing the first defect petition for a Toyota UA recall on 1983-84
22           Camry's in 1986 which were later recalled in 1990 for a cruise control
             computer short circuit.

23       6.       The Center has also played an active role in class action litigation

24  — opposing as well as supporting class-action settlements, and providing expert

25  testimony .The Center has participated in class actions as an objector and as legal

26  counsel to objectors in a number of automotive class actions, including *In re*

27  *General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768

28
                                        2
     DECLARATION OF CLARENCE DITLOW IN SUPPORT OF OBJECTIONS OF ALLEN ROGER SNYDER
        AND LINTON STONE WEEKS TO CY PRES PROVISIONS OF CLASS ACTION SETTLEMENT

Case 3:10-cv-01610-RS  Document 111  Filed 12/04/13  Page 27 of 33
Case 8:10-ml-02151-JVS-FMO  Document 3599  Filed 05/10/13  Page 4 of 10  Page ID
#:118285

1    (3d Cir. 1995), *cert. denied sub nom. GMC v. French*, 64 USLW 3241 (Oct. 3,

2    1995); *Bloyed v. General Motors Corp.*, 881 S.W.2d 422 (Tex. App. 1994), *aff'd*

3    916 S.W.2d 949 (Tex. 1996); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir.

4    1998); *West v. Carfax, Inc.*, Case No. 04-CV-1898 (Ohio Ct. Comm. Pl., Trumble

5    County 2004); *Ford Explorer Cases*, Case Nos. JCPP 4266 & 4270 (Sacramento

6    County Super. Ct. 2008); *True v American Honda Motor Co.*, 749 F.Supp 2d 1052

7    (C.D.Cal. 2010).  I have appeared as an expert witness (at trial and in connection

8    with various law-and-motion proceedings) on behalf of class-action plaintiffs in a

9    number of cases, including *Howard v. Ford Motor Co.*, Case No. 763785-2

10    (Alameda Super. Ct. 2000); *Annelli v. Ford Motor Co.*, 2007 WL 3087960 (Conn.

11    Super. Ct. 2007); *Trew v. Volvo Cars of No. Am. LLC*, 2007 WL 22339210 (E.D.,

12    Cal. 2007); and *Anderson v. General Motors Corp.*, Case No. JCCP 4396 (Los

13    Angeles Super. Ct. 2007); and on behalf of class-action defendants in such cases as

14    *Avery v. State Farm Mut. Automobile Ins. Co.*, 216 Ill.2d 100 (Ill. 2005), *cert.*

15    *denied,* 547 U.S. 1003 (2006), and a related case entitled *Smith v. Allstate Insurance*

16    *Co.*, Case No. 03-L-125 (Ill. Cir. Ct. 2003), among others.

17         7.      I have also testified about motor vehicle-related issues before

18    Congressional committees more than 50 occasions.  For example, the Center was

19    the only consumer or auto safety group to be invited to testify before both House

20    and Senate Committees in 2010 regarding the very issue at the heart of this

21    litigation — unintended acceleration (UA) in Toyota vehicles.  The Center was also

22    invited to present testimony on amendments to the National Traffic and Motor

23    Vehicle Safety Act to upgrade safety standards and the National Highway Traffic

24    Safety Administrations ability to advance motor vehicle safety and hold auto

25    companies accountable as the industry moved to more electronics in automobiles.

26    See:

27

28

DECLARATION OF CLARENCE DITLOW IN SUPPORT OF OBJECTIONS OF ALLEN ROGER SNYDER
AND LINTON STONE WEEKS TO CY PRES PROVISIONS OF CLASS ACTION SETTLEMENT

- Statement of Clarence M. Ditlow, Executive Director, Center for Auto Safety, On S. 3302, The Motor Vehicle Safety Act of 2010, Before the Senate Commerce, Science & Transportation Committee - 5/19/10

- Statement of Clarence M. Ditlow, Executive Director, Center for Auto Safety, On Proposed Motor Vehicle Safety Act of 2010, Before the Subcommittee on Commerce, Trade, and Consumer Protection, House Energy and Commerce Committee - 5/6/10

