PAGES 1-77

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE RICHARD SEEBORG

IN RE:  APPLE IPHONE/IPOD          )
WARRANTY LITIGATION                )  NO. 10-1610 RS
                                   )
THIS DOCUMENT RELATES TO:          )
ALL ACTIONS                        )
                                   )
                                   ) SAN FRANCISCO, CALIFORNIA
                                   ) WEDNESDAY
                                   ) JANUARY 29, 2014
_____ _____) 1:30 O'CLOCK P.M.


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**FOR PLAINTIFFS:**          **FAZIO MICHELETTI LLP**
                             2410 CAMINO RAMON
                             SUITE 315
                             SAN RAMON, CALIFORNIA 94583
                     BY:     **JEFFREY L. FAZIO, ESQUIRE**
                             **DINA MICHELETTI, ATTORNEY AT LAW**
AND

                             **KRALOWEC LAW**
                             THE KRALOWEC LAW GROUP
                             **188 THE EMBARCADERO, SUITE 800**
                             SAN FRANCISCO, CALIFORNIA 94105
                     BY:     **KIMBERLY A. KRALOWEC, ATTORNEY AT LAW**



FURTHER APPEARANCES ON NEXT PAGE.

***REPORTED BY:   KATHERINE WYATT, CSR 9866, RMR, RPR***

```
 1   FURTHER APPEARANCES:

 2   ALSO FOR PLAINTIFFS:

 3   CHAVEZ & GERTLER LLP

 4   42 MILLER AVENUE

 5   MILL VALLEY, CALIFORNIA 94941

 6   BY:  MARK A. CHAVEZ, ESQUIRE

 7   AND

 8   EARL L. BOHACHEK, ATTORNEY AT LAW

 9   1108 FIFTH AVENUE

10   THIRD FLOOR

11   WESTAMERICA BANK BUILDING

12   SAN RAFAEL, CALIFORNIA 94901

13   AND

14   CHIMICLES& TIKELLIS LLP

15   ONE HAVERFORD CENTRE

16   361 WEST LANCASTER AVENUE

17   HAVERFORD, PA. 19041

18   BY:  STEVEN A. SCHWARTZ, ESQUIRE

19        TIMOTHY N. MATHEWS, ESQUIRE

20   AND

21   CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP

22   30 N. LASALLE STREET

23   SUITE 3200

24   CHICAGO, ILLINOIS 60602

25   BY:  ANTHONY F. FATA, ESQUIRE
```

```
 1   APPEARANCES CONTINUED              MR. CHAVEZ

 2   FURTHER APPEARANCES:

 3   FOR DEFENDANT:

 4   MORRISON & FOERSTER

 5   425 MARKET STREET

 6   SAN FRANCISCO, CALIFORNIA 94105-2482

 7   BY:  GEORGE C. HARRIS, ESQUIRE

 8        PENELOPE A. PREOVOLOS, ATTORNEY AT LAW

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    JANUARY 29, 2014                        1:30 O'CLOCK P.M.

 2

 3                    P R O C E E D I N G S

 4        THE CLERK:  CALLING CASE C 10-1610, IN RE: APPLE

 5    IPHONE/IPOD WARRANTY LITIGATION.

 6        COUNSEL, PLEASE STATE YOUR NAME.

 7        MS. MICHELETTI:  DINA MICHELETTI, FAZIO MICHELETTI,

 8    CO-LEAD COUNSEL FOR THE PLAINTIFF.

 9        THE COURT:  GOOD AFTERNOON.

10        MR. SCHWARTZ:  STEVE SCHWARTZ FROM CHIMICLES & TIKELLIS,

11    CO-LEAD COUNSEL FOR THE PLAINTIFF.

12        THE COURT:  GOOD AFTERNOON.

13        MR. MATHEWS:  TIM MATHEWS ALSO FROM CHIMICLES & TIKELLIS.

14        THE COURT:  GOOD AFTERNOON.

15        MR. CHAVEZ:  GOOD AFTERNOON, YOUR HONOR.  MARK CHAVEZ FOR

16    PLAINTIFFS.

17        THE COURT:  GOOD AFTERNOON.

18        MS. KRALOWEC:  GOOD AFTERNOON, YOUR HONOR.  KIM KRALOWEC

19    WITH THE KRALOWEC LAW GROUP FOR THE PLAINTIFFS.

20        THE COURT:  GOOD AFTERNOON.

21        MR. FATA:  GOOD AFTERNOON.  ANTHONY FATA, F-A-T-A, ON

22    BEHALF OF PLAINTIFFS AND THE CLASS.

23        THE COURT:  GOOD AFTERNOON.

24        MR. BOHACHEK:  GOOD AFTERNOON, YOUR HONOR.  EARL BOHACHEK,

25    COUNSEL FOR PLAINTIFFS.
```

```
1          THE COURT:  GOOD AFTERNOON.

2          MR. FAZIO:  GOOD AFTERNOON, YOUR HONOR.  JEFFREY FAZIO,

3   FAZIO MICHELETTI FOR THE PLAINTIFFS.

4          THE COURT:  GOOD AFTERNOON.

5          MS. PREOVOLOS:  GOOD AFTERNOON, YOUR HONOR.  PENELOPE

6   PREOVOLOS FOR APPLE INC.

7          THE COURT:  GOOD AFTERNOON.

8          MR. HARRIS:  GOOD AFTERNOON, YOUR HONOR.  GEORGE HARRIS

9   ALSO FOR APPLE.

10          THE COURT:  GOOD AFTERNOON.

11          THIS MATTER IS ON CALENDAR FOR FINAL APPROVAL HEARING.  I

12   HAVE READ THROUGH THE PAPERS THAT WERE SUBMITTED THAT DETAIL

13   THE PROPOSED SETTLEMENT AND SETTLEMENT CLASS, AND I AM FAMILIAR

14   WITH THIS CASE FROM BEFORE.

15          WHAT I'LL DO IS I'LL ASK WHICHEVER PLAINTIFF

16   REPRESENTATIVE THAT WANTS TO ADDRESS THE QUESTION TO JUST GIVE

17   ME THE RUNDOWN AGAIN OF THE BASIC TERMS.

18          I WILL NOT HIDE THE BALL ON YOU.  I THINK THIS, AS I THINK

19   I INDICATED AT PRELIMINARY APPROVAL, I THINK THE SUBSTANCE OF

20   THE SETTLEMENT APPEARS TO BE A FAIR, REASONABLE AND ADEQUATE,

21   SOLID SETTLEMENT, GIVEN THE CLASS MEMBERS ARE OBTAINING WHAT

22   APPEARS TO BE VIRTUALLY FULL RECOVERY.

23          SO I AM INCLINED TO THINK THERE AREN'T ANY PROBLEMS IN

24   THAT REGARD.  THEN, I WANT TO TALK A LITTLE ABOUT THE

25   ATTORNEYS' FEES AND DISCUSS WHERE WE GO FROM THERE.  BUT THAT'S
```

1    SOMEWHAT SEPARATE AND APART FROM THE MERITS OF THE SETTLEMENT.

2         SO WHO WOULD LIKE TO JUST GIVE ME A RUNDOWN OF THE TERMS?

3    AND IT CAN BE IN AN ABBREVIATED FASHION.  I HAVE GONE THROUGH

4    WHAT YOU SUBMITTED BUT --

5         MS. MICHELETTI:  CERTAINLY.  I WILL DO SO, YOUR HONOR.

6    THANK YOU.

7         THIS IS A $53 MILLION NONCASH -- I'M SORRY -- NON

8    REVERSIONARY ALL CASH SETTLEMENT.  WE HAVE DONE AN EXTENSIVE

9    NOTICE CAMPAIGN.  AND AT THE END OF THE DAY WE HAVE 137,000

10   DIRECT PAY SETTLEMENT CLASS MEMBERS.

11        THESE FOLKS WILL BE GETTING CHECKS WITHOUT EVER HAVING TO

12   SUBMIT A CLAIM FORM.  AND THEN ANOTHER 25,000 OR SO PEOPLE WHO

13   SUBMITTED CLAIM FORMS, MOST OF THEM ONLINE, ENTIRELY ON LINE AT

14   THEIR CHOOSING.

15        AND AS A RESULT THE $53 MILLION REPRESENTS AN AGGREGATE

16   GROSS RECOVERY OF 159 PERCENT OF THE AVERAGE AMOUNTS THAT THE

17   SETTLEMENT CLASS MEMBERS PAID TO APPLE FOR REPLACEMENT DEVICES.

18        AND EVEN IF YOUR HONOR GRANTS OUR FEE PETITION IN FULL

19   THEY WILL BE RECEIVING APPROXIMATELY 112 PERCENT OF THEIR

20   AVERAGE LOSSES.  AND THAT'S APPROXIMATELY $229 A PERSON.

21        THE COURT:  AND THE RELEASE IN THIS CASE IS FOCUSED ON THE

22   CLAIMS IN THE CASE, AND EXCLUDES PERSONAL INJURY, THAT SORT OF

23   THING.

24        MS. MICHELETTI:  IT NOT ONLY IS FOCUSED ON THE CLAIMS, BUT

25   IT IS LITERALLY LIMITED TO PEOPLE WHO WERE DENIED WARRANTY

```
 1    COVERAGE.  SO IT'S NOT PER DEVICE OR DEVICE OWNER.  IT'S PEOPLE
 2    WHO WERE AFFECTED.  AND, YES, IT EXCLUDES PERSONAL INJURY.  IT
 3    IS ABOUT AS NARROW A RELEASE AS YOU WILL FIND IN A CLASS
 4    ACTION, AND THAT WAS DELIBERATE.
 5        THE COURT:  THERE WAS A BIT OF ACTIVITY AT THE END OF
 6    DECEMBER WHERE IT LOOKED LIKE THERE WERE -- WELL, APPEARS THAT
 7    WE'VE GOT -- I THINK THERE WERE FOUR OBJECTORS.  AND SEVERAL, I
 8    GUESS, ALL NOW HAVE FALLEN BY THE WAYSIDE.
 9        BUT I KNOW THAT I WAS CONTACTED WITH RESPECT TO SOME
10    DISPUTE, AND I REFERRED IT TO JUDGE RYU.  AND AS I UNDERSTAND
11    IT FROM LOOKING AT THE DOCKET THERE WAS A FLURRY OF ACTIVITY,
12    BUT THEN IT ALL DIED OUT.
13        CAN YOU GIVE ME AN UPDATE ON WHAT TRANSPIRED?
14        MS. MICHELETTI:  ABSOLUTELY.  I'M GOING TO START BY
15    TELLING YOU WE ONLY HAD 23 OPT-OUTS, WHICH IS PHENOMENAL.  WE
16    HAD ONE OBJECTOR.  ONLY ONE SETTLEMENT CLASS MEMBER OBJECTED.
17    AND THAT WAS PART OF THE FLURRY OF ACTIVITY THAT YOUR HONOR
18    SAW.
19        THAT WAS JEFFREY SCOTT KESSINGER.  AND MR. KESSINGER IS A
20    PROFESSIONAL OBJECTOR.  HE WAS REPRESENTED BY FOUR PROFESSIONAL
21    OBJECTOR COUNSEL.  WE SOUGHT DISCOVERY.
22        MAGISTRATE JUDGE RYU GRANTED THE DISCOVERY VIRTUALLY IN
23    FULL.  AND PAR FOR THE COURSE THE PROFESSIONALS LITERALLY AS
24    THE MAGISTRATE JUDGE LEFT THE BENCH, KESSINGER'S COUNSEL TURNED
25    TO ME AND ASKED IF WE WOULD ALLOW HIM TO WITHDRAW THE OBJECTION
```

```
1    IN EXCHANGE FORGO THE DISCOVERY THAT WE HAD BEEN GRANTED.

2        SO I THINK THAT SPEAKS VOLUMES FOR BOTH THE MERITS OF HIS

3    OBJECTION AND, OF COURSE, HIS MOTIVATION.

4        THE COURT:  SO AS WE SIT HERE NOW THERE ARE NO OBJECTIONS.

5        MS. MICHELETTI:  ZERO CLASS MEMBERS HAVE OBJECTED.  ZERO.

6        THE COURT:  OKAY.  AND THE RECORD WILL REFLECT THAT THE

7    CASE HAS BEEN CALLED --

8        MS. MICHELETTI:  THERE IS --

9        THE COURT:  -- AND I DON'T BELIEVE ANYONE HAS APPEARED

10   WITH A REQUEST TO ACT AS AN OBJECTOR IN THIS INSTANCE.

11       MS. PREOVOLOS.

12       MS. PREOVOLOS:  I JUST WANT TO BE CLEAR AND CANDID.  THIS

13   ISN'T A DISAGREEMENT WITH PLAINTIFFS.  SO THERE ARE TWO

14   OBJECTORS, PSEUDO, PURPORTED OBJECTORS, BRADSHAW AND CASEY.

15   NEITHER ARE ACTUALLY CLASS MEMBERS FOR REASONS I CAN EXPLAIN.

16       THE COURT:  RIGHT.  I UNDERSTAND.

17       MS. PREOVOLOS:  BUT BECAUSE I CAN'T FORECLOSE ANY RISK

18   THAT THEY WILL APPEAL, I THINK MY VIEW WOULD BE YOUR HONOR

19   SHOULD RULE ON THOSE OBJECTIONS AND OVERRULE THEM.

20       I CAN QUICKLY TELL YOU WHY, OR I CAN WAIT UNTIL AFTER

21   MS. MICHELETTI HAS SPOKEN.  BUT I DO HAVE THAT CONCERN THAT

22   ALTHOUGH MR. CASEY VIOLATED JUDGE RYU'S ORDER IN MULTIPLE WAYS,

23   AND MR.BRADSHAW SAYS HE'S NOT REALLY OBJECTING, YOU KNOW, I'M

24   NOT ONE FOR IGNORING SUCH THINGS.

25       MS. MICHELETTI:  AND WE ACTUALLY WEREN'T -- WE WERE GOING
```

1    TO SPECIFICALLY ASK THAT YOUR HONOR RULE ON MR. CASEY.  HE IS

2    NOT A SETTLEMENT CLASS MEMBER.  HOWEVER, EVEN AFTER BEING SHOWN

3    EVIDENCE OF THIS, HE HAS REFUSED TO WITHDRAW HIS OBJECTION.

4    AND HE HAS ALSO IGNORED THE JUDGE'S ORDERS TO APPEAR FOR

5    DEPOSITION.

6         IN FACT, ONE OF OUR LAWYERS TRAVELLED TO WISCONSIN AND WAS

7    WAITING FOR HIM TO SHOW UP FOR DEPOSITION, AND HE JUST WAS A

8    NO-SHOW.

9         SO WE WILL ASK YOUR HONOR TO PLEASE ISSUE SPECIFIC

10   FINDINGS ON HIS LACK OF STANDING, AS WELL AS OVERRULE AND

11   STRIKE HIS OBJECTION, BECAUSE HE HAS NO STANDING TO ASSERT

12   THEM.

13        MR. BRADSHAW ADMITS HE'S NOT A CLASS MEMBER.  HE SIMPLY

14   ASKED YOUR HONOR TO EXTEND THE CLASS PERIOD.  SO WE SEE HIM AS

15   SORT OF A DIFFERENT ANIMAL THAN MR. CASEY.

16        MS. PREOVOLOS:  THE ONLY POINT I WOULD ADD IS EVEN WITHOUT

17   HIS FAILURE TO MAKE A CLAIM DURING THE CLASS PERIOD, BRADSHAW

18   WAS OUT OF WARRANTY WHEN HE MADE HIS CLAIM.  AND HE ADMITTED

19   THAT HE SUBMERGED HIS DEVICE IN WATER.  SO I DO THINK THE

20   RECORD IS PRETTY CLEAR ABOUT MR. BRADSHAW.

21        AND I ALWAYS WORRY ABOUT WHETHER THESE PEOPLE DECIDE TO

22   POP BACK UP WITH AN APPEAL.

23        THE COURT:  ALL RIGHT.  SO I SUPPOSE THE RULING ON

24   OBJECTION DOESN'T PRECLUDE THEM FROM SUBMITTING AN APPEAL.

25        MS. MICHELETTI:  NO.

```
 1        THE COURT:  BUT YOUR REQUEST IS THAT I TAKE ACTION ON IT
 2   EVEN IF IT'S SOMEWHAT UNCLEAR AS TO WHETHER OR NOT THEY HAVE
 3   ACTUALLY MADE AN OBJECTION.  SO WITH RESPECT TO MR. BRADSHAW,
 4   FOR EXAMPLE, WE DON'T KNOW.  HE REALLY ISN'T AN OBJECTIVE.  BUT
 5   YOU THINK I SHOULD SAY IN SOME FORM OR ANOTHER IF HE IS, IT'S
 6   OVERRULED?
 7        MS. PREOVOLOS:  WELL, I THINK -- AND I SAID I WOULD
 8   CONSIDER MS. MICHELETTI'S VIEW, TOO. BUT MY VIEW WOULD BE THAT
 9   THE COURT RULE TO THE EXTENT HE PURPORTS TO OBJECT, HE'S NOT A
10   CLASS MEMBER.  HE DOESN'T HAVE STANDING.
11        AND I THINK THE SAME IS TRUE OF CASEY WHO HAD HIS CLAIM
12   PAID UNDER WARRANTY AND APPLE PUT THAT EVIDENCE IN THE RECORD.
13        MS. MICHELETTI:  BY CAUTION WE DON'T THINK THAT WOULD
14   HURT.  WE DEFINITELY WOULD ASK YOUR HONOR TO RULE SPECIFICALLY
15   ON MR. CASEY.  WE BELIEVE MR. CASEY IS A FRONT FOR A
16   PROFESSIONAL OBJECTOR.  THERE ARE ALL KINDS OF SIGNS.
17        AND AS YOU KNOW, THEY ARE REALLY ONLY HERE TO FILE THE
18   APPEAL.  AND SO IF WE CAN GET SPECIFIC FINDINGS ON HIS LACK OF
19   STANDING WE BELIEVE THAT WE CAN HAVE THE APPEAL SUMMARILY HEARD
20   AND DISMISSED.
21        THE COURT:  OKAY.  WITH RESPECT TO MR. CASEY, AGAIN, NOT
22   SUGGESTING THAT HE IS EITHER A CLASS MEMBER OR IN A POSITION TO
23   OBJECT, HIS ISSUE, IF I RECALL CORRECTLY, WAS WITH RESPECT TO
24   SOME OF THE CY-PRES RECIPIENTS, PROPOSED CY-PRES RECIPIENTS,
25   ALTHOUGH IT APPEARS THERE MAY NOT BE ANY CY-PRES FUNDS TO BE
```

```
1    HAD HERE.

2         BUT JUST SO THE RECORD IS CLEAR, DO YOU WANT TO ADDRESS

3    WHATEVER THIS ISSUE WAS?  IT HAD TO DO WITH THE CENTER FOR AUTO

4    SAFETY.

5         MS. MICHELETTI:  THAT WAS ACTUALLY MR. KESSINGER.

6         THE COURT:  THAT'S RIGHT.

7         MS. MICHELETTI:  CASEY'S OBJECTION WAS, I THINK, A PAGE,

8    AND IT WAS NOTHING.  I THINK HE HAD MENTIONED THE CY-PRES, BUT

9    MR. KESSINGER IS THE ONE WHO WENT INTO MORE DETAIL.

10        THE COURT:  OKAY.

11        MS. MICHELETTI:  AND, YOU KNOW, ALL I CAN SAY IS THAT TO

12   THE EXTENT THAT THE OBJECTION WAS DIRECTED AT THE CENTER FOR

13   AUTO SAFETY SUITABILITY, I CAN ADDRESS THAT.  THERE WAS ALSO A

14   CO-ISSUE WHERE MR. KESSINGER RAISED SOME SCANDALOUS ALLEGATIONS

15   AGAINST MR. CHAVEZ, WHICH IF YOUR HONOR HAS QUESTIONS ABOUT

16   THAT, MR. CHAVEZ WILL ADDRESS THEM.

17        BUT AS FAR AS THE CENTER FOR AUTO SAFETY, WE HAVE PUT

18   FORTH EVEN MORE INFORMATION IN ORDER TO --

19        THE COURT:  WELL, I THINK AT PRELIMINARY APPROVAL I ASKED

20   SOME QUESTIONS ABOUT IT, BECAUSE JUST ON THE SURFACE IT WASN'T

21   SELF-EVIDENT TO ME WHAT THE CONNECTION WAS BETWEEN THAT ENTITY

22   AND WHAT WE WERE TALKING ABOUT IN TERMS OF THIS DISPOSITION.

23        MS. MICHELETTI:  RIGHT.  I'M SORRY.

24        THE COURT:  GO AHEAD.

25        MS. MICHELETTI:  AS YOUR HONOR NOTED, FIRST OF ALL THERE'S
```

