1   PENELOPE A. PREOVOLOS (CA SBN 87607)
    (PPreovolos@mofo.com)
2   GEORGE C. HARRIS (CA SBN 111074)
    (GHarris@mofo.com)
3   MORRISON & FOERSTER LLP
    425 Market Street
4   San Francisco, California  94105-2482
    Telephone:  415.268.7000
5   Facsimile:  415.268.7522

6   *Attorneys for Defendant*
    APPLE INC.

7

8                   UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                       SAN FRANCISCO DIVISION

11

12                                          Case No. CV 10-01610-RS

13  IN RE APPLE IPHONE/IPOD WARRANTY        **DEFENDANT APPLE'S RESPONSE TO
    LITIGATION                              CHIMICLES AND TIKELLIS LLP'S
14                                          MOTION FOR AN ORDER
                                            AUTHORIZING DISTRIBUTION OF
15                                          RESIDUAL SETTLEMENT FUND**

16                                          The Honorable Richard Seeborg

17

18

19

20

21

22

23

24

25

26

27

28

## <u>TABLE OF CONTENTS</u>

**Page**

I.     INTRODUCTION ....................................................................................................... 1

II.    THE COURT HAS BROAD DISCRETION OVER HOW TO
       DISTRIBUTE THE REMAINDER OF THE SETTLEMENT FUND ........................... 2

       A.     Custodial Escheatment ................................................................................... 2

       B.     Second Distribution ........................................................................................ 3

       C.     *Cy Pres* ........................................................................................................... 4

III.   CONCLUSION .......................................................................................................... 6

1    **I.    INTRODUCTION**

2          Apple agrees with movant that further direction from the Court is required to address the

3    approximately $4.6 million remaining in the Net Settlement Fund[1] and that this Court has broad

4    equitable authority to direct the disposition of those remaining funds. The Parties have engaged in

5    discussions on how to address the remaining funds but, other than with respect to paying late

6    claims,[2] have been unable to reach consensus due to the lack of definitive guidance in the

7    Settlement Agreement, necessitating Court intervention.  (*See* Final Order ¶ 10 ("If counsel

8    cannot reach an agreement, the matter will be submitted to the Court for determination.") (ECF

9    No. 154).)

10          In Apple's view, the most equitable solution is for the Court to order that the unclaimed

11   funds be escheated for the benefit of the Settlement Class Members to whom those funds were

12   previously allocated.  In the alternative, a second distribution to those Settlement Class Members

13   who cashed their initial checks could also be made, but that would necessarily result in some

14   Settlement Class Members (those who cashed their checks) being favored over others (those who,

15   for whatever reason, did not) even though all Settlement Class Members' claims were released in

16   the Settlement.  Because the Settlement Class Members who cashed their checks already received

17   what they were entitled to under the Settlement and because Apple has already incurred 32%

18   more in settlement administration costs than had been contemplated,[3] Apple should not be forced

19   to bear the costs of a second distribution that benefits only a subset of the Settlement Class.  The

20   costs of any such second distribution (which Apple contends would be preferable to an immediate

21   *cy pres* distribution) should be borne by the subset of the Settlement Class that would benefit

22   from it.

23

24

---

25          [1] Capitalized terms not defined herein are defined in the Stipulation of Settlement and
     Release of Claims ("Settlement Agreement") (ECF No. 76-1).

26          [2] Apple agrees that, in light of the sufficient funds available, late claims should be paid at
27   Apple's expense.  *See* Motion at 2 n.1 (ECF No. 163).

28          [3] *See* Fourth Supplemental Declaration of Patrick Passarella ("4th Passarella Decl."), ¶ 15
     (ECF No. 163-2).

## II.    THE COURT HAS BROAD DISCRETION OVER HOW TO DISTRIBUTE THE REMAINDER OF THE SETTLEMENT FUND

This Court's equitable powers give it broad discretion over the Settlement Fund, including amounts remaining in the fund after distribution.  *See, e.g.*, *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1307 (9th Cir. 1990).  In exercising that discretion, the Court "should be guided by the objectives of the underlying statute and the interests of the silent class members."  *Id.* Apple believes there are three potential alternatives to exhaust what remains of the Settlement Fund:  (1) escheat of the funds allocated to particular Settlement Class Members to the governments of each Settlement Class Member's state of residence to be held for the benefit of those Settlement Class Members; (2) a second distribution of what remains in the fund to those Settlement Class Members who cashed their checks (and presumably would do so again); or (3) distribution of all remaining funds to the *cy pres* recipients identified in the Final Order.[4]

The relevant language of the Settlement Agreement provides that:  "To the extent there is a balance remaining in the Net Settlement Fund after the pPparties [sic] use their best efforts to fully compensate Settlement Class Members, such balance shall be equally distributed *cy pres* at the conclusion of the claims administration process . . . ."  (Settlement Agreement ¶ 18.)  Notably, the phrases "best efforts to fully compensate" and "at the conclusion of the claims administration process" are vague and do not provide definitive guidance to the Parties or Court.