- Statement of Clarence M. Ditlow, Executive Director, Center for Auto Safety, On Toyota Sudden Unintended Acceleration Before the Senate Commerce, Science & Transportation Committee - 3/2/10

- Statement of Clarence M. Ditlow, Executive Director, Center for Auto Safety, On Toyota Sudden Unintended Acceleration Before the House Oversight & Government Reform Committee - 2/24/10

8.      I am very knowledgeable about Toyota Unintended Acceleration as shown by the invitations to testify before the US Congress multiple times as shown above and by my presentation before the National Academy of Sciences on Unintended Acceleration. The Center has a web page on Toyota UA at www.autosafety.org/toyota-sudden-acceleration. I have reviewed the Settlement documents in this litigation as well as Operative Third Amended Economic Loss Master Consolidated Complaint (hereinafter "Amended Master Complaint").

9.      The lawsuit is all about defects in Toyota's with electronic throttle control systems ("ETCS" or "ETCS-I"). The lawsuit is not about defective drivers or how driver error caused UA. Indeed, driver error is Toyota's defense to defects in its vehicles.

10.      Plaintiffs alleged: "Toyota promised that these new systems would operate safely and reliably. This promise turned out to be false in several material respects. In reality, Toyota concealed and did not fix a serious quality and

4

DECLARATION OF CLARENCE DITLOW IN SUPPORT OF OBJECTIONS OF ALLEN ROGER SNYDER AND LINTON STONE WEEKS TO CY PRES PROVISIONS OF CLASS ACTION SETTLEMENT

Case 3:10-cv-01610-RS   Document 111   Filed 12/04/13   Page 29 of 33
Case 8:10-ml-02151-JVS-FMO   Document 3599   Filed 05/10/13   Page 6 of 10   Page ID
#:118287

1   safety problem plaguing all ETCS cars – the vehicles had a propensity to run away

2   or accelerate contrary to the driver's intent that was greater in vehicles without

3   ETCS."   Amended Master Complaint, ¶ 2.  "Despite notice of the SUA defect in

4   ETCS vehicles, Toyota did not disclose to consumers that its vehicles – which

5   Toyota for years had advertised as "safe" and "reliable" – were in fact not as safe or

6   reliable as a reasonable consumer expected due to the heightened risk of unintended

7   acceleration."  Amended Master Complaint, ¶ 9.  Plaintiff's further alleged "Toyota

8   has sent tens of thousands of letters to UA victims falsely claiming that their UA

9   event was caused by driver error."  Amended Master Complaint, ¶ 363.

10          11.     Even after the Toyota UA recalls in 2009 and 2010, Plaintiffs

11   alleged: "SUA events kept occurring, even in vehicles that did not have floor mats

12   and vehicles that were not subject to the sticky pedal recall.  In 2010 there were

13   14,000 UA customer complaints investigated by Toyota, most of these vehicles had

14   supposedly been "fixed" by the sticky pedal and floor mat recalls.  For 99% of these

15   UA complaints Toyota concluded "NTF," i.e., no trouble found and has wrongfully

16   blamed the incidents on driver error, and thus has not fixed the cause of the UA in

17   these vehicles."  Amended Master Complaint, ¶ 10.  "Toyota has not disclosed that

18   for the period after the recalls through January 2011 over 300 complaints of SUA

19   have been filed with NHTSA."  Amended Master Complaint, at ¶ 362.

20          12.     The need to determine the failure mode of UA in Toyota's

21   continues after the recalls because: "Secretly, Toyota has received credible reports

22   of SUA events on vehicles that were subject of both recalls, including an incident

23   with videotape evidence that the driver was attempting to brake the vehicle. Toyota

24   has not provided these reports to NHTSA or revealed these facts to the public or at

25   its webinars."  Amended Master Complaint, at ¶ 361.