1    REALLY NOT A CY-PRES ISSUE IN THIS CASE.  WE ARE GOING TO

2    EXHAUST THE SETTLEMENT FUND THROUGH CHECKS.  AND THEN, EVEN

3    AFTER THOSE CHECKS ARE ISSUED, THE SETTLEMENT AGREEMENT

4    PROVIDES -- AND I CAN GUARANTEE YOU WE WILL BE ON THIS

5    PROACTIVELY -- THAT THE SETTLEMENT ADMINISTRATOR TAKE ALL

6    REASONABLE STEPS TO MAKE SURE THOSE CHECKS ARE CASHED.

7         SO TO THE EXTENT THEY ARE -- AND THEN, EVEN AFTER THAT,

8    BECAUSE THERE'S ALWAYS GOING TO BE SOME PEOPLE WHO DON'T CASH

9    CHECKS -- WHAT WE'LL DO IS WE'LL LOOK AT THAT WHEN IT'S

10   APPROPRIATE TO DO SO AND CONFER WITH APPLE, AND THEN DECIDE

11   WHAT TO DO AND PRESENT A PLAN TO YOUR HONOR.

12        BUT I CAN TELL YOU THAT IF IT'S BETWEEN SETTLEMENT CLASS

13   MEMBERS AND CY-PRES WE'RE GOING TO DO EVERYTHING WE CAN TO GET

14   THE MONEY TO THE SETTLEMENT CLASS BEFORE THE CY-PRES.

15        SO IF THERE'S A CY-PRES RESIDUAL, IT WILL BE MINIMAL AT

16   BEST.  SO FOR CENTER FOR AUTO SAFETY WE ACTUALLY THOUGHT OF ALL

17   OF THE GROUPS, IF YOU STEP BACK AND KIND OF TAKE AUTO SAFETY

18   OUT, THAT IT'S ONE OF THE MOST APPROPRIATE BECAUSE CARS ARE

19   EQUIPPED THESE DAYS TO BASICALLY BE GIGANTIC SPEAKERS FOR THE

20   IPHONE AND THE IPOD TOUCH.

21        AND, IN FACT, THE INVENTOR OF THE IPOD TOUCH NOTED THIS

22   RECENTLY.  AND THE CENTER FOR AUTO SAFETY TAKES THE SEPARATE

23   WARRANTIES THAT ARE OFTEN OFFERED WITH COMPONENTS THAT COME

24   WITH VEHICLES, SUCH AS BREAKS, TIRES, THINGS THAT HAVE THEIR

25   SEPARATE WARRANTIES, AND IT HELPS CONSUMERS OBTAIN THE BENEFITS

1    OF THOSE WARRANTIES WHEN THEY ARE NOT HONORED.

2         SO WHAT THE CENTER PROPOSES TO DO IS BASICALLY USE THIS

3    MONEY TO TAKE A LOOK AT THE KINDS OF WARRANTIES THAT ARE BEING

4    OFFERED WITH THE ANCILLARY SORT OF ENTERTAINMENT

5    TELECOMMUNICATIONS SYSTEM AND TO ENSURE THAT THERE'S

6    APPROPRIATE ENFORCEMENT, TO PROVIDE CONSUMER EDUCATION AND

7    ASSISTANCE.

8         AND IF YOU THINK ABOUT THE CLASS, I MEAN ASIDE FROM

9    CHILDREN, WE DRIVE CARS.  AND IN A FEW YEARS, IN PARTICULAR,

10   THERE'S NOT GOING TO BE A CAR THAT ISN'T EQUIPPED WITH

11   SOMETHING THAT ACCOMMODATES THE IPHONE.

12        SO IT HAS AN EXTREMELY BROAD REACH.  AND EVEN THE KIDS,

13   THEIR PARENTS ARE DRIVING THE VEHICLES WITH THE

14   TELECOMMUNICATION SYSTEM.  SO WE THINK IT'S ACTUALLY AN

15   EXTREMELY APPROPRIATE CY-PRES RECIPIENT.

16        THE COURT:  OKAY.  BEFORE WE TURN TO THE ISSUE OF FEES,

17   ANYTHING ELSE?

18        ANYTHING, MS. PREOVOLOS, YOU WISH TO -- ANYTHING FURTHER

19   YOU WANT TO ADDRESS WITH RESPECT TO THE UNDERLYING ISSUES IN

20   THE SETTLEMENT?

21        MS. PREOVOLOS:  ONLY IF YOUR HONOR HAS QUESTIONS ABOUT IT.

22        THE COURT:  ANYTHING ELSE?

23        MS. MICHELETTI:  UNLESS YOU HAVE QUESTIONS FOR ME ABOUT

24   THE SUBJECT OF THE SETTLEMENT.

25        THE COURT:  NO, I DON'T. I THINK -- AS I SAID, I THINK

1   IT'S A VERY WHOLESOME SETTLEMENT FOR THE PUTATIVE CLASS

2   MEMBERS, AND IT WAS OBTAINED EARLY ON IN THE PROCESS.  AND SO

3   ALL OF THAT IS GOOD.  AND I THINK AS WE TALKED ABOUT THE

4   RELEASE IS TAILORED APPROPRIATELY AND THE NOTICE IS CERTAINLY

5   NOT -- YOU DON'T HAVE THE USUAL ISSUES WITH RESPECT TO NOTICE.

6        IT'S DIRECT CONTACT WITH THE PUTATIVE CLASS MEMBERS, BY

7   AND LARGE.  SO THAT'S ALL TO ME GOOD.

8        SO IN TALKING ABOUT THE FEE ISSUE, THERE SEEMS TO BE SOME

9   UNCERTAINTY WHETHER OR NOT WE -- IF CALIFORNIA LAW IS THE

10  GOVERNING LAW, AS IT IS, WHETHER OR NOT WE HAVE USE A LODESTAR

11  APPROACH OR NOT.

12       AND I CAN'T SAY I THINK THERE'S CLEAR DIRECTION ON THAT,

13  BUT IT DOES SEEM TO BE A FAIRLY STRONG ARGUMENT THAT THE

14  LODESTAR IS MANDATED AS THE WAY WE NEED TO GO IN THIS INSTANCE.

15  SO I'LL LET YOU ADDRESS THAT.

16       YOU KNOW, THE DOUBLE EDGE SWORD OF A VERY PROMPT

17  CONCLUSION TO THE CASE, WHICH AGAIN IS TO BE ENCOURAGED, AT THE

18  SAME TIME IT MEANS THERE SHOULDN'T HAVE BEEN AN ENORMOUS AMOUNT

19  OF ADDITIONAL LEGAL WORK THAN WAS NECESSARY.  AND ONE OF THE

20  CONCERNS I HAVE IS IF WE DO GO DOWN THE LODESTAR APPROACH,

21  THERE ARE NUMEROUS NUMBER OF FIRMS AND THE SUBMISSION THAT I

22  RECEIVED WAS:

23          "WELL, HERE ARE ALL THE BILLING FORMS, BUT WE'RE NOT

24       VALIDATING EACH OTHER'S MATERIALS."

25       AND, IN OTHER WORDS, THERE'S NO SENSE THAT I CAN GLEAN

1   FROM THIS AS TO WHETHER OR NOT THERE'S A GOOD DEAL OF OVERLAP

2   WHEN PERHAPS THAT WASN'T WARRANTED OR -- SO THE WAY IT'S BEEN

3   PRESENTED AT THIS POINT TO THE EXTENT THAT THE LODESTAR IS THE

4   WAY TO GO IS I HAVE SOME CONCERNS ABOUT WHETHER OR NOT IT TELLS

5   ME WHAT I NEED TO DO.

6        AND I UNDERSTAND FROM YOUR PAPERS:

7             "WELL, OKAY.  WE'LL GO TO SOME LODESTAR AMOUNT.  AND

8        THEN WE'LL PUT UP WHATEVER MULTIPLIER WOULD BE APPROPRIATE

9        TO GET US TO WHERE WE WOULD BE IF WE HAD A 30 PERCENT

10       APPROACH."

11       WELL, YOU KNOW, THAT'S A BIT CART BEFORE THE HORSE KIND OF

12   APPROACH.  SO I'M JUST RUMINATING ABOUT SOME OF THE ISSUES.

13       FINALLY, WITH RESPECT TO THE STANDING, I MEAN, I DO

14   THINK -- I KNOW THE DEFENDANT'S BOTTOM LINE CONTRIBUTION IS NOT

15   GOING TO BE DIRECTLY IMPACTED BECAUSE THEY ARE COMMITTED TO THE

16   SETTLEMENT FUND THAT THEY ARE COMMITTED TO.

17       BUT I DO THINK THAT THEY HAVE A ROLE TO PLAY IN THE

18   PROCESS.  AND, YOU KNOW, NINTH CIRCUIT IS ALWAYS TALKING ABOUT,

19   FOR EXAMPLE, THE DIFFICULTY OR THE PROBLEMS WITH THE CLEAR

20   SAILING AGREEMENT.  WELL, BY DEFINITION THAT MEANS THAT THE --

21   I THINK IN A SENSE THAT THE DEFENDANTS ARE AT THE TABLE,

22   BECAUSE OTHERWISE THERE WOULDN'T BE MUCH CONCERN ABOUT A CLEAR

23   SAILING AGREEMENT IF THEY DIDN'T HAVE STANDING, ANY WAY TO

24   OBJECT FROM THE GET-GO.

25       SO THAT BRINGS ME TO WHERE WE ARE.  I MEAN, I'M NOT

```
1   EXACTLY SURE WHAT TO DO WITH OR EVEN, FRANKLY, HOW TO APPROACH

2   THE FEE REQUEST.

3       SO BEFORE WE TALK ABOUT THE NITTY-GRITTY OF IT PERHAPS YOU

4   CAN ADDRESS THE CONSTRUCT THAT I SHOULD BRING TO IT.

5       MS. MICHELETTI:  WELL, I APPRECIATE YOUR HONOR FOR GIVING

6   US GUIDANCE AS TO WHAT YOU WOULD LIKE US TO DISCUSS.  AND I AM

7   GOING TO TURN THIS PART OF THE ARGUMENT OVER TO MY COLLEAGUE,

8   MS. KRALOWEC OF THE KRALOWEC LAW GROUP.

9       BEFORE I DO, I JUST WANT TO NOTE THAT, YES, THIS CASE HAS

10  NOT BEEN A CASE THAT HAS BEEN BEFORE YOUR HONOR FOR, YOU KNOW,

11  MULTIPLE YEARS.  BUT IT'S FOUR YEARS OLD.  AND WE DID NOT GET A

12  $53 MILLION SETTLEMENT WITHOUT A SUBSTANTIAL AMOUNT OF WORK AND

13  EFFORT THAT MS. KRALOWEC WILL ADDRESS.  AND THAT WORK HAS

14  CONTINUED TO THIS DAY.  AND PART OF THE REASON YOU HAD

15  MENTIONED THE NOTICE AND NOT SEEN PROBLEMS WITH NOTICE.  THAT'S

16  BECAUSE WE MADE SURE THERE WERE NONE.

17      AND WHEN WE SAW ANY ISSUES, ANYTHING THAT EVEN SMELLED OF

18  AN ISSUE, WE WERE PROACTIVE.  WE WERE ON IT IMMEDIATELY.  AND

19  WE PUT THE SAME AMOUNT OF EFFORT INTO POST SETTLEMENT AS

20  PRESETTLEMENT WORK.  AND THAT'S REFLECTED IN THE STATISTICS

21  THAT WE HAVE.  AND THE -- YOU KNOW, THE RESPONSE OF THE

22  SETTLEMENT CLASS AND ALL OF THE THINGS THAT ARE WORTHY OF FINAL

23  APPROVAL ARE BECAUSE OF OUR EFFORTS.

24      AND NOW I'M GOING TO TURN THE PODIUM OVER TO MS. KRALOWEC.

25  THANK YOU.
```

1          MS. KRALOWEC:  THANK YOU, YOUR HONOR.

2          I WILL ADDRESS THE LEGAL QUESTION YOU RAISE OF WHETHER THE

3     LODESTAR METHOD OR THE PERCENTAGE METHOD SHOULD BE USED UNDER

4     CALIFORNIA LAW.  AND I THINK WE AGREE THAT CALIFORNIA LAW DOES

5     APPLY TO THE DETERMINATION OF THE FEE AWARD IN THIS CASE.

6          BUT LET ME START BY SAYING THAT THE BRIEF THAT YOU

7     RECEIVED FROM APPLE IN OPPOSITION TO OUR MOTION IS TYPICAL OF

8     WHAT WE HAVE SEEN IN TERMS OF VIGOROUS LITIGATION THROUGHOUT

9     THE FOUR YEARS OF THIS CASE.

10          WE HAVE FACED VIGOROUS OPPOSITION TO EVERYTHING THAT WE

11     HAVE TRIED TO DO.  AND THIS OPPOSITION IS AN EXAMPLE OF THAT.

12          APPLE CONTINUES TO DENY LIABILITY TO THE CLASS, BUT NOW

13     COMES IN ASSERTING THAT THEY ARE THE CHAMPIONS OF THE CLASS,

14     AND THEY WANT TO PROTECT THE CLASS, AND THEY WANT THE CLASS TO

15     RECEIVE MORE MONEY.

16          BUT, REALLY, THE MANNER IN WHICH THE FUND IS DIVIDED IS OF

17     NO CONCERN TO THE DEFENDANT HERE.  NOW, I UNDERSTAND THEY HAVE

18     RAISED POINTS, AND WE WILL ADDRESS THEM.  BUT WE NEED TO

19     CONSIDER THE MANY CASES THAT HAVE HELD THAT DEFENDANTS HAVE NO

20     INTEREST IN HOW A FUND LIKE THIS IS DIVIDED AND TAKE THEIR

21     ARGUMENTS WITH A GRAIN OF SALT AND NOTE, TOO, THAT NO CLASS

22     MEMBERS --

23          THE COURT:  WHY IS IT THAT THEY -- FIRST OF ALL, THEY ARE

24     FUNDING THIS.  AND WHY IS IT THAT THEY WOULD HAVE NO INTEREST

25     IN HOW IT'S DIVIDED?  I MEAN, I THINK IT IS NOT INCONSISTENT TO

1    SAY THEY MAY NOT THINK YOUR CASE -- THEY HAVE A VERY DIFFERENT

2    VIEW ON THE MERITS OF THE CASE THAN YOU DO.  BUT IT DOES NOT

3    SURPRISE ME AT ALL THAT PUT TO THE QUESTION OF HOW TO

4    DISTRIBUTE THE FUNDS, THEY WOULD PREFER THE MONEY GOES IN,

5    PERHAPS CERTAIN INSTANCES, TO THE CLASS MEMBERS THAN TO THE

6    LAWYERS.

7        I DON'T SEE ANYTHING WRONG THAT, AND I DON'T SEE WHY

8    THEY -- NOT THAT THEY ARE GOING TO NECESSARILY PREVAIL IN THEIR

9    ARGUMENTS -- BUT I DON'T SEE WHY THEY SHOULD BE PRECLUDED FROM

10   MAKING THEM.  AND PERHAPS YOU CAN ADDRESS MY POINT ABOUT ALL OF

11   THE LITIGATION ABOUT THE PROPRIETY OF A CLEAR SAILING

12   AGREEMENT,  A CLEAR SAILING AGREEMENT IN THESE SETTLEMENTS.

13       IF THERE WAS NO OPPORTUNITY FOR THE DEFENDANTS TO WEIGH IN

14   ON FEE ISSUES, WHY WOULD WE BE FIGHTING ABOUT CLEAR SAILING

15   AGREEMENTS BY DEFINITION MEANS THEY ARE GOING TO BE IN A

16   POSITION TO OBJECT OR NOT OBJECT.

17       MS. KRALOWEC:  YOUR HONOR, CLEAR SAILING AGREEMENTS ARE

18   OFTEN USED IN CASES IN WHICH THE FEES ARE AWARDED ON TOP OF THE

19   RELIEF TO THE CLASS.

20       THE COURT:  SOMETIMES.

21       MS. KRALOWEC:  SO YOU MAY AGREE THAT THEY WON'T OBJECT TO

22   ADDITIONAL FEES ON TOP OF THE RELIEF OF $500,000, WHICH THE

23   DEFENDANT IS PAYING.  AND IN THAT SITUATION A CLEAR SAILING

24   AGREEMENT SERVES A MUCH CLEARER PURPOSE THAN IT DOES IN A CASE

25   WHERE WE HAVE A NON REVERSIONARY FUND.  AND NEGOTIATING THAT IS

1   AN ACCOMPLISHMENT, IN AND OF ITSELF.

2       NONE OF THE MONEY IS GOING BACK TO APPLE REGARDLESS OF HOW

3   IT'S DIVIDED.  AND THAT'S THE POINT THAT THE COURTS THAT HAVE

4   ADDRESSED THIS ISSUE HAVE RECOGNIZED.

5       I WOULD ALSO POINT OUT THAT IN ORDER TO OPPOSE OUR FEE

6   MOTION APPLE HAS HAD ESSENTIALLY TO CONTRADICT ITS OWN

7   POSITIONS IN EARLIER BRIEFING, NAMELY IN ITS BRIEF IN SUPPORT

8   OF THE FINAL APPROVAL MOTION FILED IN NOVEMBER, WHERE APPLE

9   DISCUSSED AT LENGTH THE RISKS THAT WE WOULD HAVE TO FACE TO

10  ESTABLISH OUR CLAIMS ON THE MERITS, THAT THERE WERE SUBSTANTIAL

11  OBSTACLES TO EVEN PROVING THAT APPLE BREACHED ITS WARRANTY AT

12  ALL.

13      THAT THE LIQUID SUBMERSION INDICATORS ARE EFFECTIVE IN

14  DETECTING WATER DAMAGE.  THAT THEIR WORLD-RENOWNED EXPERTS WERE

15  GOING TO PROVE THIS AS FAR AS --

16      THE COURT:  WHY DON'T WE FOCUS MORE ON -- I MEAN, TO SOME

17  EXTENT WHETHER OR NOT THEY HAVE A PLACE AT THE TABLE IN TERMS

18  OF OBJECTING OR NOT OBJECTING IS AN INTERESTING PROCEDURAL

19  QUESTION.  BUT WHETHER OR NOT THEY ARE ARTICULATING SOME OF

20  THESE CONCERNS, OR THEY ARE COMING FROM ME, I HAVE ISSUES HERE

21  TO ADDRESS WITH YOU.

22      SO LET'S GO TO THE ISSUES AND NOT WORRY ABOUT WHETHER OR

23  NOT THEY ARE BEING CONSISTENT OR INCONSISTENT IN THEIR

24  POSITIONS.

25      SO GOING BACK AGAIN TO THIS QUESTION OF WHAT CALIFORNIA

```
1    LAW MANDATES WE DO HERE, WHY IS IT THAT YOU THINK THE LODESTAR

2    APPROACH IS NOT A MANDATORY APPROACH IN THIS INSTANCE?

3         MS. KRALOWEC:  BECAUSE THERE'S NO CALIFORNIA DECISION THAT

4    HOLDS THAT THE LODESTAR APPROACH IS MANDATORY IN A TRADITIONAL

5    COMMON FUND CASE LIKE THIS ONE WHERE THE FEE IS COMING OUT OF

6    THE FUND.

7         APPLE HAS NOT CITED A SINGLE CASE THAT INVOLVED SUCH A

8    COMMON FUND THAT HELD THIS, EITHER A PUBLISHED OPINION.  THEY

9    PROVIDED NO SUPERIOR COURT ORDERS FROM ANY JUDGES HOLDING THAT,

10   AND IT'S JUST NOT THE LAW.

11        THE PRIMARY DECISION THAT APPLE RELIES ON IS THE LEALAO

12   CASE, BUT THAT CASE IS NOT A TRADITIONAL COMMON FUND CASE.  AND

13   THE COURT ACKNOWLEDGED THAT NUMEROUS TIMES.  AND IT DISCUSSED

14   APPROACHES TO FEE AWARDS AT LENGTH, BUT IT DID SO BECAUSE IT

15   WAS CONSIDERING A NONTRADITIONAL CASE.  AND IT NEEDED TO

16   DETERMINE WHAT WAS THE APPROPRIATE APPROACH IN SUCH A

17   NONTRADITIONAL CASE.

18        BUT IT DID ACKNOWLEDGE THAT IN A TRADITIONAL, A PURE

19   COMMON FUND CASE LIKE THIS, THE PERCENTAGE METHOD IS

20   APPROPRIATE AND PERMISSIBLE.  IT'S IMPORTANT TO NOTE THAT ONE

21   YEAR --

22        THE COURT:  IF YOU GO THAT ROUTE, THOUGH -- AND, AGAIN, I

23   RECOGNIZE IT'S NINTH CIRCUIT LAW AS POSED TO CALIFORNIA LAW --

24   BUT IF YOU ARE GOING THE PERCENTAGE APPROACH THE PRESUMPTIVE

25   PERCENTAGE IN NINTH CIRCUIT LAW IS 25 PERCENT.
```