### A.    Custodial Escheatment

The Settlement Agreement provides that each Settlement Class Member "will receive a proportionate share of the Net Settlement Fund."  (Settlement Agreement ¶ 33.)  Funds were allocated to each Settlement Class Member in the appropriate amount based on their approved claims-made or direct-pay status.  (4th Passarella Decl. ¶ 5.)  With the Parties and the Settlement Administrator having exhausted their ability to put the allocated funds into the hands of each Settlement Class Member, (*id.* at ¶¶ 6-12), there effectively remains only one way to preserve

---

[4] *Six Mexican Workers*, 901 F.2d at 1307, identifies another alternative—reversion of the remaining funds to the defendant—but the Settlement Agreement (*see* Definition LL) prohibits reversion and Apple does not seek or support reversion in this case.

1   those funds for the benefit of the applicable Settlement Class Members—escheat the funds to the

2   state government of the last known address of each Settlement Class Member to be held for their

3   benefit.  Although escheatment is often disfavored, in this situation it is most likely to protect the

4   individual "interests of the silent class members."  *Six Mexican Workers*, 904 F.2d at 1307.

5   Following custodial escheatment, a small amount would remain in the Settlement Fund, which

6   could promptly be distributed *pro rata* among the *cy pres* recipients as contemplated by the

7   Settlement Agreement and Final Order, finally closing the Settlement Fund and this case.[5]

8         **B.**     **Second Distribution**

9       Another option is to make a second distribution of the remaining funds to those Settlement

10   Class Members who cashed their initial checks.  Indeed, the idea of a second distribution was

11   implicitly contemplated in the Final Order.  (Final Order ¶ 11(a).)

12       Apple does not oppose a second distribution, but suggests that should one be ordered, the

13   administrative expenses relating to a second distribution be borne by the Settlement Fund.  The

14   Settlement Administrator estimated the costs of notice and administration at $775,000 in May

15   2014, but Apple has already incurred far more than that—$1,023,044.92 as of April 30, 2015 and

16   increasing every day.  (4th Passarella Decl. ¶ 15.)  If the second distribution is going to be to the

17   exclusive advantage of the subset of Settlement Class Members who have already had their

18   claims paid and the associated checks cashed, it is only fair that those persons absorb the financial

19   impact necessary to provide them that additional compensation above and beyond the

20   "proportionate share" (Settlement Agreement ¶ 33) initially allocated to them.

21       Contrary to movant's suggestions, (Motion at 12-14), Apple's obligation under the

22   Settlement Agreement to pay for notice and administration expenses outside of the Settlement

23   Fund is not unbounded.  Rather, the Settlement Agreement provides that "Apple shall pay all

24   costs of notice and costs of administration of this Settlement Agreement *as set forth in section VI*

25

26       [5] Custodial escheat to the United States Treasury pursuant to 28 U.S.C. § 2042 would

27   merely be an intermediate step, as the governments of the states of the individuals to whom those
funds have been allocated have claim upon such funds held by the Treasury.  *See, e.g.*,
*Hodgson v. Wheaton Glass Co.*, 446 F.2d 527, 535 (3d Cir. 1971) (citing *United States v. Klein*,

28   303 U.S. 276 (1938)).

1    _and VII below_." (Settlement Agreement ¶ 21 (emphasis added); _see also id._ ("In the event that

2    the Court orders that class notice be distributed in a manner different and/or more costly than that

3    described below, the Parties shall use good-faith efforts to reach a mutually acceptable agreement

4    as to the manner in which such class notice shall be paid for and carried out.").)  In any event,

5    even if the Settlement Agreement were clear and unambiguous in this regard, which it is not,

6    movant's own authority recognizes that the Court's equitable powers allow it to take action

7    "contrary to the terms of the settlement agreement."  (Motion at 10 (citing _In re Bank of Am. Sec._

8    _Litig._, 775 F.3d 1060, 1066 & n.5 (8th Cir. 2015). )

9         Moreover, in light of the language of paragraph 21 of the Settlement Agreement, Apple's

10   earlier statements that the Net Settlement Fund would not be diminished by notice and

11   administrative expenses were true and not inconsistent with its current position.  Each Settlement

12   Class Member was allocated and distributed his or her "proportionate share" entirely at Apple's

13   expense.  The extensive follow-up performed by the Settlement Administrator was similarly done

14   entirely at Apple's expense.  (_See_ 4th Passarella Decl. ¶¶ 3-12, 15.)  All Settlement Class

15   Members who cashed their checks got exactly what was bargained for and approved under the

16   Settlement Agreement—their proportionate share paid for by Apple.

17        Apple thus proposes that should the Court order a second distribution rather than escheat,

18   such distribution should be paid out of the ample funds remaining in the Settlement Fund.