26

27

28

5

DECLARATION OF CLARENCE DITLOW IN SUPPORT OF OBJECTIONS OF ALLEN ROGER SNYDER
AND LINTON STONE WEEKS TO CY PRES PROVISIONS OF CLASS ACTION SETTLEMENT

Case 3:10-cv-01610-RS   Document 111   Filed 12/04/13   Page 30 of 33
Case 8:10-ml-02151-JVS-FMO   Document 3599   Filed 05/10/13   Page 7 of 10   Page ID
#:118288

1      13.      The Amended Master Complaint is replete with allegations that

2  Toyota concealed information on UA from the National Highway Traffic Safety

3  Administration ("NHTSA") prior to the recalls.  See e.g., ¶ 188-97. In fact, NHTSA

4  fined Toyota $16.375 million over the sticky pedal recall on April 19, 2010

5  (http://www.nhtsa.gov/PR/DOT-71-10) and an additional $16.375 million over the

6  trapped floor mat recall on December 20, 2010 (http://www.nhtsa.gov/PR/DOT-

7  216-10). In both cases, Toyota violated the National Traffic and Motor Vehicle

8  Safety Act by knowing about the defects and failing to do timely recalls.

9      14.      The Amended Master Complaint is replete with examples of

10  vehicle related failure modes that cause UA in Toyota Vehicles.  Amended Master

11  Complaint, ¶¶ 364-378. The Amended Master Complaint contains no allegations

12  that driver error caused UA in Toyota vehicles or that drivers were not educated.

13  Indeed, the Complaint highlights the tragic Saylor UA crash that killed four people

14  in a 2009 Lexus ES 350.  The driver, Mark Saylor, was a 19-year veteran of the

15  California Highway Patrol who was a highly trained and experienced driver.

16  Amended Master Complaint, ¶¶ 268-275.

17      15.      Section II (A)(6) of the Settlement Agreement in this lawsuit

18  creates a $30 million cy pres fund for an Automobile Safety Research and

19  Education Program (hereinafter "Research and Education Program").  Settlement

20  Agreement Exhibit 16. Plaintiffs' Memorandum in Support of Plaintiffs' Motion for

21  Final Approval Of Class Action Settlement (hereinafter "Plaintiffs'

22  Memorandum"), The $30 million Automobile Safety Research and Education Fund,

23  § IV.A.1.c.

24

25      16.      The Research and Education Program has three components -

26  (1) an $800,000 consumer study on defensive driving techniques and proper use of

27  vehicle safety systems, (2) a $14.2 million driver education media campaign, and

28

6

DECLARATION OF CLARENCE DITLOW IN SUPPORT OF OBJECTIONS OF ALLEN ROGER SNYDER
AND LINTON STONE WEEKS TO CY PRES PROVISIONS OF CLASS ACTION SETTLEMENT

Case 3:10-cv-01610-RS   Document 111   Filed 12/04/13   Page 31 of 33
Case 8:10-ml-02151-JVS-FMO   Document 3599   Filed 05/10/13   Page 8 of 10   Page ID
#:118289

1   (3) a $15 million research program into active safety features, vehicle control, and

2   driver attention.  Plaintiffs' Memorandum, § IV.A.1.c.(1)-(3).

3        17.        Parts (1) and (2) of the Research and Education Program not

4   only have nothing to with the underlying cause of action but also will not provide

5   any safety benefits to class members.  The underlying cause of action relates to

6   defective electronic control systems and Toyota's cover-up of the defects by

7   blaming driver error.  To provide cy pres funding for driver education would

8   legitimize Toyota's cover-up.  Furthermore, driver education programs have been

9   dismal flops in improving vehicle safety.

10        18.        The single most life saving measure a driver can take is to

11   buckle his or her seat belt.  Well over a hundred million dollars have been spent on

12   educational campaigns to get drivers to buckle up with little, if any, success since

13   seat belts became standard in the mid-1960's.  According to NHTSA:

14
15   > Seat belts were 1st installed in passenger cars in the late 1950s, and
16   > their installation in all new vehicles was required in 1968. About
17   > the same time, several public awareness efforts were implemented
18   > in the United States (as well as in Australia) to encourage seat belt
19   > use. Perhaps the most widely known of the early U.S. efforts was
20   > the *Buckle Up for Safety* campaign sponsored by the National
21   > Safety Council in 1968. This was an extensive public service
22   > campaign that was recognized and remembered by a high
23   > percentage of the public. However, this campaign appeared to have
24   > little, if any, effect on seat belt use. Observational surveys
25   > conducted by NHTSA in 19 cities across the United States found
26   > that seat belt use by drivers was only about 11% as late as 1979
27   > (Phillips, 1983). Other public information programs were
28   > implemented by the automobile industry in Michigan, one of
    > which was a paid media campaign, but neither produced a
    > substantial increase in use (e.g., Oakland County Traffic
    > Improvement Association, 1969, and Motorists Information
    > Institute, 1978)." *Strategies to Increase Seat Belt Use: An Analysis
    > of Levels of Fines and the Type of Law*, DOT HS 811413, p.7
    > (November 2010).

7

1      19.    The driver education campaigns in Parts (1) and (2) of the

2  Research and Education Program involve tasks far more complex than that in the

3  unsuccessful seat belt education which had a simple message that everyone could

4  understand - Buckle Up for Safety. Yet Buckle Up for Safety and similar seat belt

5  use campaigns failed. It is simply impossible to teach far more complex "defensive

6  driving skills, the proper use of technology, and the most important vehicle safety

7  errors associated with UA and driver attention" in a "combination of print,

8  television, Internet, and radio advertising and public service announcements" as

9  proposed under Part (2) of the Research and Education Program. Moreover

10  emergency situations are rare events, and public announcements are soon forgotten

11  so any remotely possible benefits are fleeting.

12      20.    Officer Mark Saylor with 19 years of experience with California

13  Highway Patrol had hands on driver training but was unable to avoid the UA crash

14  that killed him and three others. The media campaign envisioned by Parts (1) and

15  (2) of the Research and Education Program does not begin to compare to on track

16  emergency driving courses and will not deliver better drivers on the road.

17      21.    The safety research program in Part (3) of the Research and

18  Education Program covers areas of safety unrelated to the underlying cause of

19  action which is defects in Toyota vehicles that cause UA. The Research and

20  Education Program does not include any research programs on vehicle electronic

21  failure modes as alleged in the Amended Master Complaint, ¶¶ 364-378. If defects

22  in electronic throttle control systems are found and corrected, then the driver does

23  not have to be trained for the emergency unintended acceleration event because it

24  doesn't occur. It is far better to cure unintended acceleration rather than "targeting

25  the symptoms of unintended acceleration." Plaintiffs' Memorandum, p. 23.

26      22.    As shown in Attachment A to this declaration, a research program

27  could and should be implemented to address the underlying issue of failures in

28

8

DECLARATION OF CLARENCE DITLOW IN SUPPORT OF OBJECTIONS OF ALLEN ROGER SNYDER
AND LINTON STONE WEEKS TO CY PRES PROVISIONS OF CLASS ACTION SETTLEMENT

Case 3:10-cv-01610-RS   Document 111   Filed 12/04/13   Page 33 of 33
Case 8:10-ml-02151-JVS-FMO   Document 3599   Filed 05/10/13   Page 10 of 10   Page ID
#:118291

1   electronic systems and controls in modern vehicles. Such research would benefit

2   the class members far more than the Research and Education Program in the

3   proposed settlement.

4

5       I declare under penalty of perjury under the laws of the United States that

6   the foregoing is true and correct, and that this declaration was executed at

7   Washington, D.C., on May 10, 2013.

8

9                              Clarence M. Ditlow

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

9

DECLARATION OF CLARENCE DITLOW IN SUPPORT OF OBJECTIONS OF ALLEN ROGER SNYDER
AND LINTON STONE WEEKS TO CY PRES PROVISIONS OF CLASS ACTION SETTLEMENT