1        SO YOU'RE SAYING:

2            "WELL, YOU KNOW, WE DON'T -- CALIFORNIA LAW DOESN'T

3        MANDATE A LODESTAR.  WE'LL DO THE PERCENTAGE.  BUT IT'S

4        CALIFORNIA LAW, SO WE CAN IGNORE THE NINTH CIRCUIT'S

5        PRESUMPTIVE 25 PERCENT, AND WE CAN KICK UP TO 30 PERCENT."

6        MS. KRALOWEC:  YOUR HONOR, WE BELIEVE THE CASE LAW SHOWS

7    THAT BOTH UNDER CALIFORNIA LAW AND FEDERAL LAW THERE IS A

8    BENCHMARK OF 25 PERCENT.  AND UNDER BOTH FEDERAL LAW AND

9    CALIFORNIA LAW THE COURTS CONSIDER VARIOUS FACTORS IN

10   DETERMINING WHETHER THAT PERCENTAGE SHOULD BE ENHANCED.

11       AND WE ARE NOT ARGUING THAT THE PERCENTAGE METHOD IS

12   MANDATORY IN A COMMON FUND CASE.  WE'RE SAYING THAT THE COURT

13   HAS DISCRETION TO USE IT.

14       WE'RE SAYING IT'S THE PREFERRED METHOD, AND THAT THERE ARE

15   A LOT OF GOOD REASONS WHY IT SHOULD BE USED IN THIS CASE.  AND

16   WE ARE URGING THE COURT TO USE THE PERCENTAGE METHOD.

17       BUT THERE'S NO AUTHORITY FOR THE IDEA THAT THE LODESTAR

18   APPROACH IS MANDATORY AND THAT THE PERCENTAGE APPROACH IS OUT

19   THE WINDOW IN CALIFORNIA.

20       THE COURT:  WELL, EVEN IN THOSE INSTANCES WHERE THE

21   PERCENTAGE APPROACH IS A PERFECTLY APPROPRIATE WAY TO GO, YOU

22   USE LODESTAR AS A CHECK.  CORRECT?

23       MS. KRALOWEC:  SOME COURTS HAVE CHOSEN TO USE THE LODESTAR

24   AS A CHECK UNDER CALIFORNIA LAW, BUT IT IS NOT MANDATORY TO DO

25   SO.

```
1        THE COURT:  WHY SHOULDN'T I?

2        MS. KRALOWEC:  BECAUSE IT IS UNNECESSARY, AND BECAUSE THE

3   FACTORS THAT GOVERN THE COURT'S DETERMINATION OF THE PERCENTAGE

4   FEE ARE THE ONES THAT LEAD TO THE FAIREST RESULT.

5        THE REASONS THAT THE PERCENTAGE APPROACH IS PREFERRED OVER

6   THE LODESTAR APPROACH ARE SEVERAL, AND THEY ALL APPLY VERY

7   FORCEFULLY IN THIS PARTICULAR CASE.

8        IT PROMOTES THE FAIREST RESULT TO THE LITIGANTS.  IT

9   ALIGNS THE PARTIES' EXPECTATIONS IN TERMS OF WHAT IS CUSTOMARY

10  IN THE MARKET TO THE RESULT.

11       IT ALIGNS THE INTEREST OF THE LAWYERS WITH THE INTEREST OF

12  THE CLASS.  THE INTEREST OF THE CLASS ARE TO MAXIMIZE THE

13  RECOVERY.  THE INTEREST OF THE CLASS ARE NOT TO PROMPT THE

14  LAWYERS TO DO, YOU KNOW, A LOT OF BUSYWORK OR EXTRA UNNECESSARY

15  MOTION WORK SO THAT THEY CAN BUILD UP THEIR LODESTAR.

16       THE COURT EVEN IN THE LEALAO CASE, THE COURT ACKNOWLEDGED

17  THAT THE LODESTAR APPROACH HAS NUMEROUS DRAWBACKS, ONE OF THEM

18  BEING THAT IT DISALIGNED THE INTEREST OF THE LAWYERS WITH THE

19  INTERESTS OF THE CLASS.  IT LEADS TO DRAWN OUT LITIGATION.

20       AND IF YOUR HONOR WERE TO ADOPT THE ARGUMENT THAT APPLE IS

21  MAKING, YOU KNOW, WE'RE NEVER GOING TO BE ABLE TO SAY TO YOU

22  THAT WE MOVED FOR SUMMARY JUDGMENT OR THAT WE DEFEATED SUMMARY

23  JUDGMENT MOTION.  WE DIDN'T MOVE FOR CLASS CERTIFICATION.

24       WE WORKED VERY HARD TO GET A SETTLEMENT WITHOUT HAVING TO

25  BRING ANY SUCH DISPUTES TO THE COURT.  THEIR APPROACH WOULD
```

```
 1   ENCOURAGE US TO BE UNCOOPERATIVE AND LITIGIOUS AND TO MAKE SURE

 2   THAT WE CAN SAY THAT WE FILED ALL THESE DISCOVERY MOTIONS.

 3        WE DON'T THINK THAT'S AN APPROPRIATE WAY TO LITIGATE A

 4   CASE.  WE WORKED VERY, VERY HARD TO RESOLVE THE MANY DISCOVERY

 5   DISPUTES THAT WE DID HAVE, AND WE WERE SUCCESSFUL.

 6        AND WE -- THE ONE WE WERE NOT ABLE TO RESOLVE WAS THE

 7   THIRD-PARTY SUBPOENA TO 3M.  WE HAD TO MOVE TO COMPEL IN

 8   FEDERAL COURT IN MINNEAPOLIS SINCE THAT WAS A VERY HOTLY

 9   CONTESTED MOTION.

10        THE COURT:  WELL, IT'S VERY -- I APPLAUD YOU FOR NOT

11   ENGAGING IN LOTS OF DISCOVERY BATTLES.  I THINK THERE'S --

12   THAT'S DEFINITELY TO YOUR CREDIT AND WHAT I LIKE TO SEE.

13        BUT IT CAN'T SIMPLY BE A FUNCTION OF:

14            "WELL, BECAUSE WE DIDN'T DO IT THEN WE EFFECTIVELY

15        GET ALL THE -- IN FEES ALL THE EXPENSE THAT WOULD HAVE

16        BEEN CURTAILED IF WE HAD BEEN VERY LITIGIOUS IN

17        DISCOVERY."

18        THE CLASS GETS THE BENEFIT, AS WELL AS THE COUNSEL FROM

19   THAT PROCESS.  AND IT ISN'T JUST A -- YOU KNOW, IT ISN'T A

20   MODEL THAT WE ASSUME ALL OF THE AMOUNTS SAVED FROM RESPONSIBLE

21   LITIGATION AND PUT THAT INTO A PERCENTAGE FEE AWARD TO THE

22   ATTORNEYS.

23        I MEAN, YOU KNOW, I DON'T THINK THAT THE REWARD, IF YOU

24   WILL, FROM A LOT OF COLLABORATIVE EFFORT IN THE CASE IS YOU

25   AUTOMATICALLY GET THE SAME AMOUNT YOU WOULD HAVE GOTTEN IF YOU
```

```
 1   HAD BEEN BATTLING FOR EVERY DISCOVERY MOTION IMAGINABLE.

 2        MS. KRALOWEC:  WELL, YOUR HONOR, YOU APPEAR TO BE INCLINED

 3   TO LOOK AT THE LODESTAR, AT LEAST AS A CROSSCHECK.

 4        THE COURT:  WELL, I'M NOT NECESSARILY -- GO AHEAD.

 5        MS. KRALOWEC:  AND IF YOU DO, WE'VE PROVIDED LODESTAR

 6   NUMBERS, AND WE'VE APPROACHED THEM IN A VERY CONSERVATIVE

 7   MANNER.  AND THE MULTIPLIER RESULT IS NOT BEYOND THE SCOPE OF

 8   MULTIPLIERS THAT ARE ROUTINELY APPROVED.  AND IF IT --

 9        THE COURT:  WELL, I MEAN, WHAT DO I DO WITH THE FORM IN

10   WHICH -- LET'S ASSUME FOR A MOMENT THAT I DO THINK I DO NEED TO

11   DO SOME LODESTAR ASSESSING, EITHER AS A CHECK OR SOME OTHER

12   FORM.

13        ITS PRESENTED TO ME AS -- I FORGET HOW MANY FIRMS ARE

14   INVOLVED HERE.  YOU KNOW:

15             "HERE ARE ALL THEIR BILLS.  WE CAN'T -- ONE OF US

16        CAN'T VOUCH FOR NECESSARILY OUR CO-COUNSEL'S SUBMISSIONS."

17        HOW DO I KNOW WHAT IS -- YOU KNOW, WHAT IS OVERLAPPING IF

18   THERE ARE, YOU KNOW -- IS THERE ANY WAY TO APPROACH THAT OTHER

19   THAN, YOU KNOW, GOING EVENT BY EVENT IN DETERMINING WHETHER OR

20   NOT YOU REALLY DID NEED SEVEN PEOPLE AT A PARTICULAR PART OF

21   THE PROCEEDING?

22        I MEAN, HOW DO I -- BECAUSE THERE DOESN'T SEEM TO BE:

23             "ALL RIGHT.  THIS IS OUR CONSOLIDATED SUBMISSION.

24        WE'VE ADJUSTED FOR POINTS WHERE WE WERE COORDINATING WHICH

25        PERHAPS DIDN'T -- IS NOT A FEE EVENT," IF YOU WILL.
```

1          IT'S JUST LIKE CORE STUFF IS JUST DUMPED IN MY LAP.  AND

2    IT'S, YOU KNOW:

3               "TAKE A LOOK.  THERE'S A LOT OF ENTRIES HERE.  AND

4          THIS SHOULD BE ENOUGH TO GET US TO WHEREVER WE NEED TO GO.

5          AND IF IT'S NOT, PUT A MULTIPLIER ON IT."

6          I MEAN, TO SOME EXTENT IT DOESN'T HELP ME VERY MUCH IS MY

7    PROBLEM.

8          MS. KRALOWEC:  WELL, YOUR HONOR, LET ME SAY THIS.  WHEN

9    YOU APPLY THE FACTORS THAT HAVE BEEN ADOPTED BY THE COURTS IN

10   DETERMINING AN APPROPRIATE PERCENTAGE AWARD AS THE STARTING

11   POINT, WHICH WE BELIEVE THAT SHOULD BE THE STARTING POINT.  AND

12   THEN, YOU LOOK AT THE LODESTAR AS A CROSSCHECK.

13         THE ANALYSIS OF THE LODESTAR IS DIFFERENT FROM THE ONE

14   THAT YOU WOULD DO IF THIS WERE A PURE STATUTORY FEE SHIFTING

15   CASE, OR IF EVERYONE AGREED THIS SHOULD BE A LODESTAR CASE.

16         SO IN A PERCENTAGE OF THE FUND CASE THE PRIMARY FACTOR

17   THAT ALL OF THE COURTS CONSIDER IS THE RESULTS ACHIEVED.  AND

18   IN THIS CASE, WE'VE ACHIEVED RESULTS THAT ARE GOING TO LEAD TO

19   160,000 PEOPLE GETTING CHECKS IN THE MAIL FOR 112 PERCENT OF

20   THEIR AVERAGE LOSSES, EVEN IF THE FULL FEE THAT WE'RE

21   REQUESTING IS AWARDED.

22         AND THAT IS AN EXTRAORDINARY RESULT, REGARDLESS OF THE

23   AMOUNT OF TIME THAT IT TOOK TO ACHIEVE IT, REGARDLESS OF THE

24   AMOUNT OF WORK THAT WAS DONE.  AND WHEN YOU APPLY THE

25   PERCENTAGE METHOD, THE COURT LOOKS AT THE RESULTS ACHIEVED,

1    FIRST AND FOREMOST, WITHOUT PARSING OUT:  HOW DID YOU GET

2    THERE?

3         THE COURT:  WHAT ARE THE OTHER FACTORS?

4         MS. KRALOWEC:  THE OTHER FACTORS ARE THE RISKS INVOLVED IN

5    THE LITIGATION.  AND AS APPLE ARGUED IN ITS BRIEF IN SUPPORT OF

6    FINAL APPROVAL, THOSE WERE EXTREMELY SUBSTANTIAL.  AND WE DID A

7    VERY SIGNIFICANT AMOUNT OF WORK TO OVERCOME THEM.

8         FIRST, ON THE MERITS WHETHER THESE TECHNICAL DEVICES,

9    THESE LIQUID SUBMERSION INDICATORS WERE EFFECTIVE OR NOT AS AN

10   INDICATOR OF WATER DAMAGE TO A COMPLEX TECHNOLOGY DEVICE.

11        IT WAS GOING TO REQUIRE EXPERT TESTIMONY.  IT REQUIRED

12   CLOSE ANALYSIS OF A SIGNIFICANT NUMBER OF TECHNICAL DOCUMENTS

13   THAT WERE PRODUCED BOTH BY APPLE AND BY 3M.  AND WE

14   COLLECTIVELY DID ALL OF THAT WORK.  WHICH LAW FIRM DID IT IS

15   NOT SOMETHING THAT THE COURTS LOOK AT IN DETERMINING AN

16   APPROPRIATE PERCENTAGE FEE.

17        AND WE HAVE SEVERAL EXAMPLES OF CASES WHERE CALIFORNIA

18   JUDGES APPLYING CALIFORNIA LAW DETERMINED THAT A 30 PERCENT

19   FEE, A 33 PERCENT FEE WAS WARRANTED BASED ON THE FACT THAT

20   THESE ARE CUSTOMARY PERCENTAGES IN SIMILAR CASES WITHOUT

21   COMPARING THE AMOUNT OF WORK THAT WAS DONE BY WHICH LAW FIRMS

22   IN THE CASES THAT THEY LOOKED AT AS COMPARABLE EXAMPLES.

23        ANOTHER FACTOR UNDER -- I'M USING VIZCAINO BECAUSE THAT

24   CASE IS THE LEADING CASE.  FEDERAL JUDGES WHETHER THEY ARE

25   APPLYING FEDERAL LAW OR CALIFORNIA LAW UNDER THE PERCENTAGE

1    METHOD RELY ON THE FACTORS THERE.

2        THE QUESTION IS WHETHER THE PROPOSED PERCENTAGE IS WITHIN

3    THE RANGE OF FEE AWARDS OUT OF COMMON FUNDS OF COMPARABLE SIZE.

4    AND WE PROVIDED A NUMBER OF EXAMPLES OF FUNDS OF COMPARABLE

5    SIZE THAT IN WHICH THE COURT AWARDED 30 PERCENT OR MORE OF THE

6    FUND.

7        AND IN ANALYZING WHETHER OTHER CASES ARE COMPARABLE, THE

8    VIZCAINO COURT ITSELF DID NOT LOOK AT THE NUMBER OF MOTIONS

9    THAT WERE FILED IN THESE OTHER CASES TO SEE WHETHER THEY ARE

10   COMPARABLE TO WHAT APPLE IS URGING.  AND IT'S BECAUSE IT'S NOT

11   REQUIRED FOR THE PERCENTAGE FUND ANALYSIS WHERE THE FOCUS IS ON

12   THE RESULT ACHIEVED, THE SIZE OF THE FUND AND THE RISKS

13   INVOLVED AND THE HEAVY CONTINGENCY RISKS FACED EQUALLY BY ALL

14   OF THE LAWYERS THAT OVERCAME THE RISKS.

15       CLASS CERTIFICATION WAS ANOTHER MAJOR RISK THAT APPLE

16   EMPHASIZED IN ITS FINAL APPROVAL BRIEF.  AND WE AGREE THAT THAT

17   WAS A VERY SIGNIFICANT RISK.

18       THE TIMING IS INTERESTING.  THE DUKES V. WAL-MART CASE WAS

19   HANDED DOWN JUNE 2011.  THAT WAS ONLY A FEW MONTHS BEFORE WE

20   BEGAN THE MEDIATION PROCESS.  AND APPLE ARGUED THAT THAT CASE

21   CREATED A SEA CHANGE IN THE LAW; WE WOULD NEVER GET OUR CLASS

22   CERTIFIED.

23       AND THEY HAD A LOT OF CASES THAT THEY CITED TO US, AND

24   THEY CITED IT IN THEIR FINAL APPROVAL BRIEF IN WHICH COURTS

25   DENIED CLASS CERTIFICATION OF BREACH OF WARRANTY CLAIMS HOLDING

```
 1   THAT THE COURT HAS TO EXAMINE THE CIRCUMSTANCES OF EACH

 2   WARRANTY DENIAL; WHAT WAS THE PERSON TOLD; WHAT DID THEY KNOW?

 3        AND IN THIS CASE APPLE ARGUED THAT THEY WOULD HAVE TO

 4   EXAMINE THE INTERNAL COMPONENTS OF EACH OF THE CLASS DEVICES TO

 5   SEE WHETHER THERE WAS ANY SIGN OF LIQUID INTRUSION.

 6        HOW WERE WE GOING TO OVERCOME THAT?  WE PUT A LOT OF WORK

 7   INTO DEVELOPING A CLASS CERTIFICATION APPROACH THAT WOULD BE

 8   WORKABLE.  AND WE LITIGATED THIS CASE, YOUR HONOR, IN A

 9   DIFFERENT FORUM.  WE LITIGATED IT IN FRONT OF THE MEDIATORS.

10        WE HAD SIX MEDIATION SESSIONS.  WE HAD THREE OF THEM

11   BEFORE WE REACHED SETTLEMENT IN PRINCIPLE.  AND WE PUT ON OUR

12   CASE THERE.  I MEAN, WE HAD TO DO AS MUCH WORK AS IF WE WERE

13   OPPOSING A SUMMARY JUDGMENT MOTION OR TRYING TO GET A CLASS

14   CERTIFICATION MOTION IN TERMS OF ANALYSIS OF THE LAW AND

15   PULLING TOGETHER THE DOCUMENTS THAT SUPPORTED OUR CLAIMS.

16        AND WE HAVE A PROTECTIVE ORDER IN THIS CASE, YOUR HONOR,

17   SO -- BUT I COULD TELL YOU STORIES ABOUT THE DOCUMENTS THAT

18   WERE PRODUCED THAT SHOWED THAT THE LSI'S WERE NOT RELIABLE AS

19   INDICATORS OF ANYTHING, LET ALONE THAT THE CLASS DEVICE WAS

20   MALFUNCTIONING AS A RESULT OF LIQUID DAMAGE.

21        SO EVEN USING THE FACTORS THAT THE COURTS HAVE IDENTIFIED

22   AS RELEVANT UNDER THE PERCENTAGE APPROACH, IT ACCOUNTS FOR THE

23   WORK THAT WAS DONE.  WE WOULD NOT HAVE BEEN ABLE TO ACHIEVE THE

24   RESULTS WE DID IF WE HAD NOT DONE STELLAR WORK, IF WE HAD NOT

25   WORKED THIS CASE EXTREMELY HARD.
```

1        AND, AGAIN, THE OPPOSITION TO THE FEE MOTION HERE IS AN

2   EXAMPLE.  IT ILLUSTRATES THE SORTS OF OPPOSITIONS THAT WE

3   FACED.  THIS WAS NOT AN EASY CASE.

4        WE'RE VERY PROUD OF THE FACT THAT WE NEVER HAD TO COME IN

5   BEFORE YOUR HONOR ON A DISCOVERY DISPUTE.  BUT THAT WAS

6   BECAUSE WE WORKED REALLY HARD TO AVOID IT.  AND ALL OF THE

7   FACTORS THAT THE COURTS CONSIDER IN PERCENTAGE CASES CERTAINLY

8   WARRANT THE BENCHMARK.  AND THEY ALSO WARRANT EXCEEDING THE

9   BENCHMARK.

10        NOW, IF YOU DO A LODESTAR CROSSCHECK, WE HAVE APPROACHED

11   IT, AS I SAID, IN A VERY CONSERVATIVE MANNER.  BUT WHEN YOU DO

12   A LODESTAR CROSSCHECK, THE COURTS RECOGNIZE THAT THEY HAVE

13   ALREADY ANALYZED THE FACTORS GOVERNING FEES AWARDS UNDER A

14   PERCENTAGE OF THE FUND METHOD.

15        AND THOSE FACTORS ARE DESIGNED TO PROTECT THE INTERESTS OF

16   ALL INVOLVED, TO ENSURE THAT THE PEOPLE WHO ARE GOING TO

17   BENEFIT FROM THE CREATION OF THE FUND CONTRIBUTE TO THE COST OF

18   CREATING THE FUND.

19        AND IT'S ONLY FAIR THAT THEY DO.  AND IN THIS CASE, THE

20   CLASS MEMBERS, AS WE'VE ALL RECOGNIZED, ARE GOING TO BE WHOLE

21   ALREADY.  SO, IN EFFECT, THEY WILL NOT HAVE HAD TO CONTRIBUTE

22   ANYTHING TO THE PAYMENT OF OUR FEES.

23        AND IN THE LUQUETTA ORDER, JUDGE MUNTER WROTE THAT EVERY

24   CONTINGENT COMMON FUND CLASS ACTION OF WHICH THE COURT IS AWARE

25   HAS RESULTED IN THE CLASS RECEIVING SOME DEDUCTION FROM DAMAGES

1    TO PAY CLASS COUNSEL.

2        AND AS THE U.S. SUPREME COURT OBSERVED IN MILLS V.

3    ELECTRIC AUTO-LITE -- THE CITE FOR THAT IS 396 U.S. 375 -- TO

4    ALLOW THE OTHERS TO OBTAIN FULL BENEFIT FROM THE PLAINTIFFS'

5    EFFORTS WITHOUT CONTRIBUTING EQUALLY TO THE LITIGATION EXPENSES

6    WOULD BE TO ENRICH THE OTHERS UNJUSTLY AT THE PLAINTIFFS'

7    EXPENSE.

8        AND IF YOU GO BACK, YOUR HONOR, TO THE FIRST CASES IN

9    CALIFORNIA TO RECOGNIZE THE COMMON FUND DOCTRINE AS A FEE

10   SHIFTING THEORY FOR THE STATE, THAT WAS ONE OF THE COURT'S

11   PRIMARY CONCERNS:  MAKING SURE THAT THE OUTCOME'S FAIR TO ALL

12   CONCERNED, THAT PEOPLE DO NOT -- THAT WHO ARE GOING TO BENEFIT

13   FROM THE FUND PAY A FAIR SHARE TO PAY FOR THE WORK THAT WAS

14   NECESSARY TO CREATE THE FUND.

15       SO I WOULD SUBMIT, YOUR HONOR, THAT IF YOU APPLY THE

16   PERCENTAGE OF THE FUND METHOD YOU WILL BE ADDRESSING ALL OF THE

17   CONCERNS THAT YOU HAVE ARTICULATED.

18       AND IF YOU LOOK AT THE LODESTAR MERELY AS A CROSSCHECK

19   IT'S NOT NECESSARY TO COME UP WITH A -- TO MAKE A FINDING:

20   HERE'S WHAT THE PLAINTIFFS' COUNSEL'S LODESTAR IS.  IT'S

21   APPROPRIATE TO CONSIDER LODESTAR IN TERMS OF RANGES WHEN YOU'RE

22   LOOKING AT IT AS A CROSSCHECK.

23       IN THE X-RAY FILM CASE, JUDGE ROBINSON OVER IN ALAMEDA

24   COUNTY USED PRECISELY THIS APPROACH WHERE SOMEONE WAS SAYING:

25           "WELL, THE LODESTAR IS TOO HIGH."

1        HIS REASONING WAS:

2            "WELL, EVEN IF YOU REDUCE IT BY A THIRD THE RESULTING

3        MULTIPLIER IS WELL WITHIN THE RANGE THAT OTHER COURTS

4        APPROVE."

5        AND THE JUDGE CONSIDERED:  WHAT DO OTHER COURTS APPROVE?

6   AND WE PROVIDED INFORMATION AS WELL AS CITATIONS, A LOT OF

7   FEDERAL AND STATE COURT CASES, APPROVING LODESTARS IN THE

8   RANGE OF TWO OR THREE, WHICH IS WHAT THE MATH WOULD WORK OUT TO

9   IF WE REDUCED OUR TOTAL LODESTAR, WHICH 50 PERCENT, OR BY

10  25 PERCENT.

11       SO IF YOU USE THAT APPROACH, YOUR HONOR, I BELIEVE THAT

12  ALL OF YOUR CONCERNS SHOULD BE ADDRESSED BECAUSE THE FACTORS

13  THAT THE COURTS HAVE DEVELOPED ARE INTENDED TO ADDRESS

14  PRECISELY THOSE CONCERNS.

15       THE COURT:  OKAY.  THANK YOU.

16       MS. PREOVOLOS.

17       BY THE WAY, THE INCENTIVE PAYMENTS, WHICH I UNDERSTAND ARE

18  SUPPOSED TO BE A THOUSAND PER REPRESENTATIVE PLAINTIFF, I THINK

19  THAT IS WELL WITHIN THE BOUNDS, AND I DON'T HAVE --

20       MS. PREOVOLOS:  WE DIDN'T OPPOSE THE INCENTIVE FEES,

21  JUDGE, JUST TO BE CLEAR.  THOSE ARE UNOPPOSED.

22       YOUR HONOR, IT'S ALMOST DIFFICULT TO KNOW WHERE TO START

23  BECAUSE THIS IS A RICH TOPIC.  BUT I THINK WHERE I WANT TO

24  START IS BY SAYING -- AND I DO WANT TO TALK ABOUT THE

25  METHODOLOGY BECAUSE I THINK THE LAW IS IMPORTANT.

```
1        BUT I WANT TO SAY TO START, SIMPLY THIS: YOUR HONOR HAS
2    RECOGNIZED IN A COUPLE OF DECISIONS -- AND SOME OF THE FEDERAL
3    AND CALIFORNIA COURTS -- THAT WHATEVER METHODOLOGY YOU USE,
4    WHETHER YOU USE A LODESTAR AS I'M GOING TO ADVOCATE YOU HAVE TO
5    DO WITH PERCENTAGE OF THE FUNDS AS A CROSSCHECK, OR YOU USE
6    PERCENTAGE OF THE FUND WITH LODESTAR AS A CROSSCHECK, THE AIM
7    OF BOTH APPROACHES IS THE AWARD OF A REASONABLE, A REASONABLE
8    FEE TO COMPENSATE COUNSEL.
9        AND FOR THE REASONS I'M GOING TO COVER IN A FEW MINUTES
10   AND FOR THE REASONS ADDRESSED IN OUR BRIEF, THE FEE DEMAND HERE
11   IS UNREASONABLE.  IT IS OUTRAGEOUS.
12       THIS CASE WAS NOT REALLY LITIGATED.  PLAINTIFFS CAN TALK
13   ABOUT HOW THEY DID A GOOD JOB AND HOW APPLE WAS OBSTRUCTIVE IN
14   DISCOVERY AND THE FACT THAT THEY HAD SIX MEDIATION SESSIONS.
15   BUT THE BOTTOM LINE HERE IS:  THIS IS A CLASS ACTION IN WHICH
16   WE DIDN'T FILE A MOTION TO DISMISS, SUMMARY JUDGMENT MOTION.
17   THERE WAS NO OPPOSED CLASS MOTION.  THERE WERE SIX MEDIATION
18   SESSIONS.
19       AND IF YOU LOOK AT MR. FAZIO'S DECLARATION YOU'LL SEE THAT
20   THERE WERE APPARENTLY -- THE PLAINTIFFS CONTEND THERE WERE
21   TWO-AND-A-HALF MONTHS OF INTENSE DISCOVERY.  THAT DOES NOT AN
22   $8.8 MILLION LODESTAR MAKETH.  THERE WAS ENORMOUS DUPLICATION
23   OF EFFORTS.
24       IF YOU LOOK AT THE PLAINTIFFS' COUNSEL TABLE YOU'LL SEE
25   THAT.  AND I'M GOING TO TALK ABOUT THAT RESPECTFULLY IN A
```

1  MOMENT.

2      BUT WE HAD SEVEN PEOPLE AT EVERYTHING.  AND WHY DID WE

3  HAVE THAT?  WAS IT BECAUSE OF APPLE?  NO.  IT WAS BECAUSE THERE

4  WERE 11 FIRMS, SEVEN OF WHOM WERE IN A FEE FIGHT, AND TWO OF

5  WHOM ARE IN A HUGE FEE FIGHT.  AND YOU CAN DISCERN THAT FROM

6  MR. FAZIO AND MR. SCHWARTZ'S DECLARATIONS, BECAUSE THEY TELL

7  YOU EACH OF THEM THINKS THAT THEIR FIRM WAS THE PRIMARY

8  ARCHITECT AT EVERY IMPORTANT PHASE OF THIS LITIGATION.

9      AND MS. KRALOWEC WAS ALLIED WITH FAZIO AND MICHELETTI.

10 AND MR. CHAVEZ AND HIS COLLEAGUES TELL YOU THAT THEY HAD TO

11 LITIGATE THE STATE CASE STANDALONE.  AND THE RESULT IS YOU HAVE

12 $2 MILLION FEE DEMANDS FROM TWO FIRMS.  AND THEY WOULD LIKE YOU

13 TO DOUBLE THAT TO GET TO THEIR 30 PERCENT.

14     YOU HAVE MILLION DOLLAR DEMANDS FROM THREE OTHER FIRMS.

15 YOU HAVE A $650,000 DEMANDS.  ALL PEOPLE ARGUING IT SHOULD BE

16 DOUBLED.  AND THE PLAINTIFFS WILL TELL YOU THAT THEY MADE NO

17 EFFORT, NO EFFORT TO CUT OR TRIM THEIR LODESTAR FOR DUPLICATION

18 OF EFFORTS SO --

19     THE COURT:  LET'S SEPARATE A COUPLE OF THESE CONCEPTS OUT.

20 ONE IS PERHAPS THE THRESHOLD ISSUE, WHICH I WAS DISMISSIVE OF,

21 BUT NOW I WILL ASK YOU THE ROLE YOU HAVE TO PLAY IN THIS AT

22 THIS JUNCTURE IN THIS CASE.

23     IT IS TRUE THAT WHATEVER THE DECISION IS ON THE FEES

24 APPLE'S GOING TO PAY THE SAME AMOUNT.  CORRECT?

25     MS. PREOVOLOS:  YES.  YES, YOUR HONOR.

```
 1          THE COURT:  SO WHAT IS THE DOG IN THE FIGHT, IF YOU WILL?

 2          MS. PREOVOLOS:  I THINK WE HAVE SEVERAL DOGS IN THE FIGHT.

 3   AND I THINK IT'S IMPORTANT TO UNDERSTAND WHAT THEY ARE.  DOG

 4   NUMBER ONE:  WE UNDERSTOOD WHEN WE DID THIS SETTLEMENT FOR

 5   $53 MILLION THAT FEES WERE GOING TO COME OUT OF THAT FUND.

 6          WE WERE NEVER PREPARED TO AGREE TO 30 PERCENT OF THAT FUND

 7   GOING TO THE PLAINTIFFS.  AND WE DIDN'T AGREE TO THAT.  AND IT

 8   IS A WRITTEN TERM OF THE SETTLEMENT.  YOU CAN LOOK AT PARAGRAPH

 9   48 THAT APPLE RETAINS ITS RIGHT TO OBJECT TO THE FEE AMOUNT.

10   AND APPLE RETAINED THAT AMOUNT FOR TWO REASONS.

11          THE MAIN ONE IS, AS YOUR HONOR ABSOLUTELY DISCERNED, APPLE

12   HAS A STRONG INTEREST IN MORE MONEY GOING TO THE CLASS MEMBERS.

13   AND I WANT TO TALK FOR A MINUTE WHY IT'S NOT QUITE RIGHT TO SAY

14   THEY ARE GETTING FULL RECOVERY, BECAUSE THEY ARE NOT.  AND SO

15   THERE IS A REAL INTEREST IN MORE MONEY GOING TO THE CLASS.  AND

16   TO SAY THAT A DEFENDANT WHO SETTLES A CASE DOESN'T CARE ABOUT

17   ITS CONSUMERS ANYMORE IS ABSURD.

18          ONE OF THE REASONS DEFENDANTS SETTLE CASES -- YOU KNOW,

19   YES, THERE ARE EXPENSES OF LITIGATION.  BUT THE OTHER IS THE

20   DEFENDANT WANT THEIR CUSTOMERS TO BE HAPPY.  THAT'S ONE OF THE

21   REASONS WE SETTLE CASES TO PUT DISPUTES BEHIND US.

22          AND SO TO SUGGEST THAT APPLE DOESN'T HAVE A LEGITIMATE

23   INTEREST WHEN THEY NEGOTIATED AND AGREED TO A STAKE IN THIS,

24   AND WOULD NEVER HAVE AGREED TO SUCH A BLOATED FUND IF WE DIDN'T

25   HAVE SOMETHING TO SAY ABOUT THAT IS NONSENSE.
```

1          AND APPLE HAS A VERY STRONG INTEREST IN THE INTERESTS OF

2     ITS CONSUMERS.

3          THE SECOND, AS YOUR HONOR RECOGNIZES, IS I THINK THERE'S A

4     LARGER ISSUE, WHICH IS THERE IS A PRECEDENT HERE FOR APPLE AND

5     FOR OTHER DEFENDANTS.  AND I DON'T THINK IT'S APPROPRIATE TO

6     SAY THAT THE DEFENDANT HAS NO INTEREST IN A PILE ON OF 11 LAW

7     FIRMS, ALL OF WHOM GET TO PUT UP THEIR HANDS AND SAY:

8               "I WANT FEES.  AND I WAS FIGHTING WITH MY COLLEAGUES.

9          AND NONE OF US COULD AGREE.  AND WE ALL WENT TO EVERYTHING

10         AND WE ALL DID EVERYTHING."

11         AND APPLE HAS TO PAY FOR THAT.  AND SO IN THE NEXT CASE,

12    YOU KNOW, LET'S HAVE TEN FIRMS OR ELEVEN FIRMS OR SEVEN FIRMS

13    PILE ON AGAIN BECAUSE WE'RE GOING TO GET 30 PERCENT OF A FEE.

14         THAT IS A BEACON FOR BAD CLASS ACTION TACTICS.  AND IF YOU

15    SAY THAT A DEFENDANT WHO AGREES TO A COMMON FUND IS STUCK AND

16    HAS NOTHING TO SAY ABOUT FEES, I GUARANTEE YOU ANY CORPORATE

17    DEFENDANT WHO IS RESPONSIBLE IS NEVER GOING TO AGREE TO A

18    COMMON FUND.  AND THAT'S NOT THE RIGHT RULE.

19         YOU KNOW, I WOULD POINT TO THE FACT THAT THE COURTS IN

20    THIS DISTRICT, THEY WEREN'T DOING THAT AT THE TIME THIS CASE

21    COMMENCED.  BUT A NUMBER OF JUDGES HAVE TAKEN TO SAYING AT

22    BEING IN THE CASE THAT WE WANT ONE FIRM TO STEP FORWARD AND SAY

23    THEY ARE GOING TO LITIGATE THIS CASE.  THE DEFENDANT IS NOT

24    GOING TO PAY FOR THREE, WHICH THE VITAMINS COURT SAYS IS

25    EXCESSIVE.

```
1        HERE WE HAVE 11.  YOU CAN SEE THE PEOPLE AT COUNSEL TABLE.

2   YOU HAD FIVE ACTIVE FIRMS EVERYWHERE, FIVE OR SIX.  AND I THINK

3   THE LAW IS CLEAR APPLE DOESN'T HAVE TO PAY FOR THAT.

4        AND MAKE NO MISTAKE, WHETHER WE PAID FOR THAT BEFORE --

5   NO, WE PAID FOR THAT BEFORE, BUT WE DID NOT TAKE THE VIEW THAT

6   WE HAD AGREED TO PAY 30 PERCENT TO THE LAWYERS.  THAT WAS NOT

7   OUR VIEW.  AND IT WOULD BE A TERRIBLE PRECEDENT TO SAY THAT THE

8   DEFENDANT WHO AGREES TO A COMMON FUND HAS NOTHING TO SAY ABOUT

9   FEES.

10       THE COURT:  THE LEGAL ISSUE OF WHETHER OR NOT LODESTAR IS

11  MANDATED BECAUSE WE ARE HERE IN CALIFORNIA LAW, WHY DON'T YOU

12  ADDRESS THAT?

13       MS. PREOVOLOS:  YES, YOUR HONOR.  I'D WELCOME THAT

14  OPPORTUNITY.  SO I THINK IT'S IMPORTANT TO BE VERY STRAIGHT

15  ABOUT WHAT THE LAW IS TO THE EXTENT THAT ANYONE CAN BE.

16       BUT SERRANO V. PRIEST SAID THE STARTING POINT, THE

17  TOUCHSTONE FOR ANY LEGITIMATE FEE AWARD, LEGITIMATE IN THE EYES

18  OF THE BENCH, THE BAR AND PUBLIC IS THE ACTUAL TIME REASONABLY

19  EXPENDED BY COUNSEL.

20       AND THEY SAY THAT'S THE ONLY WAY FEES CAN BE OBJECTIVELY

21  DETERMINED.  AND AFTER THAT, COURTS HAVE SAID THAT AFTER

22  SERRANO THERE IS A VERY SERIOUS QUESTION WHETHER A COURT CAN

23  USE PERCENTAGE OF THE FUND, EVEN IN A COMMON FUND CASE.

24       THE PLAINTIFFS SAY:

25       "WELL, THAT'S WHAT APPLE SAYS."
```

 1          NO, IT'S NOT WHAT APPLE SAYS.  IT'S WHAT THE CALIFORNIA

 2    COURT OF APPEALS SAYS.  IT'S WHAT LEALAO SAYS.  IT'S WHAT

 3    VITAMIN SAYS.  IT IS WHAT KETCHUM SAYS.

 4          THE COURTS SAY -- AGAIN, AND IT'S WHAT JUTKOWITZ SAID VERY

 5    CLEARLY AND VERY STRONGLY NOT VERY LONG AFTER SERRANO WAS

 6    DECIDED.  AND THAT'S STATE COURT JUDGES LOOKING AT THEIR

 7    SUPREME COURT VERY WELL RESPECTED JUDGES.

 8          AND, LOOK, THE LEALAO COURT IS CLEARLY A HUGE FAN OF THE

 9    PERCENTAGE OF THE FUND.  AND YET THE LEALAO COURT SAYS -- AND

10    IT DOES.  IT SAYS THAT -- AND YOU CAN READ THE LANGUAGE IN THE

11    OPINION.  IT SAYS:

12              "SERRANO V. PRIEST CAST INTO SERIOUS DOUBT WHETHER

13          LODESTAR CAN BE USED IN A COMMON FUND CASE."

14          AND THE OTHER POINT I WOULD MAKE -- WELL, I WOULD LIKE TO

15    MAKE A COUPLE OF POINTS.  BUT THE NEXT POINT I WOULD MAKE, YOUR

16    HONOR, IS THIS:  SERRANO III, WHICH IS THE DECISION WE'RE

17    TALKING ABOUT, WAS DECIDED IN 1977.

18          I WAS A FIRST YEAR LAW STUDENT IN 1977.  THAT WAS 35 YEARS

19    AGO.  AND IN THE 35 INTERVENING YEARS NOT ONE CALIFORNIA COURT

20    OF APPEAL, NOT ONE HAS SAID THIS IS A COMMON FUND CASE, AND WE

21    CAN APPROPRIATELY APPLY PERCENTAGE OF THE FUND ANALYSIS,

22    NOTWITHSTANDING SERRANO.  NOT ONE.

23          AND THE PLAINTIFFS SAY TWO THINGS.  THEY SAY THERE'S BEEN

24    AN UNBROKEN LINE OF DECISIONS IN CALIFORNIA FOR 112 YEARS IN

25    FAVOR OF PERCENTAGE OF THE FUND AS THOUGH THE SUPREME COURT

```
1    NEVER DECIDED SERRANO.  BUT YOU CAN'T LOOK AT IT THAT WAY,

2    JUDGE, BECAUSE YOU'RE SITTING HERE, AND THE ISSUE FOR YOU IS

3    WHAT WOULD THE CALIFORNIA SUPREME COURT DO?

4         NOW, THE PLAINTIFFS TALK ABOUT SUPPOSED CALIFORNIA

5    AUTHORITY FOR 30 PERCENT OF THE FUND.  AND I WANT TO MAKE A FEW

6    POINTS ABOUT THAT.  POINT NUMBER ONE:  THOSE ARE ALL SUPERIOR

7    COURT DECISIONS.  THEY HAVE NO PRECEDENTIAL WEIGHT IN THIS

8    COURT.

9         WE CITE FEDERAL CASE LAW AND STATE CASE LAW SO HOLDING.

10   AND WE WOULD ASK THE COURT TO DENY THE REQUEST FOR JUDICIAL

11   NOTICE OF THOSE CASES BECAUSE THEY CANNOT BE CITED FOR THEIR

12   MERITS.

13        BUT LET'S MOVE PAST THAT, AND LET'S TALK ABOUT THOSE CASES

14   FOR A MINUTE.  SO HERE'S THE IMPORTANT THING ABOUT THOSE CASES.

15   ALL BUT TWO OF THEM ARE ORDERS PREPARED BY PLAINTIFF'S COUNSEL

16   AND SIGNED BY THE COURT.

17        THERE IS NO INDICATION THAT THE FEES WERE OPPOSED. THERE

18   IS NO INDICATION THAT THE COURT THOUGHT ABOUT THE ISSUE.  AND I

19   DON'T THINK THOSE GIVE YOUR HONOR ANY GUIDANCE.

20        JUDGE MUNTER'S SO-CALLED DECISION, WHICH THE PLAINTIFFS

21   LIKE TO TALK ABOUT IS A DECISION, AGAIN, DRAFTED BY COUNSEL.

22   WE CAN'T TELL IF THERE WAS ANY OPPOSITION.  AND JUDGE MUNTER

23   SCRIBBLED A COUPLE OF NOTATIONS.

24        DOES THAT MEAN HE THOUGHT ABOUT THIS PARTICULAR ISSUE?

25   YOU CAN'T TELL, AND I CAN'T TELL.  BUT WE KNOW -- I KNOW TWO
```

```
1   THINGS.  I KNOW JUDGE MUNTER IS A TERRIFIC JUDGE, AND I KNOW
2   HE'S A VERY BUSY JUDGE.  AND SO TO THE EXTENT THAT THAT WAS A
3   PROPOSED ORDER, UNDISPUTED, I DON'T THINK YOU CAN GIVE A LOT OF
4   WEIGHT TO IT.
5       THE OTHER POINT IS IT WASN'T A SETTLEMENT.  IT WASN'T A
6   PERCENTAGE OF THE FUND.  IT WAS A LITIGATED CASE WHERE SUMMARY
7   JUDGMENT HAD BEEN GRANTED.  THAT IS ONE CASE.  AND THE OTHER
8   CASE I APOLOGIZE FOR NOT RECALLING THE NAME, BUT IT'S THE
9   ALAMEDA CASE BY JUDGE SYREN.  AND IN THAT CASE HE DOES TALK
10  ABOUT THE ISSUES.
11      BUT HE TALKS ABOUT THE ISSUES IN A CONTEXT WHERE THE
12  PARTIES WENT THROUGH TRIAL WHERE THE PLAINTIFFS LOST SUMMARY
13  JUDGMENT.  I THINK THEY LOST SUMMARY JUDGMENT.  MAYBE THEY LOST
14  A MOTION TO DISMISS.  AND THEY LOST CLASS CERT.  AND THEY WENT
15  UP ON APPEAL, AND THEY HAD TO GET REVERSED ON APPEAL.
16      AND THEY LITIGATED THE CASE 11 YEARS, AND HE GAVE THEM A
17  1021.5 AWARD, A LODESTAR-BASED AWARD, ON EVERYTHING EXCEPT A
18  PERCENTAGE OF PUNITIVE DAMAGES.
19      I DON'T THINK THAT HELPS THE PLAINTIFFS HERE.  THE ONLY
20  OTHER CASE WHERE THE TRIAL COURT TALKED ABOUT THE LAW WAS
21  VITAMINS.  AND THAT WASN'T A PERCENTAGE OF THE FUND CASE.  THAT
22  WAS A LODESTAR CASE WHERE THE COURT OF APPEAL OVERRULED THE 2.2
23  MULTIPLIER, AND THE TRIAL COURT, I WOULD SAY, DID NOT TAKE THE
24  COURT OF APPEAL'S GUIDANCE AS SERIOUSLY AS I WOULD HAVE HOPED
25  THE COURT WOULD HAVE.
```

1        BUT IN ANY EVENT, IT'S NOT A CASE ABOUT PERCENTAGE OF THE

2    FUND.

3        AND SO THOSE ARE THE PLAINTIFFS' AUTHORITIES.  THOSE ARE

4    THE PLAINTIFFS' AUTHORITIES.

5        THE COURT:  LET ME STOP YOU FOR A MOMENT ON THE -- IF WE

6    ASSUME THAT I AM IN THE BRIAR PATCH OF LODESTAR-DOME HERE, WHAT

7    DO I -- SO THAT'S THE REALM IN WHICH I'M OPERATING.

8        WHAT IS YOUR SUGGESTION ON HOW I APPROACH IT?  BECAUSE ON

9    THE ONE HAND CENTRAL TO THE PLAINTIFFS' ARGUMENT, BE IT

10   PERCENTAGE OR LODESTAR, IS THAT THE RESULT HERE HAS BEEN A VERY

11   STRONG RESULT.

12       AND I KNOW IN A MOMENT I GUESS YOU ARE GOING TO TELL ME

13   WHY IT'S NOT AS STRONG AS THEY SAY IT IS.

14       BUT LET'S ASSUME IT'S A FAIRLY GOOD RESULT FOR THE

15   PUTATIVE CLASS MEMBERS.  CERTAINLY APPEARS TO ME TO BE BETTER

16   THAN I OFTEN SEE.

17       SO GIVEN THAT, IS IT YOUR POSITION THAT NO MULTIPLIER

18   WOULD BE APPROPRIATE HERE?  AND I REALIZE THAT DEPENDS UPON THE

19   LODESTAR CALCULATION, AND PERHAPS THAT'S WHAT WE HAVE TO TALK

20   ABOUT FIRST.

21       YOU'VE OBJECTED TO THE NOTION THAT THERE ARE ALL OF THESE

22   PEOPLE AT EVERY EVENT IN THIS CASE.  HOW DO I DECIPHER WHETHER

23   OR NOT THEY WERE NECESSARY OR THEY WEREN'T?

24       HOW DO I GO ABOUT IT IF I DO IT THE WAY YOU THINK I SHOULD

25   DO IT?

1     MS. PREOVOLOS:  I THINK YOUR HONOR HAS SOME DISCRETION

2     THERE.  LET ME MAKE A COUPLE OF POINTS.  POINT NUMBER ONE IS WE

3     DON'T CHALLENGE THAT THIS WAS A STRONG RESULT.  THIS WAS A GOOD

4     SETTLEMENT.  YOU KNOW, WE WOULDN'T STAND UP HERE AND ASK YOUR

5     HONOR TO APPROVE IT IF WE DIDN'T THINK IT WAS A GOOD

6     SETTLEMENT.

7         BUT THERE ARE A COUPLE OTHER FACTORS I THINK YOU HAVE TO

8     LOOK AT BEFORE YOU GET DOWN INTO THE INTESTINES OF LODESTAR.

9     AND ONE IS YOU KNOW IN TERMS OF USING A MULTIPLIER THE

10    CALIFORNIA COURTS GO AT IT A LITTLE DIFFERENTLY, PARTICULARLY

11    WHEN YOU START WITH LODESTAR AND DON'T USE IT AS A CROSSCHECK.

12        AND THEY WARN THAT MOST OF THE FACTORS THAT WOULD JUSTIFY

13    A MULTIPLIER ARE CAPTURED IN THE LODESTAR.  AND SO TO THE

14    EXTENT YOU TALK ABOUT RISK -- AND THE PLAINTIFFS TALK ABOUT

15    RISK -- YOU KNOW, THE VITAMINS, FOR EXAMPLE, SAYS:

16            "WELL, THERE'S NOT A WHOLE LOT OF RISK.  A RISK IS

17         GREATLY REDUCED WHERE THE PLAINTIFFS DON'T HAVE TO GO

18         THROUGH CLASS CERT AND TRIAL."

19        AND A NUMBER OF OTHER CASES SAY, YOU KNOW, IN CALIFORNIA

20    WE VIEW RISK AS GREATLY REDUCED WHERE YOU DON'T HAVE TO GO

21    THROUGH TRIAL.  SO I THINK THAT'S ONE BIG POINT.  I THINK IF

22    YOU LOOK AT THE PERCENTAGE OF FUND CASES I DON'T THINK YOU'RE

23    GETTING CLOSE TO 30 PERCENT.  THAT'S NUTS HERE, AND I DON'T

24    REALLY THINK YOU'RE GETTING AT 25 PERCENT.

25        I MEAN, PERCENTAGE OF FUND CASES SAY IN A BIG FUND YOU'RE

```
 1   LOOKING AT A NUMBER BETWEEN 15 AND 20.  AND I'M NOT AVOIDING

 2   YOUR HONOR'S QUESTION BECAUSE HERE'S THE POINT I WANT TO MAKE.

 3        IF YOU TAKE THEIR -- MY PARTNER, MR. HARRIS, REFERS TO IT

 4   AS THE PLAINTIFFS" UNPRUNED LODESTAR" -- AND YOU LOOK AT THE

 5   FACTS THAT ARE VERY CLEAR FROM THE DECLARATIONS WHICH IS THAT

 6   THERE WAS DUPLICATION OF EFFORT.

 7        YOU KNOW, YOU CAN'T LOOK AT A SITUATION WHERE MR. FAZIO

 8   SAYS:

 9             "MS. MICHELETTI AND I HAVE THE LEAD AT EVERY TURN."

10        AND MR. SCHWARTZ SAYS:

11             "WE STOOD AT THE FOREFRONT SQUARELY OF THIS

12        LITIGATION."

13        AND MS. KRALOWEC WAS WORKING WITH FAZIO MICHELETTI, AND

14   THE STATE PLAINTIFFS SAY THEY NEED TO DO IT STANDALONE.  I

15   DON'T THINK YOU NEED TO LOOK AT FEE RECORDS TO KNOW THERE WAS A

16   LOT OF DUPLICATION HERE.

17        OUR SUGGESTION IF THE COURT WANTS TO CUT THROUGH IT IS

18   GIVE THEM THEIR UNPRUNED LODESTAR BECAUSE THEIR UNPRUNED

19   LODESTAR IS 16.5 PERCENT OF THE FUND.

20        THE COURT:  THE 8.78 FIGURE?

21        MS. PREOVOLOS:  AND WE THINK THERE IS JUST NO WAY THAT AT

22   THE END OF THE DAY, WHICHEVER ANALYSIS YOU USE, YOU END UP WITH

23   MORE.

24        SO --

25        THE COURT:  IS THAT A -- THE REASON TO DO THAT IS THAT IN
```

```
1    A ROUGH JUSTICE YOU WOULD BE EFFECTIVELY REFLECTING A

2    MULTIPLIER IN THE SENSE THAT TO GIVE THEM THE, AS YOU SAY,

3    "UNPRUNED LODESTAR," YOU'RE EFFECTIVELY APPLYING A MULTIPLIER

4    BECAUSE UNDER YOUR THEORY THERE'S BEEN OVERSTAFFING.  AND SO IT

5    WOULD BE A FUNCTION OF NOT GOING ABOUT IT BY REDUCING IT, AND

6    THEN INCREASING IT.  WITH A MULTIPLIER IT'S THE MULTIPLIER IS

7    BUILT IN BECAUSE YOUR STARTING POINT IS AWARDING BEYOND WHERE

8    IT WAS ABSOLUTELY NECESSARY.

9         MS. PREOVOLOS:  I WOULDN'T EVEN SAY:

10             "ABSOLUTELY NECESSARY."

11        IT GOES BEYOND REASONABLE EFFORTS BY ANY ONE OR TWO FIRMS

12   ACTING NOT FOCUSED ON A FIGHT ABOUT THEIR FEES FROM DAY ONE OF

13   THIS LITIGATION.  IT WOULD BE A GENEROUS FEE AMOUNT FOR WHAT

14   HAPPENED IN THIS CASE.

15        $8.8 MILLION IS A GREAT DEAL OF MONEY.  YOU KNOW,

16   $2 MILLION OR $2.2 MILLION FOR TWO SEPARATE FIRMS AND A BUNCH

17   OF OTHER FIRMS ASKING FOR -- A COUPLE OF OTHER FIRMS ASKING FOR

18   ONE.  THAT'S A GREAT DEAL OF MONEY, SO -- BUT -- BUT, YOU KNOW,

19   SO I THINK THAT --

20        THE COURT:  IT MAY BE A GREAT DEAL OF MONEY IN THE

21   ABSTRACT, BUT THE PLAINTIFFS ARE POINTING OUT TO ME THAT THIS

22   CASE WENT ON FOR A CONSIDERABLE AMOUNT OF TIME, EVEN IF I

23   DIDN'T SEE THAT MUCH OF IT.

24        FOUR YEARS IS WHAT I THINK THESE --

25        MS. PREOVOLOS:  BUT, YOUR HONOR, IT'S NOT A FUNCTION OF
```

```
1   HOW MUCH TIME.  IT'S A FUNCTION OF WHAT HAPPENED.  AND WITH ALL

2   DUE RESPECT TO PLAINTIFFS, YOU KNOW, ASSUME INTENSE MEDIATION.

3   ASSUME INTENSE SETTLEMENT DISCUSSIONS.  ASSUME AT MOST SIX

4   MONTHS OF ACTIVE DISCOVERY, BECAUSE THAT'S -- AND THE

5   PLAINTIFFS SAY INTENSE FOR TWO-AND-A-HALF MONTHS.

6        IT JUST DOESN'T GET YOU TO NUMBERS LIKE THAT.  IT DOESN'T

7   GET YOU TO 30 PERCENT OF THIS FUND.  YOU KNOW, IF THE COURT

8   FEELS -- SO OBVIOUSLY ONE OPTION FOR THE COURT IS TO GET THE

9   TIME RECORDS AND LOOK AT THE DUPLICATION AND, YOU KNOW, RETAIN

10  A SPECIAL MASTER OR DO WHATEVER YOU DO.

11       BUT MY POINT IS I THINK YOU CAN GET -- I THINK YOU GET TO

12  THE RESULT THAT THE FEE DEMANDS HERE IS OVER THE TOP.  YOU

13  KNOW, KIND OF HOWEVER -- HOWEVER YOU DO IT.  AND I DO

14  THINK -- YOU KNOW, THE PLAINTIFFS MADE ONE INTERESTING COMMENT

15  THAT I DO WANT TO PICK UP ON.

16       YOU KNOW, THEY TALK IN THEIR PAPERS THROUGHOUT ABOUT HOW

17  OVER THE TOP APPLE WAS, AND APPLE WAS SO DIFFICULT IN DISCOVERY

18  AND YEAH, YEAH, YEAH, YEAH, YEAH.

19       AND THEY SAY:

20            "WELL, LOOK AT APPLE'S BRIEF FOR AN EXAMPLE."

21       WELL, LET'S DO THAT.  THEIR BRIEF WAS 17 PAGES LONG. THE

22  PLAINTIFF FILED TWO OVERLENGTH BRIEFS AND HUNDREDS OF PAGES OF

23  DECLARATIONS.

24       WOULD YOU SEE THAT IN A CASE WHERE ONE OR TWO FIRMS

25  EFFICIENTLY LITIGATED THIS CASE?  I DON'T THINK SO.
```

1    AND TO THE EXTENT THAT YOU ARE GOING TO HEAR -- AND I'M

2  SURE YOU'LL HEAR REBUTTAL, BECAUSE I HAVE SAID WHAT I HAVE.

3  AND APPLE IS AWFUL, AND APPLE DID ALL THESE TERRIBLE THINGS,

4  AND BLAH, BLAH, BLAH, BLAH, BLAH.  YOU KNOW, WE'VE HEARD THAT

5  IN THE PAPERS.

6    THE BOTTOM LINE IS IF THERE'S ANYTHING REMARKABLE ABOUT

7  THIS CASE IT'S THAT APPLE DIDN'T FORCE THE PLAINTIFFS TO FILE

8  ONE SINGLE MOTION TO COMPEL DISCOVERY.  AND THAT'S THE

9  OBJECTIVE FACT.  AND NOTHING IN THE TIME RECORDS IS GOING TO

10  CHANGE THAT.

11    SO I DO THINK ONE THING TO STRESS IS WHETHER YOU USE

12  LODESTAR PRIMARY, AND I THINK YOU HAVE TO DO THAT, OR WHETHER

13  YOU USE LODESTAR AS A CROSSCHECK, IF YOU ARE LOOKING AT

14  CALIFORNIA LAW, THAT IS NOT DOING IT -- CALIFORNIA LAW DOES NOT

15  DO THAT IN A KIND OF LIGHT-HEARTED WAY THAT DOES NOT TAKE

16  SERIOUSLY DUPLICATION OF EFFORT.

17    IT TAKES IT VERY SERIOUSLY.  AND THE VITAMINS DECISION AND

18  THE ROMULUS DECISION TALK ABOUT HOW YOU HAVE TO PRESUME

19  DUPLICATION OF EFFORT WITH THREE FIRMS.

20    AND I DON'T THINK YOUR HONOR HAS TO MAKE, YOU KNOW, AN

21  INCREDIBLY DETAILED EXAMINATION OF THE TIME RECORDS HERE TO

22  FIGURE OUT THAT YOU HAVE DUPLICATION OF EFFORT, AND THAT IT WAS

23  DRIVEN BY A STRUCTURE WHERE, IN PARTICULAR, THE THREE OR FOUR

24  LEAD FIRMS DIDN'T GET ALONG WITH EACH OTHER.

25    AND WE READ THINGS IN THE DECLARATIONS WHERE MR. SCHWARTZ

1   AND MR. FAZIO SAY:

2            "WE DIDN'T AGREE ABOUT THE STRATEGY OF THE CASE.  WE

3        DIDN'T AGREE ABOUT THE MERITS OF THE CASE.  AND I HAD TO

4        WRITE A POWER POINT," OR "I HAD TO WRITE MY CLASS MOTION."

5        AND THE LAW IS VERY CLEAR THAT THE CLASS AND THE DEFENDANT

6   DON'T HAVE TO PAY FOR THAT AND SHOULDN'T HAVE TO PAY FOR THAT,

7   AND THAT CREATES A HORRIBLY PERVERSE INCENTIVE.

8        YOU KNOW, THE BENCH AND THE BAR AND THE PRESS HAVE ALL HAD

9   A LOT OF CONCERNS ABOUT CLASS ACTIONS.  AND ONE OF THOSE

10  CONCERNS IS PILE ONS, AND MULTIPLE LAWYERS SCRAMBLING OVER EACH

11  OTHER IN AN UNSEEMLY BATTLE FOR FEES.

12       AND THAT HAPPENED HERE.

13       THE COURT:  REMIND ME WHEN THE CASE WAS FIRST ASSIGNED TO

14  ME I DON'T REMEMBER HAVING THE ISSUE OF LEAD COUNSEL AND THE

15  STRUCTURE BEING SOMETHING THAT I EVER WEIGHED IN ON.

16       MS. PREOVOLOS:  NO.  YOU AGREED TO A POINT MR. SCHWARTZ'S

17  FIRM AND MR. FAZIO'S FIRM CO-LEAD COUNSEL.  AND WE DIDN'T

18  OPPOSE THAT.

19       THE COURT:  RIGHT.

20       MS. PREOVOLOS:  BUT, YOUR HONOR, I ASSURE YOU IF I HAD

21  KNOWN THAT WOULD MEAN FOUR OR FIVE LAWYERS AT EVERY DEPOSITION,

22  I MEAN THIS CASE WAS OUTRAGEOUS.  I LIVED IT.  AND SO WE HAD

23  LAWYERS CRAWLING ALL OVER EACH OTHER.

24       WE HAD FIVE AND SIX LAWYERS ON EVERY PHONE CALL.  WE HAD

25  DAILY PHONE CALLS WITH THE SETTLEMENT ADMINISTRATOR, MULTIPLE

1    PHONE CALLS.  WE HAD DAILY PHONE CALLS OVER EVERY DETAIL OF THE

2    SETTLEMENT DOCUMENTS.  AND THOSE PHONE CALLS WERE ATTENDED BY

3    ME AND PERHAPS MR. MULBECK (PHONETIC).

4         IN THE DISCOVERY MEET AND CONFERS THEY WERE ATTENDED BY AN

5    ASSOCIATED OR TWO.  AND WE HAD FOUR OR FIVE PARTIES FROM THESE

6    FIRMS.

7         THE COURT:  LET ME ASK YOU --

8         MS. PREOVOLOS:  AND SO JUST TO FINISH, I'M NOT -- YOU

9    KNOW, THIS CASE MAY HAVE BEEN STRUCTURED IN A WAY THAT DIDN'T

10   PREVENT THAT.  BUT THAT DOESN'T MAKE IT OKAY TO TAKE THAT MONEY

11   AWAY FROM THE CLASS.

12        AND, YOU KNOW, CO-LEAD COUNSEL IS A COMMON --

13        THE COURT:  WELL, AND IT DOESN'T -- AND I AGREE WITH YOU

14   IT DOESN'T PRECLUDE ME FROM TAKING A CRITICAL EYE TOWARDS IT AT

15   THIS POINT SIMPLY BECAUSE IT WASN'T A QUESTION AT THE OUTSET AS

16   TO HOW IT WAS GOING TO PROCEED.  SO I THINK I'M PERFECTLY

17   ENTITLED TO TAKE A LOOK AT IT NOW.

18        AND PERHAPS BACK TO PLAINTIFFS' SIDE, YOU KNOW, WHEN I'VE

19   BEEN IN THIS POSITION WHERE I DO KNOW OR I'M ADDRESSING IT AT

20   THE BEGINNING.  USUALLY THE ARGUMENT IS THAT THERE ARE

21   PARTICULAR -- PARTICULAR VALUE ADDED TO HAVING THESE ADDITIONAL

22   FIRMS.  AND THEY HAVE ONE OR THE OTHER HAS AN EXPERTISE, AND

23   THEY CAN ADD AND SUBTRACT AND ALL THE REST OF IT.

24        WHAT IS THE JUSTIFICATION IN THIS CASE FOR A TABLE FULL OF

25   PEOPLE FOR THIS KIND OF PROCEEDING?

```
 1        I MEAN, WHY DID YOU NEED ALL THESE PEOPLE AT EVERY STAGE

 2   OF THE GAME?

 3        MS. KRALOWEC:  WELL, YOUR HONOR, I DO AGREE THAT BEFORE

 4   YOU MAKE A DECISION ON LODESTAR WE SHOULD SUBMIT OUR DETAILED

 5   TIME AND EXPENSE REPORTS BECAUSE THOSE WILL FLESH OUT THE

 6   STORY.

 7        THE CASE IS SIGNIFICANTLY MORE COMPLICATED THAN

 8   MS. PREOVOLOS IS SUGGESTING.  AND IF WE DID NOT HAVE MULTIPLE

 9   HEADS DEALING WITH A NUMBER OF THESE ISSUES WE WOULD NOT HAVE

10   ACHIEVED THE RESULTS THAT WE DID.  AND I CAN GIVE YOU EXAMPLES

11   OF SPECIFIC ISSUES THAT WE HAD TO FACE AND OVERCOME.

12        THE COURT:  BUT WAS THERE A -- DID THE TWO LEAD COUNSEL

13   FIRMS HAVE A PLAN IN TERMS OF DIVISION OF LABOR THAT, YOU KNOW,

14   IF IT INVOLVES THIS ASPECT OF THE CASE, THEN THIS FIRM'S PEOPLE

15   GO.  OR IF IT'S THIS ASPECT OF THE CASE, THIS FIRM'S PEOPLE GO.

16        THE WORST OF ALL IS FOR EVERY FIRM THAT IS SITTING AT

17   TABLE TO SEND SOMEBODY.  THAT'S PURELY FOR THE BENEFIT OF, YOU

18   KNOW, THE MULTI LATERAL APPROACH TO THE LITIGATION.  IT DOESN'T

19   GO TO WHETHER OR NOT IT'S SERVING THE CLASS.

20        MS. KRALOWEC:  YOUR HONOR --

21        THE COURT:  AND SO PERHAPS THAT'S NOT WHAT WENT ON HERE.

22   BUT THAT'S MY QUESTION.

23        MS. KRALOWEC:  THAT MIGHT BE SOMETHING FOR ONE OF THE LEAD

24   COUNSEL TO ADDRESS.  BUT LET ME SAY THIS:  APPLE WANTED US TO

25   COORDINATE DISCOVERY WITH THE STATE ACTION.
```

```
1        WE DIDN'T COME IN HERE TO ANY COURT AND GET A FORMAL

2   ORDER. BUT THAT WAS THEIR REQUEST.  THEY DIDN'T WANT TO RESPOND

3   TO THE SAME DISCOVERY MULTIPLE TIMES.  THEY DIDN'T WANT TO

4   PRODUCE DOCUMENTS TO MULTIPLE LAW FIRMS.

5        SO THAT ASPECT OF IT WAS AT THEIR REQUEST.  AND I ALSO

6   WANT TO SAY BEFORE I HAND IT OFF TO LEAD COUNSEL THAT

7   MS. PREOVOLOS IS MISAPPLYING THE FACTORS IN THE KETCHUM V.

8   MOSES CASE.

9        IF THIS IS A LODESTAR CASE -- AND WE STILL BELIEVE

10  PERCENTAGE METHOD APPLIES.  BUT IF YOUR HONOR IS INCLINED TO

11  USE THE LODESTAR METHOD THE LEADING CASE IS KETCHUM V. MOSES.

12  AND THE LEADING FACTORS TO BE CONSIDERED ARE THE SUCCESS

13  ACHIEVED, THE CONTINGENCY RISK -- AND, IN FACT, THERE'S CASES

14  HOLDING THAT IT IS ERROR NOT TO CONSIDER CONTINGENCY RISK AS AN

15  ENHANCEMENT.

16       THAT IS THE HOLDING BOTH OF THE GREEN V. DILLINGHAM CASE

17  CITED IN THE PAPERS, IN THE WASHINGTON POWER CASE IN THE NINTH

18  CIRCUIT.  THE NINTH CIRCUIT REVERSED A DISTRICT COURT RULING

19  THAT REFUSED TO ALLOW AN ENHANCEMENT FOR CONTINGENCY RISK.

20       THE EXCELLENCE OF THE WORK DONE COLLECTIVELY --

21       THE COURT:  THE ENHANCEMENT, AND THAT GETS THEM BEYOND THE

22  25 PERCENT?

23       MS. KRALOWEC:  IT WAS REMANDED FOR A REDETERMINATION, SO

24  IT WASN'T DETERMINED BY THE NINTH CIRCUIT IN THAT OPINION.

25       WE HAD A HUGE CONTINGENCY RISK HERE.  MS. PREOVOLOS SAYS
```

1  THAT IT'S NOT A FUNCTION OF HOW MUCH TIME HAS PASSED, HOW LONG

2  THE LITIGATION LASTED.  BUT THAT IS A RELEVANT FACTOR IN A

3  LODESTAR ANALYSIS BECAUSE ONE OF THE THINGS THE COURTS CONSIDER

4  IS HOW MUCH OF A BURDEN THE CASE WAS ON CLASS COUNSEL WORKING

5  FOR NO PAY FOR FOUR YEARS; THAT WE DECLINED OTHER WORK IN ORDER

6  TO TAKE ON THIS CASE.

7      THE COURT:  THAT MAY BE.  BUT THE VERY FACT IS -- AND I

8  REALIZE THERE'S A DOUBLED-EDGE SWORD ASPECT TO IT -- BUT THERE

9  WEREN'T A LOT OF PROCEEDINGS IN THIS COURT.  SO THE IDEA THAT

10  YOUR CONTINGENCY RISK TO THE EXTENT THAT'S A REFLECTION OF HOW

11  MUCH EXPENSE AND EFFORT AND TIME IS DEVOTED TO IT BY THE

12  PLAINTIFFS' COUNSEL, IT FORTUNATELY, PERHAPS THROUGH GOOD

13  LAWYERING AND THE LIKE, DIDN'T HAVE A WHOLE LOT OF PROCEEDINGS

14  THAT WERE REQUIRED IN TERMS OF SUBMISSION OF BRIEFS AND THE

15  LIKE.

16      MS. KRALOWEC:  IT WAS GOOD LAWYERING, AND WE SHOULD NOT BE

17  PENALIZED FOR GOOD LAWYERING.

18      THE COURT:  BUT YOU SHOULDN'T GET A WINDFALL FOR IT,

19  EITHER.

20      MS. KRALOWEC:  WELL --

21      THE COURT:  YOU SHOULDN'T TAKE THE MONEY THAT YOU SAID:

22          "IF WE LITIGATED THIS UP ONE SIDE AND DOWN THE OTHER,

23      AND WE DIDN'T DO THAT, SO WE GET ALL THAT MONEY AS IF WE

24      DID."

25      THAT DOESN'T MAKE ANY SENSE.

```
1        MS. KRALOWEC:  YOUR HONOR, IN KETCHUM V. MOSES CALIFORNIA

2   SUPREME COURT SPECIFICALLY HELD THAT COMPENSATION FOR

3   CONTINGENCY RISK IS EARNED COMPENSATION AND IT IS NOT A

4   WINDFALL, RESPECTFULLY.

5        THE COURT:  OKAY.  BUT WHY DOES THAT MAKE IT EASY TO SAY

6   "CONTINGENCY RISK."  AND THEN, THAT SOUNDS FINE TO ME.  BUT IT

7   ISN'T SELF-EVIDENT THAT IT TRANSLATES INTO THE POT OF GOLD

8   YOU'RE SEEKING.

9        I MEAN, IT DOESN'T.  SURE, IT'S A FACTOR YOU TAKE INTO

10  ACCOUNT, BUT IT'S NOT AS EASY TO SAY -- YOU CAN'T JUST SAY:

11            "OH, WELL, YOU HAVE TO LOOK AT ALL THESE FACTORS, AND

12        THEREFORE WE GET X AMOUNT OF MONEY."

13       IT ISN'T THAT EASY.  SO I'M TRYING TO WRESTLE WITH WHAT IS

14  A REQUEST FOR AN EXTRAORDINARILY, IN MY MIND, LARGE AMOUNT OF

15  MONEY IN A CASE WHERE, FOR WHATEVER REASON, THERE WASN'T -- IT

16  DIDN'T GO THE DISTANCE LIKE A LOT OF THE CASES.  SO THERE IS A

17  CERTAIN ELEMENT OF -- AND I KNOW YOU WON'T LIKE THE PHRASE --

18  BUT THERE IS A CERTAIN ELEMENT OF A WINDFALL-TYPE OF ASPECT TO

19  IT.  THAT'S TROUBLING TO ME.

20       MS. KRALOWEC:  YOUR HONOR, I'LL LET LEAD COUNSEL ADDRESS

21  SOME OF THESE POINTS.  BUT WHEN YOU LOOK AT FEES -- CASES WITH

22  COMPARABLE SIZE SETTLEMENTS OF 30 PERCENT, 33 PERCENT FEE IS

23  WHAT THE COURT'S REACH, GENERALLY SPEAKING, WHETHER THEY USE

24  THE PERCENTAGE APPROACH OR THE LODESTAR APPROACH.  AND THAT WAS

25  NOTED IN THE CHAVEZ V. --
```

```
 1        THE COURT:  I THINK THE PROBLEM WITH THIS AREA -- AND,

 2   FRANKLY, THIS IS NOT A CRITICISM OF YOUR PRESENTATION.  BUT YOU

 3   CAN FIND A CASE FOR ANY PROPOSITION.  I MEAN, IT REALLY IS --

 4   YOU KNOW, I MEAN IT IS SO SPECIFIC TO THE CASE THAT YOU CAN

 5   SAY:

 6             "OH, LOOK.  HERE ARE FIVE CASES WHERE THEY GAVE 33

 7        PERCENT.  HERE ARE TEN CASES WHERE THEY GAVE 16 PERCENT."

 8        IT DOESN'T HELP VERY MUCH.  IT HELPS ONLY IN THE SENSE

 9   THAT IF IT'S SO FAR OUTSIDE OF THE -- BEYOND THE PALE, ONE CAN

10   SAY:

11             "NO COURT IN LIVING MEMORY HAS EVER GONE DOWN THIS

12        FAR OR EVER GONE UP THIS FAR."

13        THAT, I AGREE, HELPFUL.  BUT, YOU KNOW, THE FACT THAT

14   THERE ARE SOME CASES THAT HAVE GIVEN 33 PERCENT, AND THERE'S

15   SOME CASES THAT HAVE GIVEN 12 PERCENT, I'M NOT SURE HOW MUCH

16   THAT HELPS ME.  BUT OKAY.

17        SO IF COUNSEL WANTS TO WEIGH IN -- AND WHAT I WOULD

18   APPRECIATE, BECAUSE I WILL BE WRAPPING THIS UP AT SOME POINT

19   SHORTLY.  LET'S -- IT'S A GIVEN THAT, YOU KNOW, YOU ALL WORKED

20   HARD, AND IT'S A GREAT RESULT AND ALL THAT.  I DON'T WANT TO

21   REPLOW THAT GROUND.

22        WHAT MY PARTICULAR CONCERN IS IS THE STRUCTURE ON THE

23   PLAINTIFFS' SIDE AND WHY IT WAS NECESSARY.

24        MR. SCHWARTZ:  SURE.  I APPRECIATE THAT.  AND JUST

25   TOUCHING ON THE LAST POINT YOUR HONOR RAISED ABOUT IT'S
```

1    IMPORTANT TO LOOK AT IS THIS A CASE THAT'S BEYOND THE PALE SO

2    ARE WE IN THE COMFORT ZONE AND THE RANGE.

3        I CAN GUARANTEE YOUR HONOR THAT IF YOU SEARCH AS HARD AS

4    MS. KRALOWEC SEARCHED AND AS HARD AS MS. PREOVOLOS SEARCHED

5    YOU'RE NOT GOING TO FIND A CASE WHERE CLASS MEMBERS WILL NET

6    112 PERCENT OF THEIR DAMAGES.

7        OR IF MS. PREOVOLOS HAS HER WAY, OR APPLE HAS THEIR WAY,

8    THEY WILL NET 133 PERCENT OF THEIR DAMAGES.  I'D LOVE TO SEE A

9    CASE THAT SAYS THAT IS A CASE THAT CLASS COUNSEL SHOULD GET

10   CUT.

11       THAT IS A CASE THAT CLASS COUNSEL SHOULD GET LESS THAN

12   30 PERCENT.  AND THAT'S A CASE WHERE CLASS COUNSEL GETS LESS

13   THAN A MULTIPLE OF -- AND YOU CAN PICK THE NUMBER.  ON THE FULL

14   LODESTAR IT WILL BE 1.8 PERCENT.

15       ON THE 25 PERCENT OF THE REPORTED LODESTAR IT WOULD BE IN

16   THE MID TWO'S.  OF A 50 PERCENT CUT OF REPORTED LODESTAR IT

17   WOULD BE IN THE MID THREES.  LESS THAN VIZCAINO.

18       YOU'LL NEVER FIND A CASE AS FAR AS I CAN TELL WHERE YOU

19   WOULD GET MULTIPLES LOWER THAN THAT OR PERCENTAGES LOWER THAN

20   THAT WHERE WE HAVE A FULL RECOVERY PLUS, WHERE A NET RECOVERY

21   IS ABOVE FULL RECOVERY.

22       AND I THINK YOUR HONOR GAVE MS. PREOVOLOS THE CHANGE TO

23   SUGGEST WHETHER OR NOT THIS CASE WAS REALLY AS GOOD AS WE

24   PORTRAYED IT.  AND IT WAS AS GOOD AS WE PORTRAYED.

25       AND I THINK THAT LEADS TO ANOTHER ISSUE WHICH

```
 1    MS. PREOVOLOS RAISED, WHICH IS:

 2              "THIS IS A BEACON FOR BAD CLASS ACTION PRACTICE."

 3         YOU KNOW, I THINK SHE OPENED A CAN OF WORMS.  I THINK I

 4    WANT TO EXPLORE THAT A LITTLE BIT.

 5         THIS IS NOT THE FIRST APPLE CONSUMER CASE WITH IPODS AND

 6    IPHONES AND MACS.  THEY HAD AN ANTENNA GATE CASE WITH THE

 7    IPHONE IV.  THEY HAD THE MACBOOK MAGSAFE ADAPTOR CASE.

 8         THOSE WERE CASES WHERE THERE WERE 25 DIFFERENT LAWSUITS

 9    FILED ACROSS THE COUNTRY.  THAT WAS A PILE ON BECAUSE EVERYONE

10    KNEW THAT THE ANTENNA WAS BAD FOR THE IPHONE IV.

11         AND SO WHAT HAPPENED?  NO LITIGATION.  LOTS OF LAW FIRMS.

12    APPLE REACHES A SETTLEMENT.  CLAIMS MADE.  WHAT WAS THE CLAIMS

13    RATE IN THOSE CASES?  LESS THAN A MILLION DOLLARS OF CLAIMS

14    FILED.

15         APPLE AGREES TO CLEAR SAILING FOR FEES FOR THOSE LAWYERS

16    BECAUSE APPARENTLY IN THOSE CASES APPLE HAD NO PROBLEM WITH

17    PAYING LAWYERS WHO AGREE TO A CLAIMS FUND PROCESS WHERE

18    VIRTUALLY NOTHING GETS PAID OUT.

19         MS. PREOVOLOS:  FEES WERE A TOUCH LESS, AND THEY WERE CUT

20    BY JUDGE WHYTE SUBSTANTIALLY IN THE ANTENNA CASE.

21         MR. SCHWARTZ:  THEY WERE CUT BY JUDGE WHYTE --

22         THE COURT:  WHICH JUDGE WHYTE?

23         MS. PREOVOLOS:  THE SAN JOSE JUDGE WHYTE, RONALD.

24         MR. SCHWARTZ:  THE GOOD JUDGE WHYTE.  THEY ARE ALL GOOD.

25         THE FEES WERE CUT IN THAT CASE, AND APPLE DID AGREE TO
```

```
 1    THEM.
 2         BUT THE POINT IS THE CLAIMS PROCESS DIDN'T GENERATE CLAIMS
 3    BECAUSE WHAT WE DID IN OUR CASE FOR THE CLAIMS PROCESS IS WE
 4    TOOK A CLAIMS PROCESS THAT APPLE AND KCC HAD DONE IN OTHER
 5    CASES.  AND OUR STANDARD WAS -- AND IT WAS GOOD ENOUGH FOR
 6    SOMEONE ELSE, SO IT WILL BE GOOD ENOUGH FOR US.
 7         OUR STANDARD WAS:  THIS IS GOING TO BE THE BEST CLAIMS
 8    PROCESS POSSIBLE.  AND IF YOU TAKE A LOOK AT THE DECLARATION OF
 9    MR. PASSARELLA FROM KCC, THE CLAIMS ADMINISTRATOR, WHAT YOU'LL
10    SEE IS WORDS LIKE:
11              "AT CLASS COUNSEL'S REQUEST. CONCERNS RAISED BY CLASS
12         COUNSEL.  CLASS COUNSEL'S DIRECTION."
13         WHAT WE DID IS WHAT APPLE'S -- APPLE'S GOT GREAT
14    ENGINEERS, BUT IT'S GOT THE GREATEST MARKETERS IN THE WORLD,
15    TOO.  APPARENTLY, APPLE AND KCC COULD NOT PERFECT THE CLAIMS
16    PROCESS IN SOME OTHER CASES.  IN THIS CASE, WE MADE SURE THE
17    CLAIMS PROCESS WORKED TO A TEE.
18         AND WE IDENTIFIED EVERY SINGLE WEAKNESS IN IT.  AND THE
19    DETAILS ARE IN THE DECLARATIONS FILED BY KCC, WHICH SHOWS THAT
20    BUT FOR OUR INTERVENTION WE GOT NOTICE TO EVERYONE.  WE FOUND
21    90 PERCENT OF THE ADDRESSES OF THE DIRECT PAYMENT PEOPLE.
22         WE GOT 25,000 CLAIMS.  A LOT OF THOSE CLAIMS WERE
23    VALIDATED AFTER SUBMISSION.  EITHER THERE WERE DEFECTS BECAUSE
24    WE HAD APPLE GO AND FIND SERIAL NUMBERS BASED ON INFORMATION.
25         AND WE HAD IDENTIFIED WEAKNESSES WHICH WILL MAKE EVERY
```

```
1    SINGLE CLAIMS ADMINISTRATION PROGRAM IN THE FUTURE BETTER.

2         SO THIS IS NOT A BEACON OF BAD CLASS ACTION LITIGATION.

3         THIS IS NOT A SETTLEMENT WHERE IT'S MILLIONS FOR LAWYERS

4    AND PENNIES FOR THE CLASS.

5         THIS IS A CASE -- AND I THINK THE REASON WHY APPLE IS VERY

6    UPSET HERE IS THIS IS A CASE WHERE APPLE DID NOT WANT TO PAY

7    BEFORE WE FILED.  DIDN'T WANT TO GO THROUGH AN EARLY RESOLUTION

8    THROUGH CLRA, OR WHATEVER PROCESS.  DIDN'T WANT TO PAY US WHILE

9    WE LITIGATED.  DIDN'T WANT TO PAY US MEDIATION SESSION NUMBER

10   ONE.  DIDN'T WANT TO PAY US MEDIATION SESSION NUMBER TWO.

11        WE HAD TO DRAG IT OUT OF THEM?  AND WE DRAGGED IT OUT OF

12   THEM BECAUSE WE GAVE THEM A SHELLACKING IN THIS LITIGATION.

13        SO I THINK WE HAVE TO SAY IT.  WE HAD TO GO AND CREATE A

14   LITIGATION RECORD IN ORDER TO CONVINCE APPLE AND ITS EXECUTIVES

15   THAT ITS POLICY WAS FLAT OUT WRONG.  WE DID IT.

16        THE COURT:  ASSUMING FOR A MOMENT THAT I, IN ONE FORM OR

17   ANOTHER, HAVE TO BE COGNIZANT OF THE LODESTAR ISSUES HERE --

18        MR. SCHWARTZ:  SURE.

19        THE COURT:  -- GO TO THE QUESTION OF:  WHY DO WE NEED ALL

20   OF YOU M,FRANKLY?

21        MR. SCHWARTZ:  OKAY.

22        THE COURT:  YOU KNOW, WHY SHOULD THERE BE SIX PEOPLE OR

23   SIX DIFFERENT FIRMS REPRESENTED AT A CASE EVENT?

24        MR. SCHWARTZ:  OKAY. AND THAT IS CERTAINLY A FAIR

25   QUESTION.
```

```
1          THE COURT REPORTER:  EXCUSE ME.  CAN YOU PLEASE SLOW DOWN?

2          MR. SCHWARTZ:  SORRY.  I'M SORRY.

3          THAT IS A FAIR QUESTION.  AND, FIRST OF ALL, LET'S PUT

4    THIS IN PERSPECTIVE.  THERE'S SOME DEPOSITIONS WHERE SOME

5    PEOPLE ARE ON THE PHONE.  THERE'S SOME DEPOSITIONS WHERE WE

6    WERE LIKE, FOR EXAMPLE, WHEN SOMEONE WAS TAKING DAY ONE OF

7    APPLE'S IPHONE QUALITY MANAGER, I WAS EXPECTING TO TAKE UP

8    WHERE THE STATE GUY LEFT OFF, SO I WAS THERE.

9          SO THERE ARE THINGS LIKE THAT.  BUT IF YOU TAKE A LOOK AT

10   THOSE THINGS IT'S NOT A MATERIAL SEGMENT OF THE TOTAL LODESTAR

11   OF THIS CASE FOR PEOPLE WHO ARE AT DEPOSITIONS.

12         THE 3M DEPOSITIONS, TWO DEPOSITIONS BACK-TO-BACK.  I WAS

13   THERE.  MR. FAZIO -- I TOOK ONE.  MR. FAZIO TOOK ONE.

14   MS. MICHELETTI WAS THERE.

15         YOU KNOW, I GOT TO TELL YOU IF YOU ASK ANYONE IN THE CLASS

16   WAS IT A GOOD IDEA FOR US TO GET THE TESTIMONY WE GOT FROM 3M?

17         NO CLASS MEMBER WOULD SAY:

18             "I WISH YOU WOULD HAVE DONE A LITTLE BIT LESS IN THAT

19         DEPOSITION AND THOSE DEPOSITIONS," BECAUSE WE SCORED HOME

20   RUNS IN THOSE DEPOSITIONS, YOUR HONOR.

21         WE GOT APPLE'S -- BIG CUSTOMER OF APPLE TO GIVE US

22   TESTIMONY THAT GAVE US GREAT TESTIMONY TO HELP US CONVINCE

23   APPLE THAT IT WAS NOT JUST GOING TO PAY A LITTLE BIT OF MONEY

24   IN THIS CASE, OR NOT JUST AGREE TO A CLAIM PROCESS, BUT IT WAS

25   GOING TO PAY A BOATLOAD OF MONEY, 53 MILLION.
```

```
 1          WITH REGARD TO THE DISCOVERY ISSUES, I'LL USE 3M AS AN

 2     EXAMPLE.  WE AGREE, AND I THINK YOUR HONOR AGREES, WE SHOULD BE

 3     PAID FOR THE WORK BEFORE WE FILED THE MOTION TO COMPEL TO TRY

 4     TO GET IT DONE AND FOR THE WORK SUCCESSFULLY DURING THE MOTION

 5     TO COMPEL PROCESS.

 6          WITH RESPECT TO APPLE, WE'RE NOT SAYING THAT WE WANT TO

 7     GET PAID FOR HOURS THAT WE NEVER DID IN A MOTION TO COMPEL

 8     PRACTICE THAT NEVER HAPPENED.  BUT FOR US TO GET APPLE TO AGREE

 9     TO WHAT WE ASKED FOR, WE HAD TO GO THROUGH THE WHOLE PROCESS OF

10     MEET AND CONFERS WITH APPLE.

11          WE HAD TO GO GIVE THEM LAW.  WE HAD TO GO GET DEPOSITION

12     TESTIMONY FROM 3M, FOR EXAMPLE, WHICH SHOWS THEIR PRIVILEGE

13     OBJECTIONS WERE BOGUS.

14          WE HAD TO GO FIGHT OVER AND OVER AGAIN.

15          LET'S TALK ABOUT --

16          THE COURT REPORTER:  EXCUSE ME.

17          MR. SCHWARTZ:  I'M SORRY.

18          LET'S TALK ABOUT DUPLICATION ON THIS SIDE.

19          MS. PREOVOLOS, VERY EXPERIENCED, VERY HIGH-QUALITY LAWYER.

20     SHE HAD MR. MULBECK, A PARTNER WORKING ON THE CASE FULL-TIME.

21          THERE WERE TWO ASSOCIATES ORIGINALLY IN THE CASE, SAMEUL

22     LUNIER AND ALEXI KLESTOFF.

23          WE WERE HAVING THIS DISCOVERY BATTLE.  THE TEAM WASN'T BIG

24     ENOUGH.

25          THEN THEY HAD LYNN MILLER (PHONETIC), SENIOR -- SENIOR
```

```
1    LITIGATION --

2        THE COURT:  COUNSEL, I DON'T THINK IT'S A -- I DON'T THINK

3    IT'S A COMPARABLE ANALYSIS, BECAUSE APPLE MAKES ITS DECISIONS

4    ON COMPENSATING ITS LAWYERS.  AND THEY MAY BE ENTIRELY WASTEFUL

5    IN THAT PROCESS.  THAT'S NOT MY PROBLEM, AND THAT'S NOT YOUR

6    PROBLEM.

7        MR. SCHWARTZ:  SURE.

8        THE COURT:  IF THEY HAVE FIVE EXTRA SOULS THERE, THEIR

9    SHAREHOLDERS MAYBE CAN SAY:

10            "THIS IS A WASTE OF TIME."

11       BUT THAT'S NOT PART OF THIS PROCESS.  AND THE VERY -- AND

12   IT'S NOT -- IT'S NOT JUST, YOU KNOW, HOW MUCH MUSCLE YOU BRING

13   THERE.  IT ISN'T IF THEY HAVE GOT FIVE WE HAVE TO HAVE FIVE,

14   AND WE'RE GOING TO DO A TUG OF WAR.

15       IF THEY ARE WASTING MONEY THAT DOESN'T JUSTIFY THE OTHER

16   SIDE WASTING MONEY, BECAUSE MY JOB IS I HAVE A ROLE TO PLAY ON

17   PROTECTING THE PUTATIVE CLASS MEMBERS.  I DON'T HAVE A ROLE TO

18   PLAY PROTECTING APPLE'S BOYS AND GIRLS.

19       MS. PREOVOLOS:  YOUR HONOR, RESPECTFULLY, I DIDN'T ATTEND

20   A SINGLE DEPOSITION IN THIS CASE.  MR. MULBECK DID.

21       THE COURT:  BUT I DON'T EVEN CARE. I DON'T CARE HOW MANY

22   PEOPLE --

23       MS. PREOVOLOS:  BUT -- WELL, BUT TO THE EXTENT IT BEARS ON

24   EFFICIENCY HOW MANY PEOPLE WENT TO WHAT, MR. MULBECK AND I DID

25   NOT DOUBLE TRACK.
```

```
1            THE COURT:  OKAY.

2            MS. PREOVOLOS:  AND OUR ASSOCIATES DID NOT DOUBLE TRACK.

3    AND SO IT DOES MATTER BECAUSE IT TELLS YOU IT DIDN'T HAVE TO BE

4    DONE THAT WAY.

5            THE COURT:  OKAY.

6            GO AHEAD.

7            MR. SCHWARTZ:  WE HAVE TO BATTLE A TEAM THAT WE'RE UP

8    AGAINST.  MORRISON & FOERSTER, AS WE ALL KNOW, IS A GREAT FIRM

9    WITH GREAT LAWYERS.  AND THEY HAD SUPPORT FROM APPLE BOTH

10   INTERNAL EXPERTS FROM APPLE, SENIOR LAWYERS FROM APPLE.

11           AND WHAT WE HAD TO DO IS FIGURE OUT A WAY TO CONVINCE

12   SOMEONE, YOUR HONOR IN CLASS AND SUMMARY JUDGMENT, A JURY AT

13   TRIAL.  WE HAD TO CONVINCE SOMEONE:

14               "DON'T BELIEVE WHAT APPLE'S ENGINEERS SAY, EVEN

15           THOUGH THEY ARE THE BEST IN THE WORLD.  DON'T BELIEVE WHAT

16           THEY ARE SAYING ABOUT HOW THESE THINGS WORK IN IPHONES.

17           YOU HAVE TO BELIEVE US."

18           AND TO BUILD THAT RECORD WE HAD TO FIRST EXTRACT THE

19   DOCUMENTS FROM THEM.  AND WE DID THE WORK.  WE HAVE AFFIDAVITS

20   FROM ALL THESE -- YOU KNOW, ALL THESE FIRMS.  AND, YOU KNOW, I

21   THINK THAT --

22           THE COURT:  ALTHOUGH, APPARENTLY, I HAVE TO GO BACK AND

23   LOOK AT THEM.  MS. PREOVOLOS IS SUGGESTING THAT SOME OF THESE

24   AFFIDAVITS ARE:

25               "WE DID THE MOST IMPORTANT WORK.  WE DID THE MOST
```

```
 1        IMPORTANT WORK."

 2        IS THAT WHAT I'LL SEE WHEN I GO BACK AND TAKE A LOOK AT

 3   THEM AGAIN?

 4        MR. SCHWARTZ:  YOUR HONOR, YOU WILL SEE PEOPLE SAYING WHAT

 5   IMPORTANT WORK THEY DID.  BUT I THINK THE KEY THING TO FOCUS ON

 6   ISN'T PEOPLE'S CHARACTERIZATIONS OF HOW IMPORTANT THE WORK WAS.

 7        TAKE A LOOK AT WHAT PEOPLE HAVE SWORN UNDER OATH:

 8            "THIS IS THE WORK WE DID.  THIS IS THE OBSTACLES WE

 9         FACED.  THIS IS HOW WE OVERCAME THOSE OBSTACLES.  THIS IS

10         HOW WE GOT LITIGATION LEVERAGE TO PUT APPLE IN A BOX WHERE

11         APPLE DECIDED THAT INSTEAD OF NOT PAYING AND LITIGATING

12         THIS CASE IT WAS GOING TO PAY."

13        I'M NEVER GOING TO SAY IN A CASE IN A NATIONAL CLASS

14   ACTION OF THIS SIGNIFICANCE, I'M NEVER GOING TO SAY THAT

15   NOTHING COULD HAVE BEEN DONE, YOU KNOW -- YOU CAN ALWAYS HAVE

16   THINGS DONE MORE EFFICIENTLY ON ANY SIDE IN A BATTLE.

17        I THINK THE REAL ISSUE IS, FROM YOUR PERSPECTIVE YOU HAVE

18   TO PROTECT THE CLASS.  MAKE SURE THAT OUR FEES ARE FAIR TO US

19   TO COMPENSATE US, BUT ALSO ARE REASONABLE.  AND, AGAIN, WHEN

20   YOU'RE TALKING ABOUT THE CLASS MEMBERS GET 112 AND 133 PERCENT

21   NET, TO GO AND SECOND GUESS THE CREATIVE PROCESS, WHICH

22   SOMETIMES IS MESSY.

23        IN THIS CASE WE HAD A CREATIVE PROCESS.  SOMETIMES WE

24   DISAGREED ON THINGS.  AND YOU KNOW WHAT WE DID?  WE FOUGHT IT

25   OUT TO FIGURE OUT WHAT WAS THE BEST WAY TO GO.
```

```
 1        TAKE THE PRELIMINARY APPROVAL BRIEF.  WE HAD A LOT OF WORK

 2   EDITING THAT BRIEF INTERNALLY.  THEN WE HAD A LOT OF WORK

 3   EDITING IT BECAUSE APPLE DECIDED IT HAD A ROLE IN IT.  APPLE

 4   BROUGHT THE MEDIATOR IN FOR THAT.

 5        MESSY PROCESS?  SURE.  COULD SOMEONE SITTING BACK LOOKING

 6   AT IT AND SAY:

 7             "GOD, WHY DO WE HAVE TO PAY FOR THAT TIME BECAUSE IT

 8        COULD HAVE BEEN DONE QUICKER.  WE COULD HAVE HAD ONE

 9        PERSON DO IT.  MAYBE ONE PERSON REVIEW IT."

10        BUT YOU KNOW WHAT?  THE PRODUCT WE GAVE YOUR HONOR, YOUR

11   HONOR TOLD US IT WAS A VERY GOOD PRODUCT.  AND IT WAS.

12        AND WE SAVED YOU TIME, WHICH IS, FRANKLY, MORE IMPORTANT

13   THAN ALL OUR TIME HERE. AND I FEEL LIKE LISTENING TO THE

14   ARGUMENTS I FEEL LIKE IN A CASE WHERE WE HAVE GOTTEN A GOLD

15   PLATED RECOVERY FOR OUR CLASS MEMBERS IN A VERY DIFFICULT CASE

16   WITH VERY DIFFICULT CHALLENGES, THAT WE'RE BEING PUNISHED

17   BECAUSE WE WORKED THROUGH THE CHALLENGES IN A WAY WHICH MAYBE

18   IT'S NOT THE WAY SOMEONE WOULD HAVE SAID:

19             "OH, IN A PERFECT WORLD IS THAT THE WAY I WOULD DO

20        IT?"

21        FINE.  IN A PERFECT WORLD I WOULD DO THE WHOLE CASE ALL BY

22   MYSELF WITH NO ONE TO HELP ME, AND IT WOULD BE REAL EASY.

23        BUT THIS IS NOT A PERFECT CASE.  AND I THINK ALL OF US

24   WOULD ADMIT ON OUR SIDE THAT THIS IS A CASE WHERE THE SUM OF

25   THE PARTS WAS GREATER THAN ALL THE INDIVIDUAL PARTS, BECAUSE WE
```

```
1    HAD TO STRUGGLE THROUGH ISSUES.

2         AND EVEN, FOR EXAMPLE, LET'S TAKE A LOOK AT THE ALLOCATION

3    PLAN THAT WE ULTIMATELY AGREED UPON.  THERE WERE SOME TOUGH

4    ISSUES.  VERY DETAILED TOUGH ISSUES ON THE ALLOCATION PLAN.  WE

5    HAD, YOU KNOW, A LOT OF DIFFERENT VIEWS.

6         WITHIN APPLE'S LAWYERS THERE WAS SOME DIFFERENT VIEWS.  WE

7    ARE ON PHONE CALLS WITH APPLE'S LAWYERS WHERE THERE WERE LIKE

8    SEVEN OR EIGHT DIFFERENT OPINIONS.

9         WE ACTUALLY HAD IT OUT WITH EACH OTHER, MULTIFACETED.  WE

10   ACTUALLY SPENT A GOOD PORTION OF A MEDIATION WITH NOT JUST

11   MEDIATOR MS. YANNI, BUT ALSO WITH MEDIATOR JUDGE INFANTE ON THE

12   VERY ISSUE WHERE WE ACTUALLY DID DUELING PRESENTATIONS.

13        AND MS. PREOVOLOS AND I, WE DECIDED TO PLAY LAWYER FOR THE

14   LAST TWO COMPETING PROPOSALS.  AND WE EVENTUALLY FIGURED OUT

15   AFTER THOSE PRESENTATIONS WHICH ONE MAKES THE MOST SENSE.

16        AND I THINK WE ALL AGREE AT THE END WHAT WE DID WAS THE

17   RIGHT ONE.  APPLE WOULD PROBABLY SAY:

18             "WELL, ALL THE TIME THAT WAS SPENT DEBATING ALL THAT

19             INTERNALLY WITH US CROSSED WITH APPLE AND THREE-WAY WITH

20             THE MEDIATORS WAS A WASTE OF TIME."

21        WELL, IT'S NOT A WASTE OF TIME IF THE EFFORT LEADS TO THE

22   RIGHT RESULT.  JUST LIKE WHEN APPLE MAKES THESE BEAUTIFUL

23   DEVICES THAT THEY MAKE, IT'S NOT ONE ENGINEER WHO SAYS:

24             "I'M GOING TO MAKE THE NEXT IPHONE, THE IPHONE VI."

25        THEY HAVE MULTIPLE ENGINEERS COMPETING WITH EACH OTHER
```

```
1    TRYING TO FIGURE OUT, YOU KNOW, WHAT'S RIGHT AND WHAT'S WRONG.

2         WHAT IS REALLY SURPRISING ABOUT THAT IN THIS KIND OF CASE?

3         I DON'T THINK IT'S REALLY SURPRISING THAT WE WORKED HARD

4    AND ATTACKED ALL THESE ISSUES IN A MULTIFACETED WAY.

5         AND, YOU KNOW, WE BEAR THE RISK.  IF WE WOULD HAVE BEEN

6    WRONG AND APPLE WOULD HAVE WON BECAUSE, FOR EXAMPLE, THE MAZZA

7    CASE WAS DECIDED, YOU KNOW, A WEEK OR TWO BEFORE WE REACHED

8    AGREEMENT ON THE $53 MILLION NUMBER.

9         OR IF WAL-MART HAD SOMEHOW EVISCERATED OUR CLAIMS, WE HAD

10   A LOT OF RISKS GOING IN HERE, AND WE WERE PAYING EXPERTS AND

11   WHATNOT.

12        SO I REALLY THINK THIS DUPLICATION ISSUE THAT APPLE HAS

13   RAISED IS REALLY MONDAY MORNING QUARTERBACKING.  NOT A BAD

14   RESULT.  USUALLY MONDAY MORNING QUARTERBACKS ARE COMPLAINING

15   BECAUSE THE TEAM LOST.

16        WE WON THE SUPERBOWL IN THIS CASE, AND THEY ARE

17   COMPLAINING BECAUSE WE HAD TOO MANY EXTRA COACHES.

18        I DON'T THINK THAT MAKES SENSE.  AND I REALLY THINK THAT

19   IT DOESN'T JUSTIFY TAKING THIS CASE WHERE, IN MANY CASES WHICH

20   DON'T EVEN COME CLOSE TO THE RESULT FOR CLASS MEMBERS, AWARDS

21   OF 30 PERCENT OR 33 PERCENT HAVE BEEN AWARDED.

22        AND IT DOESN'T COME CLOSE TO CASES WHERE MULTIPLES OF THE

23   1.8 OR THE 2.4 OR THE 3.5, THOSE MULTIPLES ARE ORDERED ALL THE

24   TIME.  AND EVEN IF YOUR HONOR TAKES A MEAT CLEVER TO OUR 8.78

25   REPORTED LODESTAR, AND TAKES OFF, WHAT, 25 PERCENT?  ARE THEY
```

```
1    SAYING 25 OR 50 PERCENT IS REALLY -- THERE IS REALLY THAT MUCH
2    DUPLICATION?
3        EVEN IF YOUR HONOR DOES THAT YOU GET TO THE SAME PLACE
4    WHERE THE MULTIPLES ARE WELL WITHIN WHAT HAS BEEN AWARDED IN
5    OTHER CASES.
6        MS. KRALOWEC:  YOUR HONOR, IF I MAY, I DO HAVE A COUPLE OF
7    POINTS I WANTED TO MAKE.
8        THE COURT:  WELL, I NEED TO -- WE'VE NOW BEEN GOING AT
9    THIS FOR AN HOUR-AND-A-HALF, SO I DO NEED TO BRING THIS TO A
10   CLOSURE.
11       SO IF YOU HAVE A FEW FINAL COMMENTS I'LL GIVE YOU EACH AN
12   OPPORTUNITY TO MAKE THEM.
13       BUT CONDENSE THEM AS MUCH AS POSSIBLE.
14       MS. KRALOWEC:  THERE WAS ONE POINT I WANTED TO MAKE IN
15   RESPONSE TO MS. PREOVOLOS WHO SAID THAT THEY WOULD NEVER HAVE
16   AGREED TO THE $53 MILLION IF THEY HAD KNOWN THAT SO MUCH WOULD
17   GO TO THE LAWYERS.
18       THE PROBLEM WITH THAT APPROACH IS THAT IT WOULD HAVE
19   VIOLATED THE ETHICS RULES FOR US TO NEGOTIATE IT THAT WAY.  AND
20   WE DID NOT, IN FACT, NEGOTIATE IT THAT WAY.  SO THAT'S A
21   PROBLEM THAT I WANTED TO POINT OUT.  AND THE COURT SHOULD NOT
22   ADOPT A RULE THAT WOULD PROMPT THAT SORT OF AN ETHICAL
23   VIOLATION WHERE WE HAVE TO NEGOTIATE FEES AND RELIEF TO THE
24   CLASS AT THE SAME TIME.
25       I WANTED TO REMIND THE COURT THAT EVEN UNDER THE LEALAO
```

1    DECISION, WHICH IS MS. PREOVOLOS' PRIMARY DECISION, THE

2    PERCENTAGE OF THE FUND IS A MAJOR FACTOR THAT IS TO BE

3    CONSIDERED EVEN IN A LODESTAR ANALYSIS.  AND I DON'T WANT THAT

4    TO BE LOST SIGHT OF.

5        AND A COUPLE OF OTHER POINTS ABOUT WHAT WE WERE FACING.

6    WE DID HAVE A CLASS CERTIFICATION DEADLINE VERY SHORTLY AFTER

7    THE DATE ON WHICH THE CASE HAPPENED TO SETTLE IN JANUARY OF

8    2012.

9        THE CLASS CERT DEADLINE PER YOUR ORDER WAS DUE ABOUT TWO

10   WEEKS LATER.  WE, OF COURSE, HAD BEEN PREPARING FOR CLASS CERT

11   AND TO GET OUR CLASS CERTIFICATION MOTION READY.  WE MAY HAVE

12   NEEDED TO COME IN AND ASK FOR MORE TIME AT THAT POINT.

13       FORTUNATELY, THE CLASS DID SETTLE, SO WE NEVER DID FILE

14   THAT MOTION.  IT DOES NOT MEAN WE WEREN'T WORKING ON IT.  AND

15   AS FAR AS THE COMPLAINT IS CONCERNED THE FACT THERE WAS NO

16   MOTION TO DISMISS THAT'S BECAUSE WE DID AN EXTREMELY GOOD JOB

17   DRAFTING OUR COMPLAINT.  AND IT WOULD BE INAPPROPRIATE TO

18   DISCOURAGE LAWYERS FROM DOING THEIR BEST JOB POSSIBLE IN THE

19   INVESTIGATION OF THEIR CASE PRIOR TO EVEN FILING TO COME UP

20   WITH THE STRONGEST CASE THEY CAN.

21       AND THAT WAS WHAT WE HAVE DONE HERE THROUGHOUT THE COURSE

22   OF THIS LITIGATION.  AND WE SHOULD NOT BE PENALIZED BECAUSE WE

23   WERE ABLE TO VIGOROUSLY LITIGATE DISPUTES TO THE POINT WHERE

24   APPLE GAVE IN, AND WE DIDN'T HAVE TO COME TO YOU.

25       THE COURT:  ANY FURTHER COMMENTS?

```
 1          MS. PREOVOLOS:  I'LL BE VERY QUICK.  YOU'VE HEARD A LOT

 2   EVEN NOW, JUDGE, FROM THE PLAINTIFFS ABOUT WHY IT WAS

 3   APPROPRIATE TO DO THE WORK.

 4          YOU'VE HEARD VERY LITTLE ABOUT WHY MULTIPLE FIRMS HAD TO

 5   DO IT.  AND I THINK IT IS CONTRARY TO CALIFORNIA CASE LAW,

 6   CONTRARY TO THE LAW OF THIS CIRCUIT FOR PLAINTIFFS TO SUGGEST:

 7              "WELL, WE HAD TO WRITE A CLASS MOTION SO TWO

 8          DIFFERENT OR FIVE DIFFERENT FIRMS HAD TO WORK ON IT."

 9          THAT JUST DOESN'T MAKE SENSE.  AND SO I'M SORRY PLAINTIFFS

10   ARE MISSING THE POINT.  PLAINTIFFS SAY THAT -- YOU KNOW, I

11   DON'T AGREE -- "THIS IS A GOLD PLATED SETTLEMENT."

12          IT WAS A GOOD SETTLEMENT.  IT WAS A FAIR SETTLEMENT.  I

13   DON'T THINK IT WAS A GOLD PLATED SETTLEMENT.  IT'S A FUNCTION

14   OF NUMBERS.

15          AND, YOU KNOW, THE PLAINTIFFS SAY THEY GOT A HUNDRED

16   PERCENT RECOVERY.  THAT'S NOT TRUE.  BECAUSE THE RECOVERY THAT

17   WE GAVE WAS -- THE BASE AMOUNT WAS THE -- AND I DO THINK THIS

18   IS IMPORTANT.  THE BASE AMOUNT WAS THE AVERAGE AMOUNT PAID FOR

19   THAT DEVICE AND DEVICE TYPE.  THAT'S THE BASE.

20          AND WE AGREED TO THAT BECAUSE WE DIDN'T KNOW HOW MANY

21   CLAIMS THERE WOULD BE.  THEY DIDN'T KNOW.  WE DIDN'T KNOW.

22          AND THERE'S A REASON THAT THE PROVISION IS THAT THAT

23   NUMBER CAN GO UP TO TWO HUNDRED PERCENT BECAUSE THAT MEANS THAT

24   PEOPLE WHO PAID MORE WILL GET FULLY COMPENSATED.

25          SO IT'S NOT TRUE TO SAY THERE'S A WINDFALL TO THE CLASS.
```

1    AND THE 112 PERCENT NUMBER COMES IF YOU ASSUME THAT NONE OF THE

2    CLAIMS THAT ARE OUT FOR CURE ARE GOING TO GET CURED.  AND I

3    WOULDN'T ASSUME THAT.  SO I WOULD DEBUNK THAT.

4         THE THING I WANT TO COME BACK TO, BUT I DO WANT TO TAKE UP

5    A COUPLE OF POINTS HERE.  BUT WHAT I HAVE TO COME BACK AND BACK

6    AND BACK TO IS THAT THERE WAS HUGE DUPLICATION OF EFFORT HERE.

7         THE PLAINTIFFS DON'T DISPUTE IT.  IT'S ALL OVER THEIR

8    DECLARATIONS.  YOU NEED TO READ THOSE.  AND THERE WAS NOTHING

9    SO HARD ABOUT THIS CASE THAT ONE OR TWO VERY ABLE LAW FIRMS

10   COULDN'T HANDLE IT.  THEY DO IT ALL THE TIME.  I'VE SEEN ALL

11   THESE LAW FIRMS IN CASES.  IT DIDN'T REQUIRE SEVEN OF THEM.

12        YOU KNOW, THEY TALK ABOUT THE CLAIMS PROCESS AND HOW THEY

13   UPPED IT AND MAGNIFIED IT.  AND THAT WAS A HUGE PART OF THEIR

14   EFFORTS.  AND I WANT TO TAKE THAT ON, BECAUSE THE PLAINTIFFS

15   DID SCRAMBLE ALL OVER THEMSELVES DURING CLAIMS PROCESS.  AND

16   THEY DID DO SOME THINGS OF VALUE.

17        BUT HERE'S THE BOTTOM LINE.  THEY TELL YOU THAT THE GREAT

18   MAJORITY OF THE CLAIMS HERE ARE GOING TO GO THE DIRECT PAYMENT

19   SETTLEMENT CLASS MEMBERS.  AND THE CLAIMS PROCESS HAD NOTHING

20   TO DO WITH THOSE PEOPLE.  ALL THE STUFF ABOUT THE E-MAILED

21   NOTICE AND THE ROUNDS OF E-MAIL NOTICE, APPARENTLY THAT

22   GENERATED, PLAINTIFFS WOULD SAY, JUST 25,000 CLAIMS.

23        NOW THERE ARE A FEW MORE BEING CURED.  BUT, AGAIN, IT'S

24   THE KIND OF EXAGGERATION WE SEE THROUGHOUT.  AND I THINK THAT'S

25   IMPORTANT.

1          I'M NOT, BY THE WAY, AND APPLE'S NOT, BY THE WAY, SAYING,

2     YOU KNOW, PLAINTIFFS GO AWAY UNCOMPENSATED.  $8.8 MILLION IS A

3     HUGE AMOUNT OF MONEY.  YOU KNOW, IT'S MORE THAN APPLE PAID IN

4     THE OTHER CASES THE PLAINTIFFS WANT TO TALK ABOUT, BY THE WAY.

5          BUT THEIR UNADORNED LODESTAR IS A MULTIPLIER.  WHETHER

6     IT'S A TWO TIME MULTIPLIER OR A THREE TIME MULTIPLIER IT'S

7     PLENTY.

8          AND ANYTHING -- AND FIVE FIRMS OR SEVEN FIRMS, YOU JUST

9     CAN'T JUSTIFY IT.  AND IF YOU LOOK AT THEIR DECLARATIONS YOU'LL

10    FIND THAT THEY ALL WORKED ON EVERYTHING.

11         I DO WANT TO JUST TAKE UP ONE OTHER THING.  AND THAT IS

12    YOUR HONOR IS CERTAINLY RIGHT.  YOU CAN FIND A CASE TO CITE FOR

13    ANY PERCENTAGE.  AND I'LL TALK ABOUT PERCENTAGE FOR JUST A

14    MINUTE BECAUSE I HAVE TWO THINGS.

15         BUT I THINK IF YOU LOOK AT THOSE 30 PERCENT CASES YOU ARE

16    GOING TO FIND TWO THINGS.  THEY WERE ALL AGGRESSIVELY

17    LITIGATED. LOTS OF THEM THROUGH TRIAL.  AND I DO THINK GOING

18    TO THIS COURT'S BENCHMARK, OR ABOVE IT, IS NOT APPROPRIATE IN A

19    CASE WHERE PEOPLE SAY:

20              "WE NEGOTIATED REALLY HARD, AND WE HAD TO CONVINCE

21         APPLE IN MEDIATION."  BECAUSE YOU KNOW WHAT?  THAT GOES

22    ON ALONGSIDE WHAT IS GOING ON IN COURT IN MOST OF THOSE CASES.

23    AND IT DOESN'T JUSTIFY A RAPE AND PILLAGE.

24         SO I JUST THINK -- AND THAT'S UNFORTUNATE.  I DON'T MEAN

25    TO BE DISRESPECTFUL -- BUT THIS WAS OVER THE TOP.  IT WAS

1    LITIGATED IN A HUGELY OVER THE TOP WAY.

2         AND I THINK THAT'S IMPORTANT.

3         THE LAST THING I WANT TO SAY, AND THEN I AM DONE, IS THAT

4    THE PLAINTIFFS SAY LEALAO IS MY CASE.  NO.  LEALAO IS THEIR

5    CASE.  IT'S THE CASE THEY CITE OVER AND OVER IN THEIR PAPERS

6    FOR HOW GOOD PERCENTAGE OF THE FUND METHODOLOGY IS AND HOW

7    CALIFORNIA LAWS LIKE IT OR CALIFORNIA COURTS LIKE IT.  THAT'S

8    WHY I TALK ABOUT LEALAO.

9         AND HERE'S THE LAST THING THE LEALAO COURT SAID.  THE

10   LEALAO COURT SAID:

11             "THE LODESTAR METHODOLOGY ORIGINATED AS AN

12        ALTERNATIVE TO PERCENTAGE RECOVERIES WHICH OFTEN RESULTED

13        IN EXORBITANT FEE AWARDS, UNJUSTIFIED BY THE CONTRIBUTIONS

14        OF COUNSEL.  CONSIDERING THE FEE ONLY AS A PERCENTAGE OF

15        THE BENEFIT WOULD SIMPLY RESURRECT THAT PROBLEM."

16        AND, YOUR HONOR, THAT IS WHAT THE PLAINTIFFS -- EXACTLY

17   WHAT THE PLAINTIFFS ARE ASKING YOU TO DO HERE.  AND WHEN THEY

18   TALK ABOUT RISK, THREE THINGS.  RISK IS ENCOMPASSED IN THE

19   MULTIPLIER -- IN THE LODESTAR HERE BECAUSE IT'S A HUGE

20   LODESTAR.

21        NUMBER TWO, IF YOU LOOK AT THE CASES THAT TALK ABOUT

22   RISK -- AND I URGE YOUR HONOR TO DO THOSE -- TO DO THAT.  LOOK

23   AT KETCHUM.  THEY ARE NOT LARGE CLASS ACTIONS WITH LARGE FUNDS

24   TO RECOVER FROM.  THEY ARE CIVIL RIGHTS CASES.

25        KETCHUM WAS AN ANTI-SLAPP CASE.  THE CASE THE PLAINTIFFS

1    CITE IN THEIR MOST RECENT PAPERS WAS A VERY NOVEL INDIVIDUAL

2    SEXUAL HARASSMENT CASE OF A STRAIGHT MAN WAS ACCUSED OF BEING

3    GAY WHERE THE AWARD WAS NEVER GOING TO GIVE THE LAWYER THE KIND

4    OF CONTINGENCY YOU WOULD EXPECT.

5        THIS ISN'T THAT CASE.  AND SO IS RISK -- AND -- AND THE

6    COURTS ARE VERY CLEAR.  THE PLAINTIFFS TALK ABOUT ALL THE

7    TERRIBLE THINGS THAT MIGHT HAVE HAPPENED WITH MAZZA AND

8    WAL-MART.

9        WELL, GUESS WHAT?  WE SETTLED THE CASE.  THEY DIDN'T HAVE

10   TO LITIGATE THIS CASE THROUGH CLASS.  THEY DIDN'T HAVE TO TAKE

11   AN APPEAL TO JUSTIFY CLASS.  THEY DODGED THAT BULLET.  THEY

12   DODGED THE TRIAL BULLET.  AND THE 30 PERCENT CASES ARE CASES

13   WHERE THOSE BULLETS WERE NOT AVOIDED.  THEY WERE FOUGHT.

14       AND SO WE URGE YOU NOT TO GIVE UNREASONABLE AND EXCESSIVE

15   FEES.  APPLE TRIED TO DO THE RIGHT THING HERE.  APPLE WENT

16   FORWARD WITH THE SETTLEMENT AND SAID:

17           "WE WILL THROW THE FEE ISSUE TO THIS COURT."

18       AND THAT HAS TO BE TAKEN SERIOUSLY AND NOT TAKEN AWAY

19   BECAUSE THERE WAS A COMMON FUND.  APPLE HAS AN INTEREST.  THE

20   STRUCTURE OF CLASS ACTION SETTLEMENTS IS IMPORTANT TO APPLE,

21   AND APPLE'S CONSUMERS ARE IMPORTANT TO APPLE.  AND I THINK

22   THOSE THINGS ARE VERY IMPORTANT UNDER CALIFORNIA LAW.

23       THE COURT:  ALL RIGHT.

24       MS. MICHELETTI:  YOUR HONOR, IF I MAY, BECAUSE THERE HAVE

25   BEEN SO MANY THINGS SAID.  I WILL NOT REPEAT MYSELF.  BUT --

1          THE COURT:  WELL, WE COULD BE HERE UNTIL MIDNIGHT, BECAUSE

2    EVERY TIME ONE SIDE IS GOING TO SAY SOMETHING IT'S GOING TO

3    PROMPT:

4               "OH, I JUST HAVE TO SAY FIVE MORE THINGS, PLEASE."

5          SO I HAVE GOT TO BRING THIS TO A CONCLUSION.  I'LL GIVE

6    YOU AN OPPORTUNITY IN -- TO GIVE ME ABOUT THREE MORE MINUTES,

7    AND THAT'S IT.

8          MS. MICHELETTI:  AND THAT'S IT.  AND THAT'S ALL I'M GOING

9    TO TAKE, BECAUSE I'M NOT ADDRESSING EVERYTHING.

10         I DO WANT TO ADDRESS THE AMOUNTS, BECAUSE AT THE BEGINNING

11   OF THE SETTLEMENT PROCESS APPLE TOLD US THAT WE WERE WAY OFF ON

12   OUR NUMBERS.  THAT THE NUMBER OF PEOPLE AFFECTED HERE WAS

13   BASICALLY THE NUMBER OF THE DIRECT PAYS AND SOME STRAGGLERS.

14         SO THAT SETTLEMENT NUMBER THAT THEY WANTED TO START WITH

15   WAS QUITE A BIT LOWER THAN WHERE WE ENDED UP.  WE USED -- THAT

16   THEY HAD TO ADMIT THAT THEY DID NOT HAVE ALL THE RECORDS TO

17   REALLY FIGURE OUT HOW MANY PEOPLE WERE AFFECTED.

18         SO WE CAME UP WITH A DAMAGES MODEL THAT THEY ADMIT THEY

19   CAN'T FIGURE OUT A BETTER MODEL.  WHAT THEY WILL TELL YOU IS

20   OUR DAMAGES MODEL WAS WAY OVERSTATED.  WAY OVERSTATED.  BUT

21   THAT THEY HAD NO WAY TO COMBAT IT.

22         SO WHAT WE DID WAS WE TRADED ON THE AMBIGUITY IN THE

23   NUMBERS, AND WE GOT A $53 MILLION SETTLEMENT WHEN THEY WERE

24   SAYING THE MAXIMUM EXPOSURE WAS IN THE 37, $38 MILLION RANGE.

25   OKAY?

1      WE DID THAT BECAUSE OF OUR SKILL, BECAUSE OF THE PEOPLE

2  SITTING HERE AND BECAUSE OF THE NUMBER OF HEADS WE HAD AT THE

3  TABLE.  WE OUTMANEUVERED THEM.

4      WE HAVE 53 MILLION.  AND AT THE END OF THE DAY GUESS WHAT?

5  GUESS WHERE WE END UP?  KIND OF RIGHT AROUND WHAT THEY SAID WAS

6  THE UNIVERSE OF THE CLASS.  AND WHEN MS. PREOVOLOS TELLS YOU

7  THAT THIS NUMBER ISN'T REALLY A HUNDRED PERCENT RECOVERY?  WELL

8  THAT'S NEWS TO US, BECAUSE WHAT WE DID TO GET TO THAT NUMBER

9  PER CLASS MEMBER WAS WE USED THEIR DATA, THE NUMBERS THAT THE

10  CLASS MEMBERS ACTUALLY PAID APPLE FOR REPLACEMENT DEVICES.

11      THEN, WE HAD TO AVERAGE.  SO, SURE, SOME PEOPLE ARE GOING

12  TO GET LESS THAN THEY PAID, AND SOME PEOPLE ARE GOING TO GET

13  MORE THAN THEY PAID.  THAT'S THE TRADEOFF TO OUR BEING ABLE TO

14  SEND THE 137,000 PEOPLE CHECKS RATHER THAN HAVE THEM MAKE

15  CLAIMS, WHICH YOU KNOW FROM YOUR EXPERIENCE WOULD HAVE MEANT A

16  DRASTICALLY REDUCED PARTICIPATION RATE.

17      WE DID ALL THIS.  WE ENGINEERED ALL OF IT.  WE GOT MORE

18  THAN THEY WERE EVER, EVER EVEN CLOSE TO WANTING TO PUT ON THE

19  TABLE.

20      SO FOR HER TO STAND HERE AND TELL US THAT:

21          "WELL, IT'S REALLY NOT THAT BIG OF A DEAL, AND THE

22       MONEY ISN'T -- THEY ARE NOT BEING FULLY COMPENSATED."

23      THAT IS JUST FLAT OUT WRONG.  THEY ARE GOING TO BE

24  RECEIVING MORE THAN A HUNDRED -- OR 112 PERCENT OF THE AVERAGE

25  LOSS, EVEN IF WE GOT A FULL 30 PERCENT.

```
 1        THAT'S A PHENOMENAL RESULT.  AND THAT'S WHAT WE DID.

 2        AND IT WASN'T A GIFT THAT THEY GAVE CONSUMERS, BECAUSE

 3   THEY COULD HAVE SETTLED THIS CASE TWO MONTHS AFTER IT WAS

 4   FILED.  AND THEY DIDN'T.  AND THEY PUT US THROUGH HELL.  AND WE

 5   CAN SHOW YOU.

 6        WE ARE MORE THAN HAPPY TO GIVE YOU OUR TIME SHEETS.  WE

 7   WERE GOING TO BRING THEM WITH US TODAY.  AND THEY ARE THERE FOR

 8   YOU TO LOOK AT.  AND TO THE EXTENT YOU HAVE ANY QUESTIONS OR

 9   WANT TO TALK ABOUT THEM WE'RE HERE TO ANSWER AND DEFEND OUR

10   TIME.

11        WAS THERE DUPLICATION?  SURE.  WE'VE ACCOUNTED WITH

12   THAT -- FOR THAT WITH THIS LODESTAR PRESENTATION THAT WE MADE

13   TO YOU.

14        AND SO THAT'S ALL I'M GOING TO SAY.  YOU KNOW, YES, MAZZA

15   WAS DECIDED.  YES, WAL-MART WAS DECIDED. THOSE WERE HUGE

16   HURDLES.  WE DIDN'T HAVE TO FACE THEM.  BUT DO YOU THINK IT WAS

17   OUT OF THE GOODNESS OF THEIR HEART THAT THEY WROTE A CHECK FOR

18   53 MILLION?

19        IT WAS BECAUSE THE WORK WE DID SHOWED THEM THAT THEY WERE

20   GOING TO LOSE.  AND THAT'S ALL I HAVE TO SAY.

21        THE COURT:  OKAY.  THE DECISION ON FINAL APPROVAL, BECAUSE

22   OF THE NATURE OF THE STRUCTURE OF IT, I THINK YOU NEED THE

23   DECISION FROM ME ON THE FEES, AS WELL, BECAUSE THAT'S GOING TO

24   HAVE AN IMPACT ON THE DISTRIBUTION TO THE PUTATIVE CLASS

25   MEMBERS, SO IT CAN'T BE DONE IN TWO PARTS, IT APPEARS TO ME.
```

```
 1    SO UNLESS SOMEONE TELLS ME THAT IT CAN --

 2         MS. PREOVOLOS:  I'M NOT SURE THAT YOUR HONOR COULDN'T

 3    APPROVE THE SETTLEMENT SUBJECT TO A LATER DETERMINATION ABOUT

 4    DISTRIBUTION.  I DON'T KNOW THAT THE PLAINTIFFS AND I HAVE EVEN

 5    TALKED ABOUT THAT.

 6         THE COURT:  I SUPPOSE THEORETICALLY I COULD DO IT, BUT

 7    UNTIL -- TO WHAT END?  I MEAN, I'M HAPPY IF THERE'S A REASON TO

 8    DO IT THAT WAY, MAYBE I CAN BE CONVINCED TO DO IT.

 9         BUT I WOULD THINK THAT TO IMPLEMENT THE SETTLEMENT WE NEED

10    THE ATTORNEY'S FEE COMPONENT.  AND SO YOU WOULDN'T WANT TO DO

11    IT IN TWO WAVES, FOR EXAMPLE.  YOU WOULDN'T WANT TO MAKE SOME

12    SORT OF AN INITIAL DISTRIBUTION, AND THEN HAVE TO DO A SECOND

13    DISTRIBUTION DEPENDING ON THE DETERMINATION WITH RESPECT TO

14    FEES.

15         MS. PREOVOLOS:  NO, YOUR HONOR.  I'M GOING TO BE BLUNT,

16    AND I DON'T KNOW THAT THE PLAINTIFFS ARE GOING TO HAVE A

17    DIFFERENT VIEW.  WE'LL FIND OUT.  I DON'T KNOW IF THERE ARE

18    GOING TO BE APPEALS.  AND FEES ARE SEPARATELY APPEALABLE.  AND

19    SO WE WOULD HAVE TO COME BACK TO YOUR HONOR EVEN IF THERE WERE

20    NO FEE ISSUE WITH A PROPOSAL FOR DISTRIBUTION, BECAUSE WE DON'T

21    HAVE RESPONSES ON ALL THE CURE ISSUES.

22         MY THOUGHT IS THAT IT MIGHT -- BECAUSE FEES ARE SEPARATELY

23    APPEALABLE AND BECAUSE THEY ARE GOING TO HAVE TO COME BACK TO

24    YOU ON DISTRIBUTION -- AND I SUPPOSE WE CAN'T REALLY EVEN DO

25    THAT UNTIL APPEALS ARE EXHAUSTED, IF THERE ARE ANY.
```

1        BUT MY THOUGHT IS BECAUSE THEORETICALLY AT LEAST MR. CASEY

2   COULD APPEAL, I WOULDN'T MIND GETTING THE APPEAL CLOCK RUNNING.

3   AND THAT WAS MY ONLY THOUGHT.  I DON'T FEEL STRONGLY ABOUT IT,

4   BUT THEY ARE SEPARATE, I THINK.

5        THE COURT:  WHAT IS THE PLAINTIFFS' VIEWS ON THE

6   PROCEDURE?

7        MS. MICHELETTI:  THE PROCEDURE IS WE CANNOT REALLY DO THE

8   DISTRIBUTION UNTIL THE FEE ISSUE IS DECIDED.  HOWEVER, I THINK

9   THAT IF YOUR HONOR IS INCLINED TO GRANT FINAL APPROVAL THAT IT

10  WOULD BE A STEP IN THE RIGHT DIRECTION TO AT LEAST GET THAT

11  PROPOSED ORDER SIGNED AND, YOU KNOW, NAILED DOWN.

12       AND, YOU KNOW, EVEN IF ALL OF THE OUTSTANDING CLAIMANTS

13  ARE APPROVED, WHICH THEY WON'T BE, THEY ARE STILL AT

14  101 PERCENT.  SO THAT'S IF EVERYONE IS APPROVED WHO IS

15  DEFICIENT.  AND WE KNOW THAT ACTUALLY ISN'T THE CASE.

16       BUT WE WOULD AGAIN URGE YOUR HONOR TO ASK FOR OUR TIME

17  SHEETS, BECAUSE WE ARE MORE THAN HAPPY TO PROVIDE THEM.

18       MR. SCHWARTZ:  YOUR HONOR, ONE LAST POINT.  I THINK IF

19  YOUR HONOR DID ORDER FINAL APPROVAL SEPARATELY, AS PART OF THAT

20  ORDER WE COULD HAVE THE FACTUAL FINDING THAT MR. CASEY IS NOT A

21  CLASS MEMBER, BECAUSE THAT'S UNREBUTTED.  AND I THINK THE CLOCK

22  ON THAT WOULD START RUNNING.  AND I THINK THAT WILL HELP US GET

23  TO THE ENDPOINT.  BECAUSE THE GOAL HERE IS TO PUT MONEY INTO

24  THE POCKETS OF CLASS MEMBERS AS SOON AS WE CAN.

25       THE COURT:  OKAY.  VERY GOOD.  I'LL GO BACK AND DO MY

1    HOMEWORK ON THESE ISSUES.

2        AND, AS I SAID, I'M GOING TO APPROVE THE SETTLEMENT, SO

3    THERE'S NO MYSTERY THERE.  AND THE FEE ISSUE I NEED TO DO SOME

4    FURTHER THOUGHT AND WORK.  AND SO I MAY BE REACHING OUT FOR

5    MORE INFORMATION.  I DON'T WANT ANY MORE RIGHT NOW.

6        SO I'LL PROCEED FROM THERE.

7        THANK YOU.

8        MS. MICHELETTI:  THANK YOU, YOUR HONOR.

9        MS. KRALOWEC:  THANK YOU.

10       MS. PREOVOLOS:  THANK YOU.

11       THE COURT:  THANK YOU.

12       (THEREUPON, THIS HEARING WAS CONCLUDED.)

13   STENOGRAPHY CERTIFICATION

14       "I CERTIFY THAT THE FOREGOING IS A CORRECT
     TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE
15   ABOVE-ENTITLED MATTER."
         FEBRUARY 2, 2014
16       KATHERINE WYATT

17

18

19

20

21

22

23

24

25

          KATHERINE WYATT, CERTIFIED COURT REPORTER # 9866
               925-212-5224  CSR  RPR  RMR