19   Following a second distribution, any remaining funds could promptly be distributed _pro rata_

20   among the _cy pres_ recipients to close the Settlement Fund and this case.

21        **C.**    _**Cy Pres**_

22        The Settlement Agreement and Final Order clearly contemplate a final distribution of

23   remaining funds to _cy pres_ recipients.  (_See, e.g._, Settlement Agreement ¶ 18; Final Order ¶ 4(d).)

24   The instant dispute principally revolves around whether the _cy pres_ distribution should happen

25   now or after a further distribution to the Settlement Class (whether through escheatment or a

26   second distribution to those that cashed their checks).  What is beyond dispute, however, is that

27   during the approval process, none of the Parties or the Court contemplated that an amount

28

1  approaching $4.6 million, (4th Passarella Decl. ¶ 11), would be subject to *cy pres* distribution.

2  Apple therefore opposes an immediate *cy pres* distribution.

3        Indeed, the push by certain of Class Counsel for a very large and immediate *cy pres*

4  distribution is squarely contrary to these same lawyers' repeated representations to the Court that

5  any *cy pres* distribution would occur only after best efforts had been made to distribute all funds

6  to the Settlement Class Members and that any *cy pres* distribution would be minimal.  The

7  Response to Objections, signed by all Class Counsel, including those who now advocate an

8  immediate *cy pres* distribution, asserts that only "in the unlikely event of a residual would any

9  part of the Settlement Fund go to any of the proposed *cy pres* recipients."  (ECF No. 141 at 7.)

10  The Response emphasizes that there will be a *cy pres* distribution only if there is a balance

11  remaining in the Net Settlement Fund "after the Parties use their best efforts to fully compensate

12  Settlement Class Members" and that "distributions to *cy pres recipients, if any, will be minimal."*

13  (*Id.* (emphasis added).)  Indeed, at the final approval hearing, counsel who now favor immediate

14  *cy pres* distribution told the Court:  "If it's between settlement class members and cy-pres we're

15  going to do everything we can to get the money to the settlement class before the cy-pres.  If

16  there's a cy-pres residual, it will be minimal at best."  (Final Approval Hearing Transcript at 11-

17  12 (attached as Exhibit A).)  Apple cannot help but note that the Class Counsel who have now

18  reversed course and insist on a premature and immediate *cy pres* distribution have relationships

19  with four of the five *cy pres* recipients.

20        Clearly, the Parties believed that were there to be necessity of a *cy pres* distribution, it

21  would be *de mimimus.*  (Settlement Agreement ¶ 18 ("To the extent there is a balance remaining .

22  . . ."); ECF No. 97 at 28 ("If any portion of the Settlement Fund remains after all of the

23  distributions required by the Settlement Agreement and/or further distributions are impractical,"

24  only then would the "remainder [] be distributed as *cy pres*."); ECF No. 100 at 4 ("Only if there is

25  a residual remaining . . . will any part of the Fund be paid to a *cy pres* recipient.").)  The Final

26  Order also reflects this understanding.  (Final Order ¶ 4(d) ("While the Settlement provides for

27  potential *cy pres* distribution to approved non-profit organizations if the Settlement Fund is not

28

1   exhausted, any such distribution is likely to be small given the large number of validated

2   claims.").)[6] An immediate *cy pres* distribution is therefore inappropriate.

3   **III.    CONCLUSION**

4          For the foregoing reasons, Apple asks that a further distribution, either through

5   escheatment (the best alternative to protect the interests of the silent class members) or a second

6   distribution to Settlement Class Members who cashed their checks, occur before any remainder of

7   the Settlement Fund is given to the *cy pres* recipients.

8

9   Dated:  June 18, 2015                     MORRISON & FOERSTER LLP

10                                          By:    /s/ Penelope A. Preovolos
11                                                 Penelope A. Preovolos

12                                          *Attorneys for Defendant*
                                            APPLE INC.

13

14

15

16

17

18

19

20

21  sf-3538979

22

23  _____

24          [6] Although it can be debated whether approximately $4.6 million remaining in a
    $53 million fund qualifies as "small", the approximately $918,000 in proposed distributions to
25  each *cy pres* recipient would be very significant to certain of those recipients. The most recent
    IRS Form 990 available on ProPublica (http://projects.propublica.org/nonprofits/) shows the
26  National Association of Consumer Advocates Inc. had revenues from all sources for 2012 of
    $926,601 (compared to expenses of $943,454) and for 2011 of $613,457 (compared to expenses
27  of $1,079,960).  (Ex. B.)  The Center for Auto Safety is even smaller, with 2013 revenues of
    $545,330 (compared to expenses of $723,215) and 2012 revenues of $686,649 (compared to
28  expenses of $722,628).  (Ex. C.)

APPLE'S RESPONSE TO MOTION FOR DISTRIBUTION OF SETTLEMENT FUND
CASE NO. CV 10-01610-RS                                                                